**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | | |
|---|---|---|
| Timothy Tangen, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 6:21-cv-00335-BHH |
| | ) | |
| Fluor Intercontinental, Inc.; Fluor Government | ) | |
| Group International, Inc.; and Alliance Project | ) | |
| Services, Inc. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS**
**FLUOR INTERCONTINENTAL, INC. AND FLUOR GOVERNMENT GROUP**
**INTERNATIONAL, INC.'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................... 1

SUMMARY OF FACTS ......................................................................................... 7

I. FLUOR WAS INTEGRATED INTO THE MILITARY'S OPERATIONS AT BAF ....... 7

    A. The Army Established LOGCAP to Integrate Contractors on the Battlefield into Military Operations. ......................................................... 7

    B. Under the LOGCAP IV Contract, Fluor Was in Fact Integrated into Military Operations and Performed Mission-Critical Services at BAF. ................. 8

II. THE MILITARY MAINTAINED COMMAND AUTHORITY OVER BAF AND RELIED ON FLUOR TO PROVIDE ESSENTIAL SUPPORT SERVICES. ................... 9

    A. The Military Vetted Local Nationals and Decided Which Local Nationals Could Be Employed and Retained. ...................................................... 10

        1. The Military Dictated and Enforced a Policy to Hire Local Nationals to the Maximum Extent Possible. ............................................. 10

        2. The Military Decided Which Local Nationals Were Approved to Perform LOGCAP IV Support Services. .................................................. 11

        3. The Military Continually Monitored the Security Risks Posed by Local National Employees Throughout Their Employment. .................... 13

    B. The Military Was Responsible for All Security at BAF, and the Military Authorized Fluor to Perform Certain Supporting Functions. .............................. 14

        1. The Military Designed and Controlled Access to the Base at ECPs. ....... 14

        2. The Military Was Responsible for Surveillance and Security Throughout BAF, Including at the NTV ................................................. 16

    C. Despite Fluor's Offer to Provide Increased Supervision of Local Nationals, the Military Prohibited 24/7 Supervision, Including Supervision at Their Workplace. ............................................................................... 16

III. THE ARMY HAS REFUSED TO RELEASE CLASSIFIED INFORMATION ESSENTIAL TO LITIGATING THIS ACTION FAIRLY ............................................. 17

    A. The United States Government Controls Which Information Is Designated Classified and Imposes Specific Restrictions on Government Contractors ......... 18

    B. The Army Classified Significant Amounts of Information Regarding Its Investigations, Including Most Evidence Addressing Military Failures. ............. 19

i

C.     The Army Has Repeatedly Refused to Allow the Full Army Investigation Report From Being Used in Third-Party Tort Litigation. ...................................... 21

STANDARD OF REVIEW ............................................................................................. 21

ARGUMENT ................................................................................................................... 22

I.     PLAINTIFF'S CLAIMS ARE PREEMPTED BASED ON THE "COMBATANT ACTIVITIES" EXCEPTION TO THE FEDERAL TORT CLAIMS ACT. ................... 22

     A.     The Fourth Circuit Established a Broad Preemption Rule Barring Suits Arising Out of Combatant Activities. ................................................................. 24

     B.     The Combatant Activities Preemption Rule Is Broader Than the Political Question Doctrine Defense Addressed by This Court in *Hencely*. ....................... 25

     C.     Plaintiff's Claims Arise Out of Combatant Activities. .......................................... 26

     D.     Any Attempt to Impose State Tort Law Standards on the Warzone Activities at Issue Would Impermissibly Touch Military Decisions and Undermine Federal Interests. ................................................................................. 28

          1.     State Tort Law Would Touch the Military Decisions Regarding How and When to Supervise Local Nationals, Including the Military's Decision Not to Supervise Nayeb at His Work Place. ............. 28

          2.     State Tort Law Would Touch the Military Decisions to Hire and Retain Nayeb Despite the Military's Exclusive Knowledge of His Taliban Ties and Suspicious Behavior During Security Screenings. ....... 31

          3.     State Tort Law Would Touch Military Decisions Related to the Force Protection and Base Security Failures That Caused Plaintiff's Injuries. ...................................................................................... 32

II.     THE COURT SHOULD DISMISS PLAINTIFF'S CLAIMS BECAUSE THE ARMY HAS REFUSED TO RELEASE ESSENTIAL CLASSIFIED INFORMATION. .............................................................................................................. 34

     A.     Dismissal Is Proper When Lack of Classified Information Disables the Parties' Claims or Defenses. ................................................................................. 34

     B.     Dismissal Is Appropriate Here Because the United States Has Refused to Allow Use of Classified Information Necessary in This Litigation. .................... 38

          1.     Plaintiff's Attempt to Establish a Prima Facie Case Risks Exposing Classified Information. .............................................................. 38

2.    Fluor Cannot Establish Defenses Without Classified Information Being Withheld by the Army. .................................................. 41

III.    THE COURT SHOULD DISMISS PLAINTIFF'S BREACH-OF-CONTRACT CLAIM BECAUSE HE IS NOT AN INTENDED THIRD-PARTY BENEFICIARY TO THE LOGCAP IV CONTRACT. ................................................. 44

A.    The Presumption Against Third-Party Beneficiary Status Can Be Overcome Only by Showing the Clear Intent of Both Contracting Parties. ......... 44

B.    The Complaint Does Not Sufficiently Plead Third-Party Beneficiary Status. ................................................................................................. 47

C.    The Contract and Other Evidence Confirms Plaintiff Was Not an Intended Third-Party Beneficiary. ....................................................... 48

CONCLUSION ...................................................................................................... 50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abilt v. Central Intelligence Agency*,
    848 F.3d 305 (4th Cir. 2017) ...................................................36

*Aiello v. KBR, Inc.*,
    751 F. Supp. 2d 698 (S.D.N.Y. 2011).............................................. *passim*

*Al Shimari v. CACI Int'l, Inc.*,
    679 F.3d 205 (4th Cir. 2012) (en banc) ...........................................2, 50

*Alfred A. Knopf, Inc. v. Colby*,
    509 F.2d 1362 (4th Cir. 1975) ...................................................34

*Am. Ins. Ass'n v. Garamendi*,
    539 U.S. 396 (2003)..........................................................34

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)......................................................21, 22

*Bareford v. Gen. Dynamics Corp.*,
    973 F.2d 1138 (5th Cir. 1992) ...................................................36

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)..........................................................22

*Bentzlin v. Hughes Aircraft Co.*,
    833 F. Supp. 1486 (C.D. Cal. 1993) ..............................................36

*Boyle v. United Techs. Corp.*,
    487 U.S. 500 (1988)............................................24, 34, 43, 44

*Cobin v. Hearst-Argyle Television, Inc.*,
    561 F. Supp. 2d 546 (D.S.C. 2008).............................................39, 48

*Cothran v. Rock Hill*,
    43 S.E.2d 615 (S.C. 1947) ......................................................44

*DTM Research, LLC v. AT&T Corp.*,
    245 F.3d 327 (4th Cir. 2001) ...................................................35

*El-Masri v. United States*,
    479 F.3d 296 (4th Cir. 2007) ................................................35, 41

*Farnsworth Cannon, Inc. v. Grimes*,
   635 F.2d 268 (4th Cir. 1980) (en banc) ........................................................................ *passim*

*Feres v. United States*,
   340 U.S. 135 (1950) .................................................................................................... 47

*Flexfab, L.L.C. v. United States*,
   424 F.3d 1254 (Fed. Cir. 2005) ................................................................................. *passim*

*GECCMC 2005-C1 Plummer St. Office Ltd. P'ship v. JPMorgan Chase Bank, Nat'l Ass'n*,
   671 F.3d 1027 (9th Cir. 2012) .............................................................................. 44, 45

*Gen. Dynamics v. United States*,
   563 U.S. 478 (2011) ........................................................................................ 5, 36, 38

*German Alliance Ins. Co. v. Home Water Supply Co.*,
   226 U.S. 220 (1912) .................................................................................................... 47

*Halkin v. Helms*,
   598 F.2d 1 (D.C. Cir. 1978) ....................................................................................... 35

*Harduvel v. Gen. Dynamics Corp.*,
   878 F.2d 1311 (11th Cir. 1989) ................................................................................. 43

*Harris v. Kellogg Brown & Root Srvcs., Inc.*,
   724 F.3d 458 (3d Cir. 2013) ...................................................................................... 28

*Helene Curtis Indus., Inc. v. United States*,
   312 F.2d 775 (Ct. Cl. 1963) ....................................................................................... 43

*Hencely v. Fluor Corp. Inc.*,
   No. 6:19-cv-00489-BHH, 2020 WL 2838687 (D.S.C. June 1, 2020) ............................ *passim*

*Hines v. Davidowitz*,
   312 U.S. 52 (1941) ..................................................................................................... 34

*Johnson v. United States*,
   170 F.2d 767 (9th Cir. 1948) ................................................................................ 26, 27

*Kasza v. Browner*,
   133 F.3d 1159 (9th Cir. 1998) .......................................................................... 35, 37, 40

*In re KBR, Inc., Burn Pit Litig.*,
   268 F. Supp. 3d 778, 820 (D. Md. 2017), *vacated as moot due to affirmance
   based on lack of jurisdiction*, 893 F.3d 241 (4th Cir. 2018) ..................................... 26

*In re KBR, Inc. Burn Pit Litig.*,
   744 F.3d 326 (4th Cir. 2014) ................................................................................. *passim*

*In re KBR Inc., Burn Pit Litig.*,
    893 F.3d 241 (4th Cir. 2018) .................................................................8, 23

*Klamath Water Users Protective Ass'n v. Patterson*,
    204 F.3d 1206 (9th Cir. 2000) ..................................................................45

*Loquasto v. Fluor Corp., Inc.*,
    No. 3:19-cv-01455-B (N.D. Tex.) ......................................................1, 39, 42

*Madison ex rel. Bryant v. Babcock Ctr., Inc.*,
    638 S.E.2d 650 (S.C. 2006) .....................................................................40

*Martin v. Halliburton*,
    618 F.3d 476 (5th Cir. 2010) .....................................................................1

*Mathis v. GEO Grp., Inc.*,
    No. 2:08-CT-21-D, 2009 WL 10736631 (E.D.N.C. Nov. 9, 2009)............46, 47, 49

*Molerio v. FBI*,
    749 F.2d 815 (D.C. Cir. 1984) ..................................................................36

*Norat v. Fluor Intercontinental, Inc.*,
    2018 WL 1382666 (D.S.C. Mar. 19, 2018) ................................... *passim*

*Orff v. United States*,
    358 F.3d 1137 (9th Cir. 2004) ..................................................................45

*Philips v. Pitt Cty. Mem'l Hosp.*,
    572 F.3d 176 (4th Cir. 2009) ....................................................................48

*Roedler v. Dep't of Energy*,
    255 F.3d 1347 (Fed. Cir. 2001)............................................................47, 48

*Saleh v. Titan Corp.*,
    580 F.3d 1 (D.C. Cir. 2009) ................................................... *passim*

*In re Sealed Case*,
    494 F.3d 139 (D.C. Cir. 2007) .............................................................36, 40

*Sec'y of State for Def. v. Trimble Navigation Ltd.*,
    484 F.3d 700 (4th Cir. 2007) .................................................. *passim*

*Sterling v. Tenet*,
    416 F.3d 338 ..............................................................................35, 37, 43

*Stokes v. Westinghouse Savannah River Co.*,
    206 F.3d 420 (4th Cir. 2000) ....................................................................47

*Taylor v. KBR, Inc*,
    658 F.3d 402 (4th Cir. 2011) ...................................................................................26

*Taylor v. KBR, Inc.*,
    No. 2:09-cv-341, 2010 WL 1707530 (E.D. Va. Apr. 16, 2010) ..............................27

*Tenenbaum v. Simonini*,
    372 F.3d 776 (6th Cir. 2004) ...................................................................................36

*Tenet v. Doe*,
    544 U.S. 1 (2005)......................................................................................................37

*Totten v. United States*,
    92 U.S. 105 (1876)....................................................................................................35

*Touchberry v. City of Florence*,
    367 S.E.2d 149 (S.C. 1988) .....................................................................................44

*United States ex rel. Touhy v. Ragen*,
    340 U.S. 462 (1951)..................................................................................................21

*United States v. Reynolds*,
    345 U.S. 1 (1953)......................................................................................................35

*Weinberger v. Catholic Action of Haw./Peace Ed. Project*,
    454 U.S. 139 (1981)..................................................................................................38

*White v. Raytheon Co.*,
    No. 07-10222-RGS, 2008 WL 5273290 (D. Mass. Dec. 17, 2008).........................37

*Zschernig v. Miller*,
    389 U.S. 429 (1968)..................................................................................................34

*Zuckerbraun v. Gen. Dynamics Corp.*,
    935 F.2d 544 (2d Cir. 1991)......................................................................................36

**Statutes**

18 U.S.C. § 798..............................................................................................................19

28 U.S.C. § 517..............................................................................................................43

Contract Disputes Act ....................................................................................................50

Federal Tort Claims Act...............................................................................................2, 3

Veterans' Benefits Act ...................................................................................................50

## Other Authorities

32 C.F.R. Part 516.................................................................................................21

32 C.F.R. § 117.............................................................................................18, 19

Army Reg. 600-8-22 (Mar. 2019)..........................................................................27

Army Reg. 700–137 (Dec. 16, 1985)........................................................................7

Br. for the United States as Amicus Curiae, *KBR, Inc. v. Metzgar*,
     No. 13-1241, 2014 WL 7185601 (U.S. Dec. 16, 2014)....................................25, 31

Classified National Security Information, Exec. Order No. 13,526 (2009) ..................18

Fed. R. Civ. P. 8....................................................................................................22

Fed. R. Civ. P. 12..............................................................................21, 22, 39, 48

Fed. R. Civ. P. 56...............................................................................................22

U.S. Const. Art I, § 10 ..........................................................................................34

# INTRODUCTION

This lawsuit arises out of an attack by a Taliban operative on a U.S. Military base at Bagram Airfield ("BAF") in the Parwan Province of Afghanistan. The attack occurred during Operation Freedom's Sentinel ("OFS"), which began on January 1, 2015 and is part of the NATO-led Resolute Support Mission. OFS has two concurrent and complementary missions: the elimination of terrorism in Afghanistan and the development of self-sustained Afghan security.[1]

On November 12, 2016, Ahmad Nayeb deliberately detonated a suicide bomb inside BAF's secure perimeter. The attack killed five Americans and wounded more than a dozen others. Plaintiff Timothy Tangen, an active duty member of the U.S. Air Force at the time, alleges he was in close proximity to the enemy combatant when the bomb exploded. The Taliban attack was both an unquestionable tragedy and an unfortunate reality of the Taliban's years' long, asymmetric warfare campaign against U.S., Coalition, and Afghan forces, as well as the Afghan people.

The allegations in this lawsuit mirror those in *Hencely v. Fluor Corp.*, No. 6:19-cv-00489-BHH, pending before this Court.[2] Both cases arise from the same Taliban suicide bombing attack. Both cases implicate the same uniquely federal interests inherent in overseas military operations. And both cases trigger application of threshold, federal-law-based defenses, which exist to protect these federal interests and should be resolved "at an early stage" of the litigation to minimize "interference with military prerogatives." *Martin v. Halliburton*, 618 F.3d 476, 488 (5th Cir. 2010) ("Because the basis for many of these defenses is a respect for the interests of the Government in military matters, district courts should take care to develop and resolve such defenses at an early

---

[1] *See*, *e.g.*, https://www.army.mil/article/156517/operation_freedoms_sentinel_and_our_continued_security_investment_in_afghanistan.

[2] A third suit, also arising from the same Taliban attack, was recently dismissed by the Northern District of Texas for lack of subject matter jurisdiction under the political question doctrine. *See Loquasto v. Fluor Corp., Inc.*, No. 3:19-cv-01455-B (N.D. Tex.).

stage while avoiding, to the extent possible, any interference with military prerogatives.").

As set forth herein, and in motions filed by Fluor in *Hencely*, there are at least three reasons this suit should be dismissed: (i) Plaintiff's claims are preempted based on the Federal Tort Claims Act's "combatant activities" exception; (ii) dismissal is warranted based on the Army's refusal to release essential classified information; and (iii) Plaintiff lacks standing to assert a breach-of-contract claim under Fluor's federal government contract. These are separate bases for dismissal that rest on distinct legal authorities, but they emanate from the same core principle: The injection of private litigation and state-law-based standards into overseas military operations creates significant conflicts with the Military's paramount interest in regulating the conduct of war. *See In re KBR, Inc. Burn Pit Litig.*, 744 F.3d 326, 349 (4th Cir. 2014) ("when state tort law touches the military's battlefield conduct and decisions, it inevitably conflicts with the combatant activity exception's goal of eliminating such regulation of the military during wartime"); *Saleh v. Titan Corp.*, 580 F.3d 1, 7 (D.C. Cir. 2009) ("The very purposes of tort law are in conflict with the pursuit of warfare."); *Al Shimari v. CACI Int'l, Inc.*, 679 F.3d 205, 227 (4th Cir. 2012) (en banc) (Wilkinson, J., dissenting) ("Simply put, these state tort claims have no passport that allows their travel in foreign battlefields, and we have no authority to issue one.").

*First*, this suit is barred under the Fourth Circuit's broad "combatant activities" preemption test. *See Norat v. Fluor Intercontinental, Inc.*, 2018 WL 1382666, at *12-13 (D.S.C. Mar. 19, 2018) (citing *Burn Pit*, 744 F.3d at 349-51). The Fourth Circuit's preemption test is as follows:

> During wartime, where a private service contractor is integrated into combatant activities over which the military retains command authority, a tort claim arising out of the contractor's engagement in such activities shall be preempted.

*See Norat*, 2018 WL 1382666, at *12 (quoting *Saleh v. Titan Corp.*, 580 F.3d 1, 9 (D.C. Cir. 2009)). This test recognizes the "significant conflict" between the operation of state tort law and

the federal interest underlying the FTCA—namely, "foreclos[ing] state regulation of the military's battlefield conduct and decisions." *See Norat*, 2018 WL 1382666, at *12 (quotations and citations omitted). As this Court explained, "the federal government occupies the field when it comes to warfare, and its interest in combat is always precisely contrary to the imposition of a non-federal tort duty." *Id*. (quotations and citations omitted). As a result, "the combatant activity exception creates a type of ***field preemption***, ***broader than the political question doctrine***." *See Aiello v. KBR, Inc.*, 751 F. Supp. 2d 698, 711 (S.D.N.Y. 2011) (emphasis added). Under this "field" preemption rule, "the military need not maintain exclusive operational control over the contractor for [combatant activities] preemption to apply; rather, the government's interest in immunizing a military operation from suit is present when the military retained command authority, even if the contractor exerted *some limited influence over an operation*." *Norat*, 2018 WL 1382666, at *6, 12 (internal quotations omitted; italics altered).

Here, perhaps the best illustration of state tort law impermissibly "touching" and interfering with sensitive military judgments—thereby triggering preemption—is Plaintiff's core allegation that "Nayeb worked alone and unsupervised" and "Fluor negligently failed to supervise Nayeb at the HAZMAT work center." ECF 1 ¶¶ 58, 108. The extent to which Fluor was able to supervise Nayeb, the Taliban fighter, was a function of the terms and conditions of Fluor's contract with the Army. As confirmed in a sworn declaration provided by Mr. Gordon Jones—one of the Army's most senior Contracting Officers who was at BAF during the relevant timeframe—the Army established written policies and issued directives to Fluor regarding the requisite level of supervision for Local Nationals at BAF. Ex. 1, Jones Decl. ¶¶ 19−20. Because Plaintiff challenges "activities stemming from" these military directives, the suit is preempted. *See Burn Pit*, 744 F.3d at 349-51. Under Fourth Circuit law, state law cannot "touch" and thereby interfere with the

3

Military's determination of the "proper" amount of supervision of Local Nationals on overseas military bases. This alone triggers preemption. Beyond that, the Army *prohibited* Fluor from supervising Local Nationals during certain times, including *while they were at their workplace*. *Id.* ¶ 19 (noting military policy did not require escorting Local Nationals "while at their work facilities"). In fact, despite Fluor's offer, the Army decided *not* to modify Fluor's contract to require the very degree of supervision that Plaintiff here would seek to impose via state law:

> The LOGCAP contract did not require Fluor personnel to have 24/7 "eyes-on" contact with Local Nationals once they entered Bagram…Prior to November 2016, I attended and participated in discussions with Fluor about possibly *modifying the Base Access Policy to require escorting of Local Nationals while at their work place*. During these discussions, Fluor indicated that it could take on this *additional work* with appropriate contract direction and funding. However, the modification discussions did not move beyond the discussion phase as *additional funding was required*.

*Id.* ¶ 20 (emphasis added). In short, the Army made a battlefield decision on where to place its resources. If Plaintiff is allowed to pursue his claims, state tort law would not only "touch" this military judgment *not* to require or pay for supervision of Nayeb while at his work place, but also *countermand* the Army's directive.[3]

Moreover, any attempt to litigate and try this case—including the presentation of Plaintiff's claims and Fluor's defenses—would result in state-tort law impermissibly "touching" numerous

---

[3] To be clear, there is a material difference between "supervision" for LOGCAP job performance and supervision for security purposes. *See* Ex. 4, Wilson Decl. ¶¶ 11, 65. The former requires oversight sufficient to ensure that employees are satisfying PWS work requirements. *Id.* The latter is a force protection measure that the Military controlled through its Access Policy. *Id.*; *see also* Ex. 22, Bagram Airfield Badge, Screening, and Access Policy (Dec. 5, 2010) ("BAF Access Policy"). Here, Plaintiff's allegation is that Fluor should have provided the very type of workplace supervision that, Mr. Jones explained, the Army deliberately rejected due to lack of funding. *See, e.g.*, ECF 1 ¶ 58 ("Nayeb worked alone and unsupervised"). And, in any event, the distinction is immaterial to the combatant activities preemption analysis, as there can be no question that allowing this suit to proceed would result in state tort law "touching" the military battlefield judgment *not* to provide a greater level of supervision over Nayeb.

other military judgments. For example, as the Court has acknowledged, Fluor is entitled to defend itself by showing that "the Army—and not Fluor's alleged conduct—caused Plaintiff's injuries." *See Hencely v. Fluor Corp. Inc.*, 2020 WL 2838687, at *14 (D.S.C. June 1, 2020).[4] Thus, at any trial, Fluor would present evidence showing, among other things:

- The Army selected and sponsored Nayeb, a known Taliban fighter, for hiring, *and* the Army knew Nayeb provided "trained and coached" answers during interviews, but the Army never warned Fluor of these extraordinary risks and instead repeatedly granted Nayeb access to the base on a daily basis for a period of years. *See, e.g.*, Ex. 7, Army 15-6 Report at 33 ¶ 15.b(2).

- The Army obtained specific counterintelligence indicating an attack on the base was imminent—in fact the Army was warned "the night before" the attack—but the Army failed to act on this intelligence, and failed to warn Fluor of this extraordinary risk. *See* Ex. 13, Army 15-6 Report, Exhibit 2J at 3.

- The Army failed to detect Nayeb or others smuggling or otherwise acquiring deadly explosives later identified as rare and indicative of "a higher echelon of involvement from a terrorist network." *See* Ex. 16, Army 15-6 Report, Exhibit 4P at 4−5.

Even if pointing the finger at these military judgments would not result in "second guessing," it will result in state tort law "touching" the military judgments, which this Court has acknowledged triggers "combatant activities" preemption. *See Norat*, 2018 WL 1382666, at *12.

*Second*, the Army's refusal to release essential classified information provides a separate ground for dismissal. Again, at any trial, Fluor would be permitted to demonstrate that the U.S. military—"and not Fluor's alleged conduct—caused Plaintiff's injuries." *See Hencely*, 2020 WL 2838687, at *14. But the Army has repeatedly refused to release highly relevant information that directly bears on Fluor's causation defense and other key issues. Under the law, because Fluor's defense is disabled due to the Army' refusal, that requires dismissal of the entire suit. *See, e.g.*, *Gen. Dynamics v. United States*, 563 U.S. 478, 487 (2011) ("It seems to us unrealistic to separate . . . the claim from the defense, and to allow the former to proceed while the latter is barred.").

---

[4] The Court specifically referenced South Carolina law regarding this proposition, but it is true under any substantive state tort law.

Fluor's inability to obtain essential classified information is also further reason why this suit conflicts with uniquely federal interests and is preempted. Unlike a routine workplace accident in a civilian setting, in this battlefield contractor suit classified information pervades the allegations and defenses. As a result, Fluor did not have unfettered access to the witnesses and evidence, nor the ability to conduct its own comprehensive investigation. In fact, the mere act of conducting such an investigation inside a war zone "would pose a significant risk of interfering with the military's combat mission." *Aiello*, 751 F. Supp. 2d at 711. But "relegating the contractor to defending the claim without the benefit of [its own] investigation[] could result in a deprivation of the contractor's property without the important right to discover favorable evidence"—a result that would be patently unjust *and* would undermine federal interests by, *inter alia*, "lead[ing] to higher costs of contracting for the United States." *See id*.

***Third***, Plaintiff is not a third-party beneficiary to Fluor's federal government contract and thus lacks standing to assert a breach-of-contract claim. Third-party beneficiary status for any contract is rare. With respect to a federal government contract, plaintiffs bear an especially heightened burden. To qualify as a third-party beneficiary—a status which would bring with it *the right to sue the federal government* for breach of contract—a plaintiff must plead and establish that both the contractor and the government contracting officer intended to confer a direct benefit on him. *See*, *e.g.*, *Flexfab, L.L.C. v. United States*, 424 F.3d 1254, 1263 (Fed. Cir. 2005) ("But the government does not lightly consent to suit."). Here, Plaintiff pled only bare legal conclusions about his purported third-party beneficiary status. He failed to allege sufficient facts regarding the parties' requisite intent—in fact he did not plead *any* facts concerning the Army Contracting Officer's intent—and, at best, he cites generic contract provisions that actually refute his position.

## SUMMARY OF FACTS

I.    **FLUOR WAS INTEGRATED INTO THE MILITARY'S OPERATIONS AT BAF.**

A.    **The Army Established LOGCAP to Integrate Contractors on the Battlefield into Military Operations.**

In 1985, as part of a major policy shift away from an all-volunteer military and toward a greater reliance on private contractors, the Army established the Logistics Civil Augmentation Program, referred to as "LOGCAP." The purpose of LOGCAP is to ensure that "civilian contractors [may] perform selected services in wartime to augment Army forces" in order to "release military units for other missions or fill shortfalls." *Burn Pit*, 744 F.3d at 332 (citing Army Reg. 700–137, at 1–1 (Dec. 16, 1985)); *see also* ECF 1 ¶ 44. Since the inception of LOGCAP, the size of the Army's active duty force has reduced considerably, from well over a million to about half a million. To fill in this significant gap, the Army has increasingly relied on contractors to perform combat support functions that were historically carried out by uniformed personnel. *See*, *e.g.*, Ex. 2, Bednarek Decl. ¶¶ 15−16.

"By its design, the LOGCAP Contract integrates contractor capabilities within the 'total force' in order to fulfill an operational commander's requirements." Ex. 2, Bednarek Decl. ¶ 16; *accord* Ex. 1, Jones Decl. ¶ 6. Army Regulation 700-137 sets forth Army policy and practices with respect to LOGCAP. *See* Ex. 3, Riley Decl. ¶ 15. The regulation repeatedly emphasizes the need to "integrate" the LOGCAP contractor within the military operations and overall mission.[5]

Under the LOGCAP design, the support services that are assigned to the LOGCAP

---

[5] *See, e.g.*, Army Reg. 700-137 at 3-2.b ("Integrate LOGCAP services into [Operations Plans] and [Operations Orders]."); *id.* at 3-3.d ("integrate, coordinate, and synchronize day-to-day LOGCAP administration, planning, management, training, and execution"); *id.* at 4-1 ("develop collaborative plans to manage and integrate LOGCAP contractor capabilities"); *id.* ("the integration of organizations and agencies to support program planning and contract execution"); *id.* at 4-2 ("Planning is critical for the integration and management of LOGCAP-contracted sustainment services in support of deployed forces during contingency operations.").

contractor all stem from directives issued by an operational military commander, which are then funneled through the Army's contracting mechanism and issued to the contractor. *See* Ex. 2, Bednarek Decl. ¶ 16; *see also* Ex. 3, Riley Decl. ¶¶ 21−23. "While the contractor receive[s] direction via appropriate contracting channels, the operational commander's intent and guidance drives the requirements that are fulfilled by the LOGCAP contractor." Ex. 2, Bednarek Decl. ¶ 20; *see also In re KBR Inc., Burn Pit Litig.*, 893 F.3d 241, 257 (4th Cir. 2018) ("[T]he contracting arm merely translated the operational command's requirements into contractual terms. . . .").

> **B.      Under the LOGCAP IV Contract, Fluor Was in Fact Integrated into Military Operations and Performed Mission-Critical Services at BAF.**

In 2007, the Army competitively awarded Fluor Contract No. W52P1J-07-D-0008 ("LOGCAP IV Contract"). Fluor performed under the LOGCAP IV Contract at BAF, including the base contract and related Statements of Work, Performance Work Statements, Task Orders, and Letters of Technical Direction. ECF 1 ¶¶ 45−48. At the time of the November 2016 Taliban attack, Fluor was providing base operations support to the U.S. Military at BAF under LOGCAP IV Contract Task Order 0005. *See* Ex. 4, Wilson Decl. ¶ 5. Fluor provided a range of essential support services, including facilities management, hazardous materials, pest control services, laundry services, food service operations, and motor pool. *Id.*

In order to perform these critical support services, Fluor closely interacted with and worked alongside the Military at BAF. As the Army's lead Contracting Officer, Ms. Weindruch, explained: "Fluor augmented and was integrated within the military at Bagram Airfield, and Fluor worked alongside the military, in performing services under the LOGCAP IV contract." Ex. 5, Weindruch Decl. ¶ 3. Further, Ms. Weindruch emphasized that numerous Army personnel interacted with Fluor "on a daily basis," and Mr. Weindruch and her team had "daily communications" with Fluor. Ex. 6, Weindruch Depo., at 17-23. Mr. Jones, another senior Army Contracting Officer, explained

that Fluor's "integration" was both extensive and critical to mission success:

> I believe Fluor's integration within the military's operations, enabled Fluor to react quickly, and effectively to the unique challenges the Army faced on the battlefield….
>
> During my tours at Bagram, including the period leading up to and as of the November 2016 attack, I worked very closely with Fluor personnel. We worked seven days a week, 16 hours each day. ***I had face to face discussions with Fluor or about Fluor on an hourly basis***, either in Fluor's office or in my office, which were located very near one another. ***This constant interaction with Fluor was critical to the success of the mission***, as it is my personal belief that the Army could not have carried out its mission without Fluor.

Ex. 1, Jones Decl. ¶¶ 11−12 (emphasis added); *see also id*. ¶ 21 ("Fluor personnel worked closely, side-by-side with military personnel in order to carry out the mission"); *accord* Ex. 3, Riley Decl. ¶ 8; Ex. 5, Weindruch Decl. ¶ 5.

In addition, the Army monitored and evaluated Fluor's performance through constant interactions, daily oversight, and frequent meetings. Fluor submitted reports to the Military, on a daily or weekly basis, to ensure a real-time, free flow of information between Fluor and the Military. Ex. 3, Riley Decl. ¶ 26; *accord* Ex. 5, Weindruch Decl. ¶ 6. As further illustration of the close collaboration and integration of Fluor within the military's operations, Fluor personnel who held appropriate clearances at times received classified briefings from the U.S. Military. Such briefings were deemed by the Army to be a necessary part of the continual dialogue between Fluor and the military that was essential to perform under the contract. Ex. 3, Riley Decl. ¶ 26. There is no evidence that Fluor was ever briefed on the threat Nayeb posed.

## II.    THE MILITARY MAINTAINED COMMAND AUTHORITY OVER BAF AND RELIED ON FLUOR TO PROVIDE ESSENTIAL SUPPORT SERVICES.

"Under military doctrine, the military alone is responsible for the force protection at each FOB [Forward Operating Base], and the military exercises total control over who is allowed access to any FOB." Ex. 2, Bednarek Decl. ¶ 18. In fact, the Army has never engaged Fluor to provide

security under the LOGCAP IV Contract, and Fluor personnel could not carry firearms at BAF, for self-defense or otherwise. *See* Ex. 4, Wilson Decl. ¶ 7.[6]

Although the Military was responsible for force protection and base security, the Military relied on Fluor to provide certain administrative, ministerial, and other support services, and the Military integrated Fluor into certain aspects of the Military's force protection and security mechanisms. *See*, *e.g.*, Ex. 1, Jones Decl. ¶ 16 ("Fluor was integrated within the force protection screening process"); Ex. 2, Bednarek Decl. ¶ 18 ("the military cannot successfully carry out its responsibilities, including its force protection responsibilities, without the support provided by contractors such as Fluor"). For example, as set forth below, Fluor provided support personnel for the Military Force Protection Screening Cell; Fluor operated retina-scanning machines at Entry Control Points; and Fluor carried out escorting and supervision of Local Nationals pursuant to the Military's requirements, protocols, and restrictions.

**A.    The Military Vetted Local Nationals and Decided Which Local Nationals Could Be Employed and Retained.**

As explained below, the hiring and retention of Local National employees and subcontractors working at BAF stemmed from a number of military directives.

          1.    The Military Dictated and Enforced a Policy to Hire Local Nationals to the Maximum Extent Possible.

According to the Army, the Afghan insurgency poses a significant, asymmetric threat to the Military's long-term success in Afghanistan. *See*, *e.g.*, Ex. 19, Army Field Manual 3-24, Counterinsurgency § 3-102 ("Insurgents are by nature an asymmetric threat."). To counter that

---

[6] Even when Fluor requested permission to provide its own limited (unarmed) force protection, the Army rejected Fluor's request. Ex. 18, Email Re: LOGCAP Security (UNCLASSIFIED). In that discussion, the Army confirmed that security was "not in the [LOGCAP IV] contractor and our [Army Regulations] clear[ly] put this responsibility on the [government]." *Id.* Accordingly, the Military provided the security necessary to facilitate Fluor's performance of its contract obligations for base operations, including operation of the NTV. *See* Ex. 4, Wilson Decl. ¶ 9.

threat, the Military instituted counterinsurgency ("COIN") strategies, including the "Afghan First Program." *See id.*; *see also* Ex. 20, Memo. re: Afghan First. The Afghan First Program was meant "to increase opportunities for Afghan socio-economic development and expansion" by "leverag[ing] the command's activities and resources to provide opportunities for economic expansion, increased entrepreneurship, and skills training for the people of Afghanistan." *Id.* at 1. The Commanding General of U.S. Forces Afghanistan issued a directive that recognized Local Nationals "may not always be the quickest or most efficient means to fulfill our requirements," but nonetheless directed all personnel to "be creative and aggressive in carrying out the Afghan FIRST Program" and to "display patience and emphasize training in order to support the long term goal of developing the Afghan economy." *Id.* at 1−2.

Thus, the Army incorporated the Afghan First Policy into Fluor's contractual obligations. Fluor's LOGCAP Contract and PWS required Fluor to hire Local Nationals "to the maximum extent possible." *See, e.g.*, Ex. 21, TO 0005 PWS, at § 1.07(b); *see also* Ex. 4, Wilson Decl. ¶ 43 ("Utilizing Afghan nationals was not an advisory policy; it was a contractual requirement."). Fluor subcontracted with Alliance Project Services ("APS") to hire Local Nationals for the LOGCAP Project at BAF. *See* Ex. 4, Wilson Decl. ¶ 44.

2.    The Military Decided Which Local Nationals Were Approved to Perform LOGCAP IV Support Services.

In addition to mandating the hiring of Local Nationals, the Army controlled *which* Local Nationals could be hired and could gain access to BAF. The Military did so by performing pre-employment screening of all Local Nationals in accordance with the Military's BAF Badge, Screening, and Access Policy. *See* Ex. 22, BAF Access Policy. The Military's Force Protection Screening Cell ("Military FPSC") performed pre-employment screenings. *See* Ex. 23, Delegation of Authority; Ex. 4, Wilson Decl. ¶ 16. The Military FPSC interviewed each Local National in

11

person to prepare a biographical workup and conduct a security screening.[7] *Id.* ¶ 17. The Military performed iris scans for a biometric check against Military watch lists, and used other biometric identifiers (*e.g.*, photograph, fingerprints, DNA) to cross-check the candidate against other Military watch lists. *Id.* ¶ 17. Local Nationals could not access BAF without a Military-issued access badge. *See id.* ¶ 13.

"Fluor did not—and could not—perform its own security screenings or counterintelligence to ascertain Nayeb's fitness for LOGCAP work and/or BAF access." *Id.* ¶ 49. Rather, "[t]he Army vetted and was responsible for deciding whether to approve the issuance of badges." Ex. 5, Weindruch Decl. ¶ 7. "Fluor did not decide whether to provide a badge to any Local National, nor did Fluor decide which type of badge to provide. Rather, the government made these determinations and then gave appropriate direction to Fluor." Ex. 1, Jones Decl. ¶ 16. Thus, "Fluor personnel executed the administrative function of providing badges to individuals and resetting pin numbers for badges, in accordance with the military's directives." *Id.*

It was the Military that identified and sponsored Nayeb for employment in support of the Military's mission at BAF. Nayeb only entered APS's LOGCAP labor pool after the TF Red Bulls Commander sponsored Nayeb's admittance to the Provincial Reconstruction Team Parwan (ROK)'s Vocational Training Center at BAF ("Parwan Vocational Training Center" or "Parwan"). *See* Ex. 24, Letter from Commander, TF Red Bulls, to Parwan ROK; *see also* Ex. 17, Army 15-6 Report, Exhibit 5H. The Military made this recommendation despite knowing of Nayeb's Taliban

---

[7] In some cases, the Military tapped Fluor to provide staffing for the Military FPSC. Ex. 4, Wilson Decl. ¶ 55. Nonetheless, the Military FPSC remains a Military Operation under Military authority. *Id.* Fluor is not made privy to the Local National's screenings. Fluor employees are not allowed to share outside the FPSC information that they learn through those positions. Thus, even if Fluor employees or Fluor subcontractor employees discovered information about Nayeb through the FPSC screening, that information could not be shared with Fluor. *Id.* ¶ 55.

association and his past activities. The Military believed—consistent with COIN and Afghan First—that providing Nayeb with employment and security would encourage his reintegration into civil society and away from the Afghan insurgency. *Id.* But recognizing the risk, as part of its sponsorship, TF Red Bulls promised to "mitigate the[] risks" of "admitting a former insurgent" to the labor pool by "respond[ing] to any security concerns promptly and fully." Ex. 24, Letter from Commander, TF Red Bulls, to Parwan ROK.

After the Military cleared Nayeb to work at BAF, APS hired him to work on the Fluor LOGCAP IV project, specifically as a laborer in the NTV. *See* ECF 1 ¶ 52. After Nayeb was hired, the Military conducted its own separate due diligence and background check before issuing Nayeb an access badge. *See also* Ex. 17, Army 15-6 Report, Exhibit 5H.

3.    The Military Continually Monitored the Security Risks Posed by Local National Employees Throughout Their Employment.

In order to evaluate the potential security threat posed by Local Nationals, the Military regularly conducted counterintelligence screening and interviews. *See* Ex. 4, Wilson Decl. ¶¶ 10, 20. The Military could, at any given time and without explanation, say to Fluor that "This Afghan is hereby terminated" *See* Ex. 4, Wilson Decl. ¶ 20.

The Military interviewed Nayeb at least six times after his initial screening: November 28, 2012; October 14, 2014; September 15, 2014; August 4, 2015; May 2016; and June 21, 2016— less than five months before his attack. *See* Ex. 4, Wilson Decl. ¶ 58; Ex. 25, Fluor's Answers to 15-6 Questions Received Dec. 4, 2016 at 3. Despite the nature of the information the Military learned from Nayeb, each time they screened him, the Military decided that Nayeb should be retained to continue working at the NTV.

The Military also conducted random counterintelligence screenings. Ex. 4, Wilson Decl. ¶ 18. The Military conducted a random counterintelligence screening of Nayeb in March 2016. *See*

13

*id.* ¶ 59 (referencing Army 15-6 Report at 33 ¶ 15.b(2)). During that interview, the Military concluded that Nayeb's answers were "trained and coached." *See* Ex. 7, Army 15-6 Report at 33 ¶ 15.b(2). Despite noting this red flag, and consistent with the priority of importance the Military placed on the Peace and Reconciliation Program, the Military decided that Nayeb could be retained as an employee working on the base, and decided not to revoke Nayeb's access to BAF. The Military made these decisions with full knowledge of Nayeb's Taliban associations, and the Military again failed to warn Fluor of Nayeb's terrorist ties and suspicious behavior. Ex. 4, Wilson Decl. ¶ 50 ("[Y]et the Military failed to inform Fluor of Nayeb's Taliban ties.").

Local Nationals were required to submit to the Military's periodic and random screenings. *See* Ex. 22, BAF Access Policy; Ex. 4, Wilson Decl. ¶¶ 9, 10, 24. In some cases, the Military immediately terminated a Local National during an interview—for reasons unknown to Fluor. In other cases, the Local National returned to the job site because the Military deemed him fit for continued employment. In either case, Fluor had no input into the decision, and Fluor had no recourse to protest a termination or even learn the underlying reasons. *Id.* ¶ 20.

> **B.    The Military Was Responsible for All Security at BAF, and the Military Authorized Fluor to Perform Certain Supporting Functions.**

Because the Military controlled physical access to BAF and retained sole responsibility for force protection and security at the base, a number of the activities at issue in this suit were carried out by the Military itself, or by contractors, including Fluor, acting at the direction of the Military.

> 1.    The Military Designed and Controlled Access to the Base at ECPs.

The Military required daily physical searches of all Local Nationals entering BAF through Entry Control Points ("ECPs"). *See* Ex. 22, BAF Access Policy § 7; Ex. 4, Wilson Decl. ¶¶ 10, 21−24, 40, 60, 62. "The military designed the overall security screening processes and the protocols used for security purposes at the ECPs." Ex. 1, Jones Decl. ¶ 17. "The military was

responsible for multiple layers of screening and ensuring personnel could safely gain access to the base." *Id.* The Military conducted hands-on pat downs, x-ray scans, counter-bomber scanners, retina scans, and bag checks.[8] *See* Ex. 4, Wilson Decl. ¶ 23. At some ECPs, "Fluor personnel augmented and supported" the Military by "operating the iris-screening machines," and "provid[ing] the output of the screening machine to the military for appropriate disposition." Ex. 1, Jones Decl. ¶17; *see also* Ex. 2, Bednarek Decl. ¶ 18.

Among other things, the Military established a screening protocol whereby Local Nationals entering the base were screened by *other* Local Nationals—who themselves were being overseen by *other* Local Nationals. The Army was aware of the risks of relying on Local Nationals to police themselves. In fact, just a few weeks before the deadly attack, a separate security contractor (REED, a contractor unrelated to Fluor) specifically warned the Army about this risk, stating: "There are Local National Supervisors at the specific posts overseeing the searching procedures that are done by Local National Guards on Local National workers coming onto Bagram. This practice might be a security risk." Ex. 9, Army 15-6 Report, Exhibit 2AQ at 1.[9] After the attack, the Army's investigation uncovered evidence (most of which is classified) that further confirmed the Army's pre-attack awareness of the threat posed by the Army's decision to have Local Nationals take on these security-related responsibilities. As one witness recounted: "We knew that the REED guards were local nationals and that there would be the possibility of a green on blue . . . we knew that was a possibility, but we thought we could close it down pretty quickly." [10] Ex.

---

[8] During Nayeb's five-plus years accessing BAF, the Military searched Nayeb over 1,500 times at ECPs. *See* Fluor's Answers to 15-6 Questions Received Dec. 4, 2016 at 3. On each occasion, Nayeb was subject to pat downs, inspections, x-rays, and iris scans. *See* Ex. 22, BAF Access Policy § 7; Ex. 4, Wilson Decl. ¶¶ 23−25.

[9] The same report noted that BAF access badges had been stolen during a car hijacking. *Id.* at 3.

[10] A "green on blue" is military parlance for an attack by a local Afghan on Coalition forces.

14, Army 15-6 Report, Exhibit 3O at 7 (prior to the attack, the Army knew "[t]here was a threat on the base because we knew there were drugs being smuggled on, alcohol was probably being smuggled on; there were nefarious things coming on" the base).

       2.       The Military Was Responsible for Surveillance and Security Throughout BAF, Including at the NTV.

In addition to perimeter security, the Military also conducted roving patrols and badge checks. *See* Ex. 4, Wilson Decl. ¶ 10. Local Nationals were subject to random searches at any time via, for example, bomb-sniffing dogs, intermediary checkpoints, and armed Military guards at buildings to enforce force protection measures. *See id.* ¶ 25. These random searches extended to facilities. *See id.* ¶ 10. For example, before the November 2016 attack, the Military conducted K-9 sweeps of the NTV yard, searching for any contraband such as explosives. *See id.* ¶ 85 n.21.

The Military also instituted a policy that prohibited Local Nationals from gaining access to certain items, deemed by the Military to present a risk, without Military oversight and approval; however, at the time of the attack, the Military had decided to place such restrictions only on cell phones, two way radios, computers, cameras, USB/digital media, and FOUO or Sensitive But Unclassified documents. *See* Ex. 22, BAF Access Policy § 15(c)-(h). As of the time of the attack, the Military had decided not to prohibit the use or possession of mechanics tools by Local Nationals. *See* Ex. 4, Wilson Decl. ¶ 71. Likewise, the Army did not to impose any such restriction in the LOGCAP IV Contract. *See id.*

**C.      Despite Fluor's Offer to Provide Increased Supervision of Local Nationals, the Military Prohibited 24/7 Supervision, Including Supervision at Their Workplace.**

"In addition to controlling base access, the military also established protocols and requirements for the escorting and supervision of the many Local Nationals who were authorized by the military to work on the base." Ex. 1, Jones Decl. ¶ 18. "The military decided which Local

Nationals needed escorts and when escorts were required and not required." *Id*. However, even as

to Local Nationals who fell under the most restrictive designation (red badges), the Military "did

not require Fluor personnel to have 24/7 'eyes-on' contact with Local Nationals once they entered

Bagram." *Id*. ¶ 20.[11] Rather, as to such Local Nationals—including the Taliban suicide bomber

Nayeb—the Military "generally required an escort with certain exceptions **when no escort was**

**required or permitted**," and this included, "for example, **while at their work facilities** and during

prayer." *Id*. ¶ 19 (emphasis added); *see also* Ex. 22, BAF Access Policy § 11.a(1) ("Red badge

[LN] personnel require an escort in all areas except work facility."); Ex. 4, Wilson Decl. ¶ 33.

Fluor was not authorized to provide eyes-on supervision under the contract where the Military's

force protection directives did not provide for it. *See* Ex. 18, Email Re: LOGCAP Security

(UNCLASSIFIED); *see also* Ex. 26, Email Re: RANDOM SURVEILLANCE ACTIVITY.

The Military made a deliberate decision *not* to direct Fluor to supervise Nayeb and other

Local Nationals at work facilities. Ex. 1, Jones Decl. ¶ 20. In fact, as Mr. Jones explained, prior to

the attack, Fluor offered to provide this additional service, but the Military declined:

> The LOGCAP contract did not require Fluor personnel to have 24/7
> "eyes-on" contact with Local Nationals once they entered
> Bagram…Prior to November 2016, I attended and participated in
> discussions with Fluor about possibly modifying the Base Access
> Policy to require escorting of Local National while at their work
> place. During these discussions, Fluor indicated that it could take on
> this additional work with appropriate contract direction and funding.
> However, the modification discussions did not move beyond the
> discussion phase as additional funding was required.

*Id*.

## III.    THE ARMY HAS REFUSED TO RELEASE CLASSIFIED INFORMATION ESSENTIAL TO LITIGATING THIS ACTION FAIRLY.

In the wake of Nayeb's attack, the U.S. Army conducted multiple investigations and

---

[11] The Military trained and certified all escorts. Ex. 3, Riley Decl. ¶ 27; Ex. 4, Wilson Decl. ¶ 10.

produced many reports, presentations, and memoranda, including an investigation report under Army Regulation 15-6 ("AR 15-6 Report"). The version of the AR 15-6 Report that the Army publicly released—which is the version referenced in Plaintiff's Complaint, *see* ECF 1 ¶¶ 107−10—is heavily redacted because the Army designated the vast majority of the report, and the investigative file, as classified. As explained below, the United States controls such designations, and the Army has repeatedly refused to release a massive amount of highly relevant, but classified, information for use in this litigation.

### A.    The United States Government Controls Which Information Is Designated Classified and Imposes Specific Restrictions on Government Contractors.

Classified information, by definition, covers such information the "unauthorized disclosure [of which] . . . reasonably could be expected to result in damage to the national security." Classified National Security Information, Exec. Order No. 13,526 (2009) § 1.1(a)(4). There are three levels of classification: (1) confidential; (2) secret; (3) top secret. *Id.* § 1.2(a).

The Department of Defense's National Industrial Security Program Operating Manual ("NISPOM") "prescribes the requirements, restrictions, and other safeguards to prevent unauthorized disclosure of classified information." 32 C.F.R. § 117.1(b)(2). The federal government generally restricts access to classified information to individuals who undergo an extensive background check, sign a nondisclosure agreement, and need to know the information. Exec. Order No. 13,526 § 4.1; *see generally* 32 C.F.R. § 117.10. The federal government exclusively controls who can access, store, or disclose classified information. *Id.* §§ 117.1-117.2. When contractors are afforded access, the NISPOM mandates that "[c]ontractors will protect all classified information that they are provided access to or that they possess." *Id.* § 117.7(a).

To comply with the NISPOM, contractors cannot disclose classified information to the public without prior government authorization. *Id.* § 117.15(h)(8). The regulations also prohibit

contractors from "disclos[ing] classified information to any federal or state court except on specific instructions of the agency . . . or the attorney representing the United States." *Id.* § 117.15(h)(7)(ii). Even "[i]nformation that has been declassified is not automatically authorized for public disclosure." *Id.* § 117.15(h)(8)(iii). Penalties for revealing classified information are significant. *See, e.g.*, 18 U.S.C. § 798 (prison sentence of up to 10-years for improper disclosure).

The LOGCAP IV Contract contains numerous restrictions related to classified information. For example, it required Fluor to "have a current U.S. Facility Clearance to the SECRET level [in accordance with] Department of Defense Directive (DoDD) 5220.22, NISPOM." Ex. 27, LOGCAP IV Contract, at § C.3.1; *see also id.* (requiring "[i]ndividuals who require access to classified information or material must have an individual security clearance at the SECRET level").

### B. The Army Classified Significant Amounts of Information Regarding Its Investigations, Including Most Evidence Addressing Military Failures.

The Army conducted multiple investigations into Nayeb's attack, but classified much of those proceedings, releasing publicly only a heavily redacted AR 15-6 Report and keeping much of the supporting materials and alternative reports classified. For example, the Army has classified:

- Criminal Investigative Division Draft Report (AR 15-6 Report Ex. 2Q);

- 2013 Bagram Airfield Vulnerability Assessment (AR 15-6 Report Ex. 2AN);

- Sept 2016 CENTCOM Mission Assurance Assessment (AR 15-6 Report Ex. 2AP);

- BAF Force Protection O and I Slidedeck (AR 15-6 Report Ex. 3A);

- Army's Watch List Overview Quick Guide (AR 15-6 Report Ex. 4AC);

- Nayeb's Biometric Identity Intelligence Resource (AR 15-6 Report Ex. 4AF);

- Nayeb's Counterintelligence Support Team ("CIST") Screening dated March 24, 2015 (AR 15-6 Report Ex. 4AJ);

- Reintegration Background, dated Nov. 10, 2010 (AR 15-6 Report Ex. 4AK);

19

- Reintegration Guide, dated February 1, 2012 (AR 15-6 Report Ex. 4AL);

- RSHQ SOP 00233 Screening Procedures for LEPs and TCNs, dated July 6, 2015 (AR 15-6 Report Ex. 4AR (heavily redacted as classified));

- USFOR-A Memorandum regarding Local Nationals and Third Country Nationals Screening Policy, dated July 10, 2016 (AR 15-6 Report Ex. 4AY);

- COMBAF JTF-1 12 Nov Bagram Airfield SB Storyboard (AR 15-6 Report Ex. 4CV (heavily redacted as classified)).

The redacted AR 15-6 Report obscured relevant sworn statements about "reports of potential threats/attacks relayed to the entry control personnel" as of the November 12, 2016 attack, as well as reports themselves. *See* Ex. 10, Army 15-6 Report, Exhibit 2B at 5−6. The Army also withheld information about a series of force protection threats conveyed, prior to the attack, by "reports" to "headquarters," including two redacted documents: "BAF Incident and Response," (Ex. 3E); and "Daily Staff Journal" (Ex. 3X). *See* Ex. 7, Army 15-6 Report at 56.

The Army listed "eight major findings" that suggest abject failures *by the Army* in performing inherently governmental functions related to force protection, intelligence gathering, and base security. *See id.* at 2−3. But the Army classified and redacted nearly all details regarding these Military battlefield failures. *See, e.g., id.* at 19−22 (questions regarding intelligence-gathering failures, with all answers redacted). The Army also classified the materials related to Nayeb's initial screening, when the Army approved his base access, and Nayeb's first CIST Screening, which occurred five years after his employment at BAF, *see id.* at 33−34.

Similarly, the Army classified and withheld virtually all information about co-conspirators and Nayeb's Taliban affiliation—even denying co-conspirators exist in the redacted report, despite clear contradictory evidence in the investigative file. *Compare id.* at 7 ("no evidence suggests . . . co-conspirators") *with* Ex. 8, Army 15-6 Report, Exhibit 2A at 1 ("classified exhibits . . . produced from other military agencies . . . identified co-conspirators to the suicide bomber"). On that point,

the Army classified the response to the question: "Were any LNs connected to the Taliban or any

other group(s)? If so, describe the connection." Ex. 7, Army 15-6 Report at 7–8.

### C.    The Army Has Repeatedly Refused to Allow the Full Army Investigation Report From Being Used in Third-Party Tort Litigation.

More than six months ago, Fluor formally requested that the Army release the complete

version of the classified AR 15-6 Report in accordance with the pertinent "*Touhy*" regulations, the

Department of Defense's mandated procedures for litigants to obtain official information for use

in litigation. 32 C.F.R. Part 516; *see also United States ex rel. Touhy v. Ragen*, 340 U.S. 462

(1951). The Army rejected Fluor's request for the complete, classified report. Ex. 28, T. Downie

Letter to D. Russell (Sept. 14, 2020). In doing so, the Army advised that it requested a Mandatory

Declassification Review, but "[u]ntil that review has been conducted, the classified portions of the

AR 15-6 [Report] shall remain classified." *Id.* Most recently, Fluor sought the full, classified AR

15-6 Report from the Army through a FOIA request. Ex. 29, K. Barnett Letter to ARCENT (Oct.

20, 2020). The Army has advised Fluor that it will again deny the release of such report.

In addition, during depositions of present and former military personnel in a parallel case

arising out of the same attack (*Loquasto*), Army counsel gave a blanket instruction to the witnesses

that they could not reveal any classified information in the litigation. *See* Ex. 30, T. Downie Letter

to P. Taaffe (Oct. 14, 2020) ("LTG (Ret.) Bednarek is prohibited from providing testimony that

reveals classified information . . . ."); Ex. 6, Weindruch Depo., at 31:13 to 31:16) ("Q…[A]m I

correct that you would instruct the witness not to answer all questions regarding any knowledge

of the classified information in the 15-6? MAJOR DOWNIE: That is correct.").

### STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, a complaint must state, "a plausible claim

for relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a

'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

unlawfully. A complaint that pleads facts that are "merely consistent with" a defendant's liability

"stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (citing

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). "Where the well-pleaded facts do not

permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—

but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)).

## ARGUMENT

I.    **PLAINTIFF'S CLAIMS ARE PREEMPTED BASED ON THE "COMBATANT ACTIVITIES" EXCEPTION TO THE FEDERAL TORT CLAIMS ACT.**

Plaintiff's claims are barred by the Fourth Circuit's "combatant activities" preemption test,

because Fluor was integrated into combatant activities at BAF, and any attempt to litigate and try

this case—including the presentation of Plaintiff's claims and Fluor's defenses—would result in

state-tort law impermissibly "touching" military judgments. *See Burn Pit*, 744 F.3d at 349.

In addition to the allegations in the Complaint, which establish that the suit arises out of

combatant activities, Fluor has attached hereto indisputable evidence further confirming that the

*Saleh* preemption standard is satisfied.[12] Specifically, attached are the sworn declarations from two

senior Army contracting officials: Ms. Lindsay Weindruch, who served as the Army's Lead

Contracting Officer for the LOGCAP IV Contract; and Mr. Gordon Jones, who served as the

Army's civilian lead over all contingency services contracts, including LOGCAP IV. In their

declarations, which were approved for use in this litigation by the Army, Ms. Weindruch and

Mr. Jones described the extensive integration of Fluor personnel into military operations. As

Ms. Weindruch confirmed: "Fluor augmented and was integrated within the military at Bagram

---

[12] We assume the Court will consider these matters outside the pleadings and convert this motion to one for summary judgment under Rule 56. *See* Fed. R. Civ. P. 12(d).

Airfield." *See* Ex. 5, Weindruch Decl. ¶ 3. Mr. Jones likewise explained: "I have firsthand knowledge of Fluor's integration within the military's operations at Bagram Airfield during Fluor's performance under the LOGCAP IV contract, including during the period of time leading up to and as of the November 2016 attack." *See* Ex. 1, Jones Decl. ¶ 6.

Also attached is the declaration of retired U.S. Army General Mick Bednarek.[13] As Gen. (Ret.) Bednarek explained, the Army designed LOGCAP for the very purpose of integrating contractors into its operations: "The fundamental purpose of the LOGCAP Contract . . . is to utilize civilian contractors to augment the military force and to act as 'force multipliers,' thereby freeing up uniformed soldiers to perform combat missions." *See* Ex. 2, Bednarek Decl. ¶ 16; *accord* Ex. 1, Jones Decl. ¶ 6. Gen. (Ret.) Bednarek also explained that military commanders initiate all directives to the LOGCAP contractor, and these directives are funneled through military contracting channels. *See* Ex. 2, Bednarek Decl. ¶ 20; *see also In re KBR Inc., Burn Pit Litig.*, 893 F.3d at 257 ("In other words, the contracting arm merely translated the operational command's requirements into contractual terms and conditions.").

For reasons set forth herein, this suit is manifestly distinguishable from *Norat*, in which an all-terrain vehicle drove into an uncovered ditch at BAF while Fluor was working under a non-LOGCAP electrical contract. *Norat*, 2018 WL 138266, at *12−13. The Taliban suicide bombing attack at issue bears no resemblance to a routine car accident allegedly caused by a lack of proper signage and misplaced traffic cones. This case implicates foreign policy issues relating to the Afghan First Policy; sensitive military judgments involving classified information; counterintelligence exclusively held by the Military regarding Nayeb's Taliban allegiances and a possible attack the night before November 12; sensitive judgments concerning the priority and

---

[13] Gen. (Ret.) Bednarek served nearly 40 years in the Army and is currently employed by Fluor.

employment of scarce resources, including active duty U.S. military manpower; and Military decisions to allow Nayeb, a known Taliban fighter, to work at BAF for five years despite his Taliban ties. The Military's involvement in and authority over the activities at issue extended *far* beyond "general oversight of Fluor's project and periodic compliance inspections." *See Norat*, 2018 WL 138266 at \*13.

### A.    The Fourth Circuit Established a Broad Preemption Rule Barring Suits Arising Out of Combatant Activities.

In *Boyle v. United Techs. Corp.*, the Supreme Court established the federal common law principle that state tort claims against government contractors are preempted when they create a significant conflict with uniquely federal interests. *See* 487 U.S. 500, 504−08 (1988). In *Saleh*, the D.C. Circuit adapted *Boyle*'s preemption principle to state tort claims against war zone logistical support contractors. The court articulated the following "battle-field preemption" formulation:

> During wartime, where a private service contractor is integrated into combatant activities over which the military retains command authority, a tort claim arising out of the contractor's engagement in such activities shall be preempted.

*Saleh*, 580 F.3d at 9.

In *Burn Pit*, the Fourth Circuit adopted the broad *Saleh* "combatant activities" preemption test. *See Norat*, 2018 WL 1382666, at \*12−13 (citing *Burn Pit*, 744 F.3d 326). That test establishes combatant activities preemption as a broad "field" preemption doctrine: "[I]n the combatant activities exception realm, the conflict between federal and state interests is ***much broader***" than the discrete conflicts under *Boyle* because "the federal government ***occupies the field*** when it comes to warfare, and its interest in combat is ***always precisely contrary*** to the imposition of a non-federal tort duty." *Id.* at 348-49 (quotations omitted) (emphasis added); *see also Saleh*, 580 F.3d at 7 ("the instant case presents us with a more general conflict preemption, to coin a term, 'battle-field preemption'"). "[T]he military need not maintain exclusive operational control over

the contractor for [combatant activities] preemption to apply; rather, the government's interest in immunizing a military operation from suit is present when the military retained command authority, even if the contractor exerted *some limited influence over an operation*." *Norat*, 2018 WL 1382666, at *6, 12 (internal quotations omitted; italics altered).[14]

Thus, a central purpose of the Fourth Circuit's broad preemption rule is avoiding the specter of state tort law influencing how the U.S. Military prosecutes a war and evaluates wartime risks, which is an untenable result that the U.S. Solicitor General has starkly warned, in briefs submitted to the Supreme Court, would be "detrimental to military effectiveness."[15] In fact, the U.S. Solicitor General endorsed combatant activities preemption as *the* doctrine that should apply to protect the paramount federal interests inherent in the conduct of war and military affairs. *Id*.

## B.    The Combatant Activities Preemption Rule Is Broader Than the Political Question Doctrine Defense Addressed by This Court in *Hencely*.

The issues raised here are distinct from those addressed in the political question ruling by this Court in the *Hencely* litigation, in which the Court held that, under South Carolina law, military judgments would not be "second guessed" because a factfinder could not apportion liability to the United States. *See Hencely*, 2020 WL 2838687, at *14.[16] There are two key distinctions.

*First*, under the political-question analysis, courts consider whether the military exercised

---

[14] Resolution of this motion does *not* turn on whether Fluor complied with all military directives. As the Fourth Circuit explained, "the purpose of the combatant activities exception is *not* protecting contractors who adhere to the terms of their contracts; the exception aims to foreclose state regulation of the military's battlefield conduct and decisions." *Burn Pit*, 744 F.3d at 350 (emphasis added) (internal quotation omitted). Fluor did comply with its contract, but regardless of such compliance, this suit is preempted because it is "the imposition of a non-federal tort duty" *alone* that creates the conflict triggering preemption. *Id*. at 349 (quotation marks omitted).

[15] Br. for the United States as Amicus Curiae, *KBR, Inc. v. Metzgar*, No. 13-1241, 2014 WL 7185601, at *21 (U.S. Dec. 16, 2014).

[16] We respectfully disagree with the Court's political-question ruling in *Hencely*, including the assumption underlying the analysis that South Carolina substantive law necessarily applied.

"direct" or "actual" control over the challenged conduct. *See Norat*, 2018 WL 1382666, at *6. By contrast, the Fourth Circuit established a broad preemption rule that expressly permits contractors to exert influence over operations, with a narrow exception applicable only "when the federal government has ***little or no control*** over a contractor's conduct." *Id*. at *12. (emphasis added).

*Second*, under the Fourth Circuit's preemption test, claims are barred when state tort law merely "*touches*" military judgments—a standard that does not require a showing that judgments will be "second guessed." As another district court applying the same *Saleh* test explained:

> [T]he combatant activity exception creates a type of field preemption, ***broader than the political question doctrine*** considered above. It is not necessary to determine whether military judgments would necessarily be examined in hearing the suit, because any claim arising out of combatant activities is preempted.

*Aiello*, 751 F. Supp. 2d at 711 (emphasis added) (denying political question doctrine motion, but granting combatant activities preemption motion); *see also In re KBR, Inc., Burn Pit Litig.*, 268 F. Supp. 3d 778, 820 (D. Md. 2017) ("Plaintiffs' claims are preempted, even if they are not nonjusticiable political questions"), *vacated as moot due to affirmance based on lack of jurisdiction*, 893 F.3d 241, 264 (4th Cir. 2018).[17]

## C.    Plaintiff's Claims Arise Out of Combatant Activities.

This Fourth Circuit's preemption rule incorporates the broad definition of "combatant activities" initially set forth in *Johnson v. United States*, 170 F.2d 767, 769−70 (9th Cir. 1948), which held that combatant activities "include not only physical violence, but [also] activities both necessary to and in direct connection with actual hostilities." *Burn Pit*, 744 F.3d at 351 ("It

---

[17] To further illustrate this distinction, in *Taylor*, a majority of the Fourth Circuit panel affirmed dismissal based on the political question doctrine, but two judges wrote separately to set forth their views that combatant activities preemption provided an "alternate grounds for the judgment." *Taylor v. KBR, Inc*, 658 F.3d 402, 413 (4th Cir. 2011). In particular, Judge Shedd wrote that he was "not convinced that the political question doctrine applies in this case," but he was convinced the broad *Saleh* preemption test was satisfied. *Id*.

therefore makes sense for combatant activities to extend beyond engagement in physical force."). Applying this definition, this action is a quintessential example of "combatant activities."

*First*, Plaintiff alleges injuries that resulted from *actual combat*: a Taliban operative "attacked the Army and detonated a bomb." ECF 1 ¶ 90. That core allegation of "physical violence"—an enemy attack inside the perimeter of a base inside a war zone—easily establishes that the claims here arise out of "combatant activities" under the Fourth Circuit's broad definition. *See Taylor v. KBR, Inc.*, No. 2:09-cv-341, 2010 WL 1707530, at *10 (E.D. Va. Apr. 16, 2010) ("[i]f shelling and receiving shelling is not combat, then combat has no meaning").[18]

*Second*, at the time of the attack, Fluor was performing "essential sustainment support services for the U.S. Army" at BAF. Ex. 5, Weindruch Decl. ¶ 3; *see also* Ex. 2, Bednarek Decl. ¶ 18 ("the military cannot successfully carry out its responsibilities, including its force protection responsibilities, . . . without the support provided by contractors such as Fluor"); Ex. 3, Riley Decl. ¶ 28 ("Fluor's performance of these augmented functions to support the military's force protection responsibility is deemed by the military to be an essential element in the overall force protection plan."). Thus, while "physical violence" alone is sufficient to meet the definition, the challenged conduct at issue included *both* "physical violence" *and* activities "necessary to and in direct connection with actual hostilities." *See Johnson*, 170 F.2d at 768–70.

---

[18] Beyond Plaintiff's allegation that the suit arises out of an enemy attack, soldiers involved in the attack—and many others who served in Afghanistan over the past two decades—were appropriately awarded Bronze Star Medals and other decorations specifically for their heroic actions in a "combat" zone. *See*, *e.g.*, Army Reg. 600-8-22 (Mar. 2019) at 3-16(e) ("the [Bronze Star Medal] is a ***combat related award*** and service or achievement under combat conditions is inherent to the medal") (emphasis added). Several soldiers injured in the attack received Purple Hearts, which they were rightly entitled to, because they were wounded in "any action against an enemy of the United States." *See id*. at 2-8. Further, soldiers deployed to BAF at the time received combat pay. *See Aiello*, 751 F. Supp. 2d at 713 (noting fact that soldier "received combat pay" as indicia that suit arose out of "combatant activities").

Moreover, numerous courts have held that support services provided by contractors inside war zones "undoubtedly" constitute "combatant activities" for purposes of the defense, even in the absence of direct violence and where the allegations centered on relatively mundane, though essential, support functions. *See*, *e.g.*, *Burn Pit*, 744 F.3d at 351 ("waste management and water treatment functions" were "undoubtedly" combatant activities); *Norat*, 2018 WL 1382666, at \*13 ("There is little doubt that Fluor's installation and maintenance of electrical systems at Bagram Airfield qualifies as engaging in combatant activities."); *Aiello*, 751 F. Supp. 2d at 713−14 ("indoor latrine maintenance" constituted combatant activities); *Harris v. Kellogg Brown & Root Srvcs., Inc.*, 724 F.3d 458, 481 (3d Cir. 2013) (maintenance of electrical systems constituted combatant activities).

**D.    Any Attempt to Impose State Tort Law Standards on the Warzone Activities at Issue Would Impermissibly Touch Military Decisions and Undermine Federal Interests.**

Application of state-tort-based duties to the conduct at issue would result in "state tort laws that touch the military's wartime decision making." *See Burn Pit*, 744 F.3d at 350.[19]

1.    State Tort Law Would Touch the Military Decisions Regarding How and When to Supervise Local Nationals, Including the Military's Decision Not to Supervise Nayeb at His Work Place.

A core allegation in Plaintiff's Complaint is negligent supervision. *See*, *e.g.*, ECF 1 ¶¶ 58, 59, 74. Plaintiff alleges that "Fluor negligently failed to supervise Nayeb at the HAZMAT work

---

[19] As the Fourth Circuit explained, in addition to the "broad" conflict caused because the very purposes of tort law are in conflict with the pursuit of warfare, allowing state tort law to apply here would *also* result in "specific conflicts" between federal and state interests: (i) "imposing tort liability on contractors that carry out the government's orders will result in the contractor charging higher prices, a cost that the taxpayers will ultimately bear"; (ii) "haling a government contractor into a court proceeding that questions the military's decision making will distract government personnel from their tasks and allow judicial probing of the government's wartime policies"; and (iii) "allowance of these claims will potentially interfere with the federal government's authority to punish and deter misconduct by its own contractors." *Burn Pit*, 744 F.3d at 349 n.11.

center," *id*. ¶ 108, and "[t]he U.S. Army did not direct Defendants in any way with respect to Defendants' retention, management, and supervision of Nayeb," *id*. ¶ 92. In the *Hencely* matter, when this Court addressed Fluor's political question motion, the Court concluded: (i) "there were no formal directives issued to Fluor about . . . how to supervise Fluor's personnel [at the NTV Yard]"; and (ii) "Fluor operated with wide latitude and considerable discretion in the ways it supervised NTV Yard employees." *Hencely,* 2020 WL 2838687, at *12. The Court was then examining "the type and degree of control that implicates nonjusticiability under *Taylor*'s first factor," and was doing so based on the then-existing record. *Id*.

Here, when the Court analyzes the allegations and facts at issue under the Fourth Circuit's broader "battle-field" preemption test, it is clear the case is barred.

First of all, by attacking the level of supervision over Nayeb, Plaintiff is challenging "activities stemming from military commands." *See Burn Pit*, 744 F.3d at 349-51. Fluor did not decide the protocols or requirements for the escorting and supervision of Local Nationals at BAF. Rather, "the military [] established protocols and requirements for the escorting and supervision of the many Local Nationals who were authorized by the military to work on the base." Ex. 1, Jones Decl. ¶ 18; *see also* ECF 10-4, BAF Access Policy § 11.a(1) ("Red badge [LN] personnel require an escort in all areas except work facility."); Ex. 4, Wilson Decl. ¶ 33. Likewise, Fluor did not decide which Local Nationals needed to be escorted and supervised, or when they needed such supervision. Rather, "[t]he military decided which Local Nationals needed escorts and when escorts were required and not required." *Id*. Because the military made these decisions, and the activities at issue stemmed from these decisions, allowing this suit to proceed would result in "state tort law touch[ing] the military's battlefield conduct and decisions." *See Burn Pit*, 744 F.3d at 349. This, alone, triggers "battle-field" preemption.

Importantly, the Fourth Circuit's preemption test is met even assuming Fluor "exerted *some* limited influence" over Nayeb's supervision because—as this Court explained in *Norat*—the exercise of some discretion by the contractor is legally irrelevant. *See* 2018 WL 1382666, at *12 (quotation and citation omitted). Under the law, "[t]he military need not maintain exclusive operational control over the contractor for preemption to apply," and "the government's interest in immunizing a military operation from suit is present" despite such contractor discretion. *Id*.

Moreover, the decision regarding whether and how to supervise Nayeb, the Taliban bomber, was plainly *not* left to Fluor's "sole discretion." *See Saleh*, 580 F.3d at 9. To the contrary, if Fluor had had the discretion to provide increased work place supervision, Fluor would have done so. *See* Ex. 1, Jones Decl. ¶ 20 ("Fluor indicated that it could take on this additional work with appropriate contract direction and funding"). It was the Army that decided, based on its own battlefield calculus, *not* to have Fluor "take on this additional work" of "escorting of Local Nationals at their work place." *Id*. ¶ 20. Permitting this case to proceed would clearly call into question the reasonableness of the Army's battlefield decision to not permit, provide for, or require additional escorts or supervision.

In fact, litigating this suit would not only result in the "broad" conflict that occurs "when state tort law touches the military's battlefield conduct and decisions," which alone triggers dismissal under the "battle-field" preemption test. *See Burn Pit*, 744 F.3d at 349. Beyond that, litigating this suit would *also* result in additional, discrete conflicts between federal directives and purported state tort duties. That is because, contrary to Plaintiff's allegations and this Court's prior statements, it is now clear that: (i) the Military *did* direct Fluor *not* to provide increased supervision of Nayeb at his work place, Ex. 1, Jones Decl. ¶¶ 18–20; and (ii) the Military *did* issue formal directives to Fluor under which Fluor did *not* have any latitude to perform additional work—i.e.,

supervision of Local Nationals—that the Army did not authorize. *Id.*; *see also* ECF 10-4, BAF

Access Policy § 11.a(1); Ex. 4, Wilson Decl. ¶ 33. As a result, Plaintiff's claims present a *direct*

conflict as between the Army's directive (not to provide additional workplace supervision) and a

hypothetical duty imposed by a state (to provide such supervision). Of course, the Fourth Circuit's

"battle-field" preemption test does not require such a discrete conflict. *See Burn Pit*, 744 F.3d at

349 ("'the relevant question is not so much whether the substance of the federal duty is inconsistent

with a hypothetical duty imposed by the state'") (quoting *Saleh*, 580 F.3d at 7). But where, as here,

such a direct conflict exists as between Military directives and a purported state-tort duty, this only

further illustrates that the litigation undermines federal interests and should be barred.[20]

> 2. State Tort Law Would Touch the Military Decisions to Hire and Retain
> Nayeb Despite the Military's Exclusive Knowledge of His Taliban Ties
> and Suspicious Behavior During Security Screenings.

Plaintiff also alleges negligent retention of Nayeb. *See*, *e.g.*, ECF 1 ¶¶ 60−63. However,

undisputed facts establish that Fluor's hiring and retention of Nayeb were "activities stemming

from military commands." *Burn Pit*, 744 F.3d at 351. Specifically, it was the Military *alone* that

made the following decisions and authorizations:

- The Military required that Fluor maximize hiring of Local Nationals. *See* Ex. 21, TO 0005
  PWS, at § 1.07(b);

---

[20] Consider the extraordinary consequences of imposing a state-tort duty in these circumstances. Among other things, this imposition would disrupt operational discipline necessary on a military base in a war zone. For instance, the next time a contractor is directed by the Military *not* to provide a heightened degree of supervision of Local National or other employees, the contractor may refuse to comply with this directive. Or, the specter of state-tort law could force the Military to expend the "additional funding" of taxpayer dollars that the Army, in its considered judgment here, elected not to spend. At a bare minimum, preemption is warranted to "guard[] against timidity of contractor personnel in performing critical functions out of fear of tort liability." *See* Br. for the United States as Amicus Curiae, *Metzgar*, 2014 WL 7185601, at * 16.

- The Military identified Nayeb specifically as a candidate, and the Military affirmatively sponsored Nayeb for employment. *See* Ex. 24, Letter from Commander, TF Red Bulls, to Parwan ROK;

- The Military vetted, reviewed, and approved Nayeb for employment. *See* Ex. 17, Army 15-6 Report, Exhibit 5H;

- The Military approved Nayeb to access the base *despite known Taliban associations*, and the Military never warned Fluor of Nayeb's Taliban ties *See* Ex. 24, Letter from Commander, TF Red Bulls, to Parwan ROK; Ex. 17, Army 15-6 Report, Exhibit 5H;

- The Military conducted seven interviews with Nayeb for the purpose of deciding whether he should be retained or terminated due to security concerns, and each time the Military decided he should be retained. *See* Ex. 4, Wilson Decl. ¶¶ 58−59; Ex. 25, Fluor's Answers to 15-6 Questions Received Dec. 4, 2016 at 3; Ex. 7, Army 15-6 Report at 33 ¶ 15.b(2);

- During one such interview in 2016, the Military observed that Nayeb provided "trained and coached" answers—a red flag of potential terrorist involvement exhibited by a known Taliban associate—but the Military still did not terminate Nayeb. *See* Ex. 4, Wilson Decl. ¶ 59; Ex. 7, Army 15-6 Report at 33 ¶ 15.b(2);

- The Military decided to continue to authorize Nayeb to access the base—on a daily basis—for more than five years. *See* Ex. 25, Fluor's Answers to 15-6 Questions Rec'd Dec. 4, 2016 at 3.

Even assuming the above facts do not require a factfinder to "second guess" military decisions, allowing this suit to proceed will inevitably result in state-tort law "touching" these military decisions. This suit is preempted because the hiring and retention of Nayeb "stemm[ed] from" numerous Military authorizations and directives. *See id.* at 351. And the decision to hire and retain Nayeb was not carried out in the "sole discretion" of Fluor. *See Saleh*, 580 F.3d at 9.

3. State Tort Law Would Touch Military Decisions Related to the Force Protection and Base Security Failures That Caused Plaintiff's Injuries.

Resolution of Plaintiff's claims also would result in state tort law touching numerous other military battlefield judgments—and failures—that allowed Nayeb and his co-conspirators to evade the military's force protection, counter-intelligence, and base security mechanisms.

For example, as the Court acknowledged in *Hencely*, Fluor is entitled to defend itself by showing that "the Army—and not Fluor's alleged conduct—caused Plaintiff's injuries." *Hencely*,

2020 WL 2838687, at *14.[21] Thus, at any trial, Fluor would present evidence showing, among other things:

- The Army selected and sponsored Nayeb, a known Taliban fighter, for hiring, *and* the Army knew Nayeb provided "trained and coached" answers during interviews, but the Army never warned Fluor of these extraordinary risks and instead repeatedly granted Nayeb access to the base on a daily basis for a period of years. *See, e.g.,* Ex. 7, Army 15-6 Report at 33 ¶ 15.b(2).

- The Army obtained specific counterintelligence indicating an attack on the base was imminent—in fact the Army was warned "the night before" the attack—but the Army failed to act on this intelligence, and failed to warn Fluor of this extraordinary risk. *See* Ex. 13, Army 15-6 Report, Exhibit 2J at 3.

- The Army chose to resource Entry Control Point ("ECPs") guards from contractor personnel, not active duty soldiers, and established screening protocols that required Local Nationals entering the base at ECPs to be screened by *other* Local Nationals who were overseen by *other* Local Nationals—despite the Army's awareness of the risks of relying on Local Nationals to police themselves, and the Army's pre-attack specific knowledge that "nefarious things" were being smuggled in through ECPs. *See* Ex. 14, Army 15-6 Report, Exhibit 3O at 7.

- The Army chose to not resource all of the detection systems at the ECPs, allowing some to become inoperable. Ex. 11, Army 15-6 Report, Exhibit 2C at 10.

- The Army chose not to employ trained and experienced personnel in the Anti-Terrorism/Force Protection mission at Bagram, instead choosing to staff the Area Support Group mission with untrained personnel. Ex. 12, Army 15-6 Report, Exhibit 2D at 5 ("I do not feel this is the right time and place for anyone to learn the AT/FP business 'as they go'. I feel that BAF desperately needs a trained and experienced AT/FP [Subject Matter Expert] now.").

- The Army failed to detect Nayeb or others smuggling or otherwise acquiring deadly explosives later identified as rare and indicative of "a higher echelon of involvement from a terrorist network." *See* Ex. 16, Army 15-6 Report, Exhibit 4P at 4−5.

Fluor can, at a minimum, try the U.S. Military as the empty chair and thus require the factfinder to consider whether these and other Military decisions *caused Plaintiff's injuries*. Even if pointing the finger at military judgments would not result in "second guessing," it will result in state tort law "touching" military judgments, which this Court has acknowledged is prohibited by

---

[21] The Court specifically referenced South Carolina law regarding this proposition, but it is true under any substantive state tort law.

the "combatant activities" preemption test. *See Norat*, 2018 WL 1382666, at *12; *Burn Pit*, 744 F.3d at 350.[22]

## II.    THE COURT SHOULD DISMISS PLAINTIFF'S CLAIMS BECAUSE THE ARMY HAS REFUSED TO RELEASE ESSENTIAL CLASSIFIED INFORMATION.

The absence of essential classified information provides a separate, independent ground for dismissal. The parties cannot fairly litigate or try this case because the Army has refused to release classified information that is central to the claims and defenses. In particular, Fluor would seek to show that the Army and/or Nayeb's co-conspirators—and not Fluor—caused the attack and Plaintiff's resulting injuries. But, in addition to triggering preemption (*see supra*), this defense and others could not be fairly presented and tried due to the massive body of classified evidence that is unavailable to the parties and the Court. That reality requires dismissal.

### A.    Dismissal Is Proper When Lack of Classified Information Disables the Parties' Claims or Defenses.

In many civil cases involving classified information, courts dismiss the case rather than risk a possible disclosure of sensitive information.[23] Dismissal is particularly appropriate when

---

[22] In addition to the Fourth Circuit's "combatant activities" preemption rule, Plaintiff's claims are also preempted because "under the circumstance, the very imposition of *any state law* [would] create[] a conflict with federal foreign policy interests," which the D.C. Circuit cited as "an alternative basis" for its holding in *Saleh. See* 580 F.3d at 13. Thus, "even in the absence of *Boyle*," Plaintiff's claims would be preempted because "[t]he states (and certainly foreign entities) constitutionally and traditionally have no involvement in federal wartime policy-making," but allowing Plaintiff's claims to proceed—under any state law or Afghanistan law—would interfere with U.S. Military policy in Afghanistan, including policy related to hiring and reliance on Local Nationals. *See id.* at 11 (citing U.S. Const. Art I, § 10 and *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 420 n.11 (2003)); *see also Hines v. Davidowitz*, 312 U.S. 52, 63 (1941) ("Our system of government . . . imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference."); *Zschernig v. Miller*, 389 U.S. 429, 432 (1968) (striking state law as "an intrusion by the State into the field of foreign affairs").

[23] The reason for such caution is based, in part, on the fact that even in camera, ex parte review poses a risk of disclosure of highly sensitive information. *See, e.g., Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362, 1369 (4th Cir. 1975) ("It is not to slight judges, lawyers or anyone else to suggest

"the circumstances make clear that sensitive military secrets will be so central to the subject matter of the litigation that any attempt to proceed will threaten disclosure of the privileged matters." *Sterling v. Tenet*, 416 F.3d 338, 348 (quoting *DTM Research, LLC v. AT&T Corp.*, 245 F.3d 327, 334 (4th Cir. 2001)); *see also Totten v. United States*, 92 U.S. 105, 107 (1876) (recognizing that classified information so pervades some matters as to be incapable of judicial resolution once the government has refused to release the information).[24] In some cases, under the "mosaic theory," it may be impossible to separate the subject matter of the case from the classified information, particularly because "the business of foreign intelligence gathering in this age of computer technology" allows "[t]housands of bits and pieces of seemingly innocuous information can be analyzed and fitted into place to reveal with startling clarity how the unseen whole must operate." *Halkin v. Helms*, 598 F.2d 1, 8 (D.C. Cir. 1978); *see also Kasza v. Browner*, 133 F.3d 1159, 1166 (9th Cir. 1998) ("Accordingly, if seemingly innocuous information is part of a classified mosaic, the state secrets privilege may be invoked to bar its disclosure and the court cannot order the government to disentangle this information from other classified information."). The Supreme Court has recognized this reality, making "clear that where state secrets form the very subject matter of a court proceeding, as in *Totten*, dismissal at the pleading stage—'without ever reaching the question of evidence'—is appropriate." *El-Masri v. United States*, 479 F.3d 296, 306 (4th Cir. 2007) (quoting *United States v. Reynolds*, 345 U.S. 1, 11 n.26 (1953)).

---

that any such disclosure carries with it serious risk that highly sensitive information may be compromised. In our own chambers, we are ill equipped to provide the kind of security highly sensitive information should have.").

[24] Although it is best known for its narrow holding, the Fourth Circuit has recognized that *Totten* stands for more than establishing a categorical bar on actions about secret espionage contracts. *El-Masri v. United States*, 479 F.3d 296, 306 (4th Cir. 2007). Instead, it confirms the broader "proposition that a cause cannot be maintained if its trial would inevitably lead to the disclosure of privileged information." *Id.*

The need for dismissal applies equally when the sensitive military secrets are central to a plaintiff's claims as to a defendant's defenses. As the Supreme Court explained, "[i]t is claims *and* defenses *together* that establish the justification, or lack of justification, for judicial relief; and when public policy precludes judicial intervention for the one it should preclude judicial intervention for the other as well." *Gen. Dynamics*, 563 U.S. at 487 (emphasis in original). Accordingly, the Fourth Circuit has routinely affirmed dismissals when the government refuses to allow the parties to use classified information needed to support their respective claims *or* defenses. *Abilt v. Central Intelligence Agency*, 848 F.3d 305, 316 (4th Cir. 2017); *Farnsworth Cannon, Inc. v. Grimes*, 635 F.2d 268, 281 (4th Cir. 1980) (en banc).[25]

For example, in *Farnsworth*, the en banc Fourth Circuit affirmed dismissal of an action between a government contractor and an individual Navy employee, alleging tortious interference with four classified Navy contracts. *See Farnsworth*, 635 F.2d at 281. The Navy refused to allow the litigants to discuss the contracts, the organizational structure of the Navy component where the defendant worked, or the defendant's job responsibilities. *Id.* at 269. The Fourth Circuit explained that classified information was so central to the dispute that "[i]n an attempt to make out a prima facie case during an actual trial, the plaintiff and its lawyers would have every incentive to probe

---

[25] Other circuits have adopted a similar approach, affirming dismissals when the government refused to permit access to classified information necessary to prove either the plaintiff's claims or defendant's defenses. *See In re Sealed Case*, 494 F.3d 139, 149 (D.C. Cir. 2007); *Tenenbaum v. Simonini*, 372 F.3d 776, 777 (6th Cir. 2004) (dismissing because "Defendants cannot defend their conduct with respect to [the plaintiff] without revealing the privileged information"); *Bareford v. Gen. Dynamics Corp.*, 973 F.2d 1138, 1142 (5th Cir. 1992) ("any further attempt by the plaintiffs to establish a prima facie case would threaten disclosure of important state secrets"); *Zuckerbraun v. Gen. Dynamics Corp.*, 935 F.2d 544, 547−48 (2d Cir. 1991) ("[T]here is no evidence available to the appellant to establish a prima facie case. . . . Discovery would thus be a waste of time and resources."); *Molerio v. FBI*, 749 F.2d 815, 825 (D.C. Cir. 1984) (granting summary judgment where state secrets privilege precluded the government from asserting a valid defense); *Bentzlin v. Hughes Aircraft Co.*, 833 F. Supp. 1486, 1496 (C.D. Cal. 1993) ("[T]he state secrets privilege seriously prejudices Hughes' ability to defend against plaintiffs' case.").

as close to the core secrets as the trial judge would permit." *Id.* at 281. Under the mosaic theory, "[s]uch probing in open court would inevitably be revealing," and dismissal was therefore necessary. *Id.*; *see also Kasza*, 133 F.3d at 1166.

In *Sterling*, the Fourth Circuit dismissed a covert employee's Title VII discrimination case against the Central Intelligence Agency. The court held that "[e]ven assuming [the employee] were somehow able to manage the impossible feat of making out all the elements of a Title VII claim without revealing state secrets, further issues would remain" because the government would still be "entitled to present, as a defense to [the employee's] prima facie case, legitimate nondiscriminatory reasons for its actions." *Id.* at 347. But those legitimate nondiscriminatory reasons for hiring and promoting the covert operatives were classified.

Applying the same principles, the U.S. District Court of the District of Massachusetts dismissed a third-party tort claim by a U.S. solider tragically killed in an Operation Iraqi Freedom friendly fire incident when the government refused to release classified information essential to the contractor's defense. *White v. Raytheon Co.*, No. 07-10222-RGS, 2008 WL 5273290, at *5 (D. Mass. Dec. 17, 2008). In *White*, the government would not release classified information about the Army's missile defense operations, including the Patriot system's rules of engagement. *Id.* at *1. In its defense, Raytheon asserted both a proximate cause defense and the government contractor defense, which both required the information the government refused to allow into the case. *Id.* at *3−4. Faced with that reality, the court had "no alternative but to order the case dismissed" after "see[ing] no practical means by which Raytheon could be permitted to mount a fair defense without revealing state secrets." *Id.* at *5.[26]

---

[26] Although the Fourth Circuit cases in which courts have dismissed actions on national security grounds also involved the government's invocation of the state secrets privilege, that step is not a

A cursory review of the redacted report reflects the huge volume of classified information upon which the findings of the report are based.

**B.      Dismissal Is Appropriate Here Because the United States Has Refused to Allow Use of Classified Information Necessary in This Litigation.**

This case concerns liability for injuries of an active duty U.S. Army soldier serving at a U.S. military base in a warzone that suffered from an enemy suicide bombing attack—an attack carried out by a Taliban fighter who was at the time known as such to the Army and still permitted by the Army onto the base for years before the attack. Given that backdrop, along with the Army's designation of substantial relevant information as classified, it is inevitable that zealous advocates representing both parties will "have every incentive to probe as close to the core secrets as the trial judge would permit." *Farnsworth*, 635 F.2d at 281; *see also Gen. Dynamics*, 563 U.S. at 487 ("Every document request or question to a witness would risk further disclosure, since both sides have an incentive to probe up to the boundaries of state secrets."). This is especially true because the classified information is central to the core issues, claims, and defenses in this case.

　　　　　1.      Plaintiff's Attempt to Establish a Prima Facie Case Risks Exposing Classified Information.

Although Plaintiff filed this lawsuit earlier this month, this is not the inception of litigation

---

prerequisite. The Supreme Court has confirmed dismissal as the appropriate option even without a formal assertion of state secrets. *See, e.g.*, *Tenet v. Doe*, 544 U.S. 1, 10−11 (2005) (upholding dismissal of case over breached espionage agreement between CIA and an alleged Soviet defector without an assertion of state secrets); *Weinberger v. Catholic Action of Haw./Peace Ed. Project*, 454 U.S. 139, 146−47 (1981) (affirming dismissal of suit challenging the Navy's failure to file a required environmental impact statement where, "[d]ue to national security reasons," the Navy could "neither admit nor deny" the fact that was central to the suit: "that it propose[d] to store nuclear weapons" at a facility). The formal assertion of state secrets signals to a court that a case touches on sensitive national security information, but the United States can send the same signal in other ways. It can file a statement of interest, intervene in the litigation, or—as it has done here—repeatedly refuse to grant the parties access to the classified information for use in the litigation. There is no functional difference in the outcome between the Army's repeated denials and a formal assertion of state secrets.

surrounding the Taliban attack, as this Court is aware. Fluor has been defending itself against identical claims in this Court (*Hencely*) and in Texas (*Loquasto*). In those cases, the Army adamantly refused to release key information about the November 12, 2016 Taliban attack. There is no reason to believe this new lawsuit will alter the Army's position.

For example, Plaintiff's Complaint relies heavily on a redacted version of an Army investigation report.[27] ECF 1 ¶¶ 107−10. Although the Army plainly did not seek to apply any state tort standards—or even fundamental rules of evidence or due process—Plaintiff alleges that "[t]he Army Investigation established that Defendants were negligent in four separate ways," *id.* ¶ 108 which mirror Plaintiff's negligence claims. Foreshadowing his intent to rely on this report to support those negligence claims, Plaintiff argues that "***[t]he entirety*** of the Army Report is admissible in evidence for all purposes under Federal Rule of Evidence 803(8)." *Id.* ¶ 100 (emphasis added). But this is plainly impossible. The Army has refused to release the entirety of the report, despite Fluor's and other parties' repeated requests. Only a heavily redacted version of the report is publicly available. Beyond being significantly incomplete, the redacted version extensively cites and relies almost exclusively on *classified* and *unreleased* exhibits. *See, e.g.*, Ex. 16, Army 15-6 Report, Exhibit 4P at 4−5 (discussing references to Nayeb smuggling explosives onto the base and the conflicting statements about co-conspirators); Ex. 8, Army 15-6 Report, Exhibit 2A at 1 ("classified exhibits . . . produced from other military agencies . . . identified co-conspirators to the suicide bomber"). As a result, the substantially incomplete version of the report

---

[27] The Complaint does not attach the Army Investigation Report. It does, however, quote from it and reference it extensively. *See, e.g.*, ECF 1 ¶¶ 107, 108, 108a, 108b, 108c, 108d, 109a, 109b, 109c, 109d, 109e, 109f, 109g, 109h, 109j, 109k, 109l, 109m, 109n, 109o, 109p, 109q, 110. Thus, the report is incorporated into the Complaint by reference and may be considered in connection with a motion to dismiss under Rule 12(b)(6). *See Cobin v. Hearst-Argyle Television, Inc.*, 561 F. Supp. 2d 546, 550 (D.S.C. 2008).

lacks the reliability and trustworthiness necessary to qualify under any hearsay exception.[28]

Even if Plaintiff sought to use partial excerpts of the redacted report, Plaintiff's use of such unclassified information would still risk disclosing classified information under the "mosaic theory."[29] Beyond that, trying to balance the evidence presented—as between classified and unclassified—risks confusing the factfinder and allowing a slanted and incomplete picture to be presented as the whole truth. *See In re Sealed Case*, 494 F.3d at 151 (dismissing case when "the truthful state of affairs would deny a defendant a valid defense that would likely cause a trier [of fact] to reach an erroneous result"). And forcing parties to litigate a case with significant gaps in the evidence can lead to a false or mistaken verdict. *See Farnsworth*, 635 F.2d at 281.

Regardless, in response to any such presentation of evidence by Plaintiff, in defending itself Fluor would need to probe the boundaries of a wealth of classified information. For example, to prevail, Plaintiff must show that his injuries were "the natural and probable consequences of the complained of act." *Madison ex rel. Bryant v. Babcock Ctr., Inc.*, 638 S.E.2d 650, 662 (S.C. 2006). In response to whatever evidence Plaintiff presents to show a Taliban suicide bombing attack was the natural and probable consequence of Fluor's conduct, Fluor would have a right to cross-examine Plaintiff's witnesses about, among other things, missed counterintelligence indicators, the

---

[28] To be clear, the partial report is not admissible. That said, information in the report, and in the heavily redacted and voluminous supporting materials, is plainly relevant. And those classified materials would undoubtedly lead Fluor to additional relevant evidence. Importantly, the Army's investigation—which was largely completed in a span of weeks over the December 2016 holidays—was by no means designed to uncover all facts that would support Fluor's defenses. Not only has Fluor been denied access to highly relevant materials, but also—perhaps more importantly—Fluor cannot pursue additional evidence referenced in those materials.

[29] The mosaic theory recognizes that it is often not easy to extricate classified information from unclassified information, and thus even unclassified information alone can reveal, indirectly, the contents of classified materials. Courts have recognized that foreign enemies can assemble "seemingly innocuous information [into] part of a classified mosaic." *Kasza*, 133 F.3d at 1166.

Army's knowledge of Nayeb's Taliban ties and past activities, the Army's failure to warn Fluor of these Taliban ties and past activities, and the unprecedented nature of an on-base attack.[30] But this information is classified, and probing the information creates a serious risk of disclosure. *See Farnsworth*, 635 F.2d at 281 ("[s]uch probing in open court would inevitably be revealing").

As a result, dismissal is the only appropriate and practical result because, as in *Farnsworth*, "any attempt on the part of [P]laintiff to establish a prima facie case" of Fluor's negligence being the proximate cause of the Taliban suicide bombing attack "would so threaten disclosure of state secrets that the overriding interest of the United States and the preservation of its state secrets precludes any further attempt to pursue this litigation." *Farnsworth*, 635 F.3d at 281.

2.    Fluor Cannot Establish Defenses Without Classified Information Being Withheld by the Army.

Fluor cannot fairly present its defenses without the withheld information. *El–Masri*, 479 F.3d at 309 (dismissal appropriate if "the defendants could not properly defend themselves without using privileged evidence"); *Farnsworth*, 635 F.3d at 281. For example, Fluor's proximate cause defense and its government contractor defense rely on classified information.

As for Fluor's proximate cause defense, it is indisputable that the Army was exclusively responsible for vetting Nayeb and deciding whether to grant him access to the base—as the Army decided to do repeatedly, for a period of years. But Fluor needs the withheld classified information to prove, for example that, in approving Nayeb's access to the base, the Army *also*: (i) failed to share its superior knowledge with Fluor that Nayeb had Taliban affiliations; (ii) failed to detect Nayeb or others smuggling into BAF or otherwise acquiring explosive materials; (iii) failed to

---

[30] Army personnel described the on-base Taliban attack as "unprecedented" and "unforeseeable," from the Army's perspective, *see* Ex. 15, Army 15-6 Report, Exhibit 4O at 7, because, among other things, "there has never been a kinetic attack on the base from within," *see* Ex. 14, Army 15-6 Report, Exhibit 3O at 7.

interdict apparent co-conspirators who helped Nayeb carry out the bombing attack; and (iv) failed

to share its superior knowledge with Fluor that a possible attack was imminent.

These are far from hollow allegations. Even a cursory review of the redacted AR 15-6

Report strongly suggests that classified information will establish that the Army or others caused

the attack. For example:

- ECP guards, under exclusive Military control, failed to prevent explosives from being brought onto BAF, *see* Ex. 7, Army 15-6 Report at 49 ("Counterintelligence source reporting indicates [the bomber] likely smuggled small quantities of homemade explosives onto Bagram Airfield") (citing AR 15-6 Report Exhibits 4CK, 4CI, 5N, and 5A – all withheld in full);

- Co-conspirators assisted Nayeb in unexplained ways, *see* Ex. 8, Army 15-6 Report Exhibit 2A at 1 ("classified exhibits . . . produced from other military agencies . . . identified co-conspirators to the suicide bomber");

- The Army failed to conduct appropriate and timely counterintelligence evaluations, *see* Ex. 7, Army 15-6 Report at 3 ("Counterintelligence shortages impaired Coalition Forces' capabilities to screen Local National employees and to identify [the bomber's] threat indicators"); and

- The Army failed to act on intelligence about a potential attack, *see* Ex. 13, Army 15-6 Report Ex. 2J at 3 ("I believe that [redacted name] the night before said there was going to be an attack but that it had been called off."); *see also* Ex. 7, Army 15-6 Report at 19−27 (redacting section answering whether "U.S. or Coalition Forces have any intelligence of value . . . of this incident before it occurred").

If this case proceeds, the Army will shut down discovery into these critical factual areas—

as it did in *Loquasto*. The Army has made this position clear through its response to Fluor's request

for the classified AR 15-6 Report, Ex. 28, T. Downie Letter to D. Russell (Sept. 14, 2020) ("the

classified portions of the AR 15-6 [Report] shall remain classified"), and its directives to witnesses

deposed in the separate lawsuit arising out of the same attack, Ex. 30, T. Downie Letter to P. Taaffe

(Oct. 14, 2020) ("LTG (Ret.) Bednarek is prohibited from providing testimony that reveals

classified information . . . ."). Thus, when Fluor seeks to depose witnesses who possess firsthand

knowledge of facts establishing that the Army and others caused Plaintiff's injuries, these

depositions—if they are even permitted—will be exercises in futility. For example, if discovery

42

were to proceed, Fluor would seek to depose Army commanders and senior intelligence officers regarding the Army's counter-intelligence. Fluor also would question Military witnesses about the role of co-conspirators in the attack. But the Army has made clear that it will not allow its witnesses to answer such questions. That is the hallmark of a case that requires dismissal under precedent.

The Army's refusal to release this information will also disable Fluor's ability to prove its government contractor defense. In particular, Fluor will be prevented from establishing that the United States possessed superior knowledge of key information about Nayeb's association with the Taliban, intelligence suggesting an upcoming attack, and possible co-conspirators—information which it failed to share with Fluor prior to the attack. *See, e.g.*, *Harduvel v. Gen. Dynamics Corp.*, 878 F.2d 1311, 1322 (11th Cir. 1989) (finding contractor met knowledge prong of *Boyle* by showing government knew of potential defect); *see also Helene Curtis Indus., Inc. v. United States*, 312 F.2d 775, 778 (Ct. Cl. 1963) ("[T]he Government—where the balance of knowledge is so clearly on its side—can no more betray a contractor into a ruinous course of action by silence than by the written or spoken word.").

Thus, for the same reasons the Fourth Circuit dismissed *Sterling* and *Farnsworth*, the Court should dismiss Plaintiff's claims, which at their core are about sensitive military secrets. To allow those claims to proceed, the Court would need to either invite a real risk of injury to national security or permit a verdict it knows to be a false or mistaken. Neither is an option under the law.[31]

---

[31] Should the Court find it necessary or important to the disposition of this case, the Court can ask the United States if it intends to assert the privilege or release the information necessary to litigation this case to the parties and the Court. *See* 28 U.S.C. § 517 (permitting the Department of Justice to attend to the interests of the United States in a pending lawsuit). If the Court elects to do so, it should stay the proceedings until this issue is resolved.

III.    **THE COURT SHOULD DISMISS PLAINTIFF'S BREACH-OF-CONTRACT CLAIM BECAUSE HE IS NOT AN INTENDED THIRD-PARTY BENEFICIARY TO THE LOGCAP IV CONTRACT.**

Plaintiff attempts to assert a breach-of-contract claim by invoking the rare "third-party beneficiary" exception to the general rule that only parties to a contract have standing to enforce the contract. *See Sec'y of State for Def. v. Trimble Navigation Ltd.*, 484 F.3d 700, 706 (4th Cir. 2007). But Plaintiff fails to allege facts establishing that both Fluor and the U.S. Army entered into the LOGCAP IV Contract intending to permit Plaintiff and thousands of other service members to directly benefit from the contract, and therefore enforce the contract. Nor could he. Plaintiff is not an intended third-party beneficiary and his breach-of-contract claim fails as a matter of law.

A.    **The Presumption Against Third-Party Beneficiary Status Can Be Overcome Only by Showing the Clear Intent of Both Contracting Parties.**

Third-party beneficiaries are exceptional in the law and "should not be granted liberally," particularly with respect to a federal government contract. *Flexfab*, 424 F.3d at 1259; *Trimble*, 484 F.3d at 706. To qualify as a third-party beneficiary under federal common law, a plaintiff must show that "the contract reflects the express or implied intention of the parties to benefit the third party." *Id.* (internal quotations omitted).[32]

The intent of both parties to the contract is therefore "the cornerstone of a claim for third-party beneficiary status," *Flexfab*, 424 F.3d at 1259, and courts must find "a clear intent to rebut the presumption that the third parties are merely incidental beneficiaries." *GECCMC 2005-C1 Plummer St. Office Ltd. P'ship v. JPMorgan Chase Bank, Nat'l Ass'n*, 671 F.3d 1027, 1033−34 (9th Cir. 2012) (applying federal common law) (internal quotations omitted). A party can rebut

---

[32] Federal common law governs civil liabilities arising out of a private contractor's performance of federal procurement contracts. *Trimble*, 484 F.3d at 705-06 (citing *Boyle*, 487 U.S. at 504–05). Even if South Carolina law applied, the result would be the same. *See Touchberry v. City of Florence*, 367 S.E.2d 149, 150 (S.C. 1988). A non-party whose benefit is merely incidental or consequential will not suffice. *See Cothran v. Rock Hill*, 43 S.E.2d 615, 617 (S.C. 1947).

this presumption only by showing that the contract language or attendant circumstances put the contracting officer on notice of the relationship between prime contractor and the third party. *Flexfab*, 424 F.3d at 1263. This is true even when the putative third-party beneficiary is seeking to recover from the contractor and not the government. *Trimble*, 484 F.3d at 706 (evaluating government's intent to decide if third party could bring breach-of-contract suit against contractor).

For example, in *Trimble*, the Fourth Circuit dismissed a foreign government's breach-of-contract claim against a defense contractor because the foreign government failed to show it was a third-party beneficiary. *Id.* Although it discussed the foreign military sales statutory regime at length to support its conclusion, the Fourth Circuit also independently found that the contract itself lacked the requisite indicia of third-party beneficiary status. *Id.* at 707−08. The Fourth Circuit held that the contract lacked any language reflecting an intent to benefit the foreign government despite the contract identifying the United Kingdom as the ultimate recipient of the military aircraft. *Id.* at 708. The court also noted that "[t]here is no mention of any involvement of [the United Kingdom], such as approval of the items, as a condition of Trimble's receipt of payment." *Id.*

The contracting parties' intent cannot be shown by merely identifying some incidental benefit the third party may derive from the contract. Many government contracts provide benefits to the public at large or smaller constituencies without extending the right to sue under the contract. That is why courts generally presume parties that benefit from a government contract are merely incidental beneficiaries and may not enforce the contract absent a clear intent to the contrary. *GECCMC*, 671 F.3d at 1033. This presumption cannot be overcome by a contract's recitation of interested constituencies, *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1212 (9th Cir. 2000), or even a showing that the contract "operates to the [third parties'] benefit and was entered into with [them] in mind," *Orff v. United States*, 358 F.3d 1137, 1147 (9th Cir. 2004).

45

Thus, Plaintiff bears an exceptional burden to prove the LOGCAP IV Contract "reflects the express or implied intention of the parties to benefit the third party." *Trimble*, 484 F.3d at 706.

Courts have routinely rejected claims from third parties seeking to claim intended third-party beneficiary status based on non-specific contract language. *Mathis v. GEO Group, Inc.* illustrates this point. There, the court dismissed a federal prisoner's third-party beneficiary claims against the federal contractor operating the prison. *Mathis v. GEO Grp., Inc.*, No. 2:08-CT-21-D, 2009 WL 10736631, at *2 (E.D.N.C. Nov. 9, 2009). To determine whether the plaintiff could meet his "particularly difficult [burden] to prove [third-party beneficiary status] in connection with a federal government contract," the court looked to contract provisions and the underlying statutory scheme. *Id.* at *20−21. The plaintiff argued that he was a third-party beneficiary because the contract required the contractor to provide "all essential health care services" as well as education, recreation activities, and telephone services to plaintiff. *Id.* at 20. But the court focused on language disclaiming government liability to third parties and identifying the government contracting officer as the only party that can take formal action for unsatisfactory performance, and it concluded that these clauses reflected the parties' intent *not* to confer third-party beneficiary status. *Id.* ("At most, plaintiff is an indirect beneficiary of the healthcare provisions in the contract.").

It makes sense that courts narrowly restrict third-party beneficiary status for government contracts given the profound implications of that rare status. If an individual or a group establishes it is a third-party beneficiary to a government contract, that third party can sue either contracting party to secure the benefits promised by the contract.[33] The government would be besieged with

---

[33] The implications of this position in the context of this suit are especially significant. If U.S. soldiers serving at bases supported by Fluor's LOGCAP IV Contract are third-party beneficiaries, those soldiers can sue both Fluor *and the U.S. Government* for allegedly breaching the LOGCAP IV Contract. Such an interpretation could allow a well-pleaded breach-of-contract count to

breach-of-contract suits by non-parties whenever a contract did not benefit a non-party to the degree the non-party hoped. *See, e.g.*, *Roedler v. Dep't of Energy*, 255 F.3d 1347, 1350−55 (Fed. Cir. 2001) (breach-of-contract suit filed by utilities' ratepaying customers). Contractors similarly would face a deluge of breach lawsuits asking courts to enforce ambiguous contract language. *See, e.g.*, *Stokes v. Westinghouse Savannah River Co.*, 206 F.3d 420, 428−29 (4th Cir. 2000) (contractor employee seeking to enforce severance pay provision in government contract); *GEO Grp., Inc.*, 2009 WL 10736631 (federal prisoner asserting breach of contract against prison operator).

In sum, government contracts rarely grant third-party beneficiary status, courts recognize such status only after a clear demonstration that *both* parties to a contract intended to grant the third-party not only a direct benefit, and thus third-party beneficiary status is an "exceptional privilege." *German Alliance Ins. Co. v. Home Water Supply Co.*, 226 U.S. 220, 230 (1912).

### B.    The Complaint Does Not Sufficiently Plead Third-Party Beneficiary Status.

Plaintiff has not come close to overcoming the strong presumption against third-party beneficiary status under the LOGCAP IV Contract. *See Trimble*, 484 F.3d at 706. Plaintiff asserts only a few allegations purportedly supporting his third-party beneficiary status, and these allegations fall far short of showing both contracting parties intended Plaintiff to be able to enforce the LOGCAP IV Contract. The Complaint includes only three paragraphs supporting his purported third-party beneficiary status. Each is a conclusory statement announcing Plaintiff's desired legal conclusion. *See* ECF 1 ¶ 125 ("The LOGCAP Materials were intended to directly benefit members of the United States armed forces, including Plaintiff at Bagram Airfield, including Plaintiff [sic]."); *id.* ¶ 126 ("Members of the United States armed forces, including Plaintiff, were the intended third party beneficiaries of these contracts."); *id.* ¶ 127 ("Defendants intended the

---

eviscerate *Feres v. United States*, 340 U.S. 135 (1950), under which the United States is not liable in tort for injuries incidental to active duty military service.

LOGCAP Materials to benefit individual U.S. soldiers."). Such conclusory assertions are insufficient. Plaintiff must plead *facts*, not mere legal conclusions. *See Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). The Court can disregard these three paragraphs, which leaves the Complaint devoid of any allegations supporting Plaintiff's third-party beneficiary status.

Even if these bare legal conclusions were enough to establish Fluor's intentions, Plaintiff does not even try to establish the U.S. Army's intent to confer third-party beneficiary status. This alone is fatal to his claim. Third-party beneficiary status cannot be created in a unilateral manner. The intent of *both* parties must be reflected—including the intentions of the Government. *Trimble*, 484 F.3d at 706; *see also Flexfab*, 424 F.3d at 1263 ("[F]or third–party beneficiary status to lie, the contracting officer must be put on notice, by either the contract language or the attendant circumstances, of the relationship between prime contractor and the third-party . . . so that an intent to benefit the third party is fairly attributable to the contracting officer.").

## C.    The Contract and Other Evidence Confirms Plaintiff Was Not an Intended Third-Party Beneficiary.

Even looking beyond Plaintiff's allegations, Plaintiff cannot establish he was an intended third-party beneficiary. There are no LOGCAP IV Contract provisions stating that Plaintiff would directly benefit or suggesting that Plaintiff (and the thousands of similarly situated military service members) could sue to enforce the contract.[34] *See Roedler*, 255 F.3d at 1350-51. Likewise, there are no contract provisions involving Plaintiff in contract administration, such as approval of items or services. *See Trimble*, 484 F.3d at 708. Plaintiff's Complaint identifies no such provisions, opting instead to merely repeat his desired legal conclusion. *See* ECF 1 ¶¶ 125−27.

---

[34] The Complaint does not attach the LOGCAP IV Contract or Task Order 0005, but references both documents extensively. *See, e.g.*, ECF 1 ¶¶ 44, 45, 46, 47, 48, 49, 50, 51, 53, 54, 55, 56, 61, 103, 108, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132. Thus, the documents are incorporated into the Complaint by reference and may be considered as part of a Rule 12(b)(6) motion. *See Cobin.*, 561 F. Supp. at 550.

On the other hand, the LOGCAP IV Contract contains language definitively *rejecting* Plaintiff's unsupported theory. To wit, the contract incorporates FAR provisions that provide a detailed framework for any contract disputes, which make clear that such disputes would involve the two contracting parties—not some unlimited group of soldiers. *See, e.g.*, Ex. 27, LOGCAP IV Contract § I-111 at 40 (incorporating 48 C.F.R. § 52.233-1) (Disputes); *id.* § I-184 at 41 (incorporating 48 C.F.R. § 52.249-6) (Termination); *id.* § I-190 at 41 (incorporating 48 C.F.R. § 52.249-8) (Default); *id.*. Beyond that, the LOGCAP IV Contract PWS explicitly states that the "[r]equirements shall focus on contingency skills and capabilities necessary to support *Army or Department of Defense component* . . . ." *Id.* § C-1.1 at 13 (emphasis added). The PWS also notes that the LOGCAP IV requirements are "mission-critical services for the *United States military*." *Id.* § C-1.3 at 13 (emphasis added). These statements confirm the obvious: Fluor's contractual obligations were to support the U.S. military's overall contingency operations, not to benefit individual soldiers and thereby grant each soldier a right to claim breach.

To find otherwise would lead to absurd results and chaos. If all "[m]embers of the United States armed forces were the intended third party beneficiaries of" the LOGCAP IV Contract—as Plaintiff alleges, ECF 1 ¶ 126—then tens of thousands (if not more) military members stationed at LOGCAP-supported bases over the past few decades could independently file breach-of-contract claims against LOGCAP contractors *and the U.S. Government* for any number of real or perceived complaints. There is no reason to think that the contracting parties intended such an extreme result. *Flexfab*, 424 F.3d at 1260-63 ("But the government does not lightly consent to suit."); *GEO Grp., Inc.*, 2009 WL 10736631, at *18 ("Given that the United States enters thousands of government contracts per year totaling more than a billion dollars, third-party beneficiary status is particularly difficult to prove in connection with a federal government contract.").

Plaintiff failed to meet his exceptional burden of establishing that Fluor and the United States intended him to be a third-party beneficiary to the LOGCAP IV Contract. Plaintiff does not even attempt to allege that the Government intended for him to be a third-party beneficiary, a legal prerequisite to such status. In any event, Plaintiff's allegations do not and cannot support his extraordinary position. Nor can his allegations overcome contradictory evidence in the contract documents themselves. As a result, Plaintiff's breach-of-contract claim must fail.

## CONCLUSION

The Court should dismiss this suit in its entirety based on "combatant activities" preemption, and, separately, based on the Army's withholding of essential classified information. The Court should also dismiss Plaintiff's breach-of-contract claim (Count VII) because Plaintiff is not a third-party beneficiary of Fluor's government contract.

Dismissal of Plaintiff's claims would not leave him without remedies, nor would it leave Fluor without accountability. Like any soldier injured in the line of duty, Plaintiff is entitled to *federal* remedies under the Veterans' Benefits Act. *See*, *e.g.*, 38 U.S.C. §§ 1110, 1131; *see also* ECF 3 ("The Department of Defense and/or The Army may have a subrogation interest in this matter due to compensation or other benefits paid to Plaintiff. The Department of Veterans Affairs may also have a subrogation interest in this matter due to medical benefits and other disability benefits provided to Plaintiff as a result of his injuries."). Likewise, contractors who perform essential functions on overseas battlefields *are* accountable to the federal government under their contract and the Contract Disputes Act. *See Al Shimari*, 679 F.3d at 242 (J. Wilkinson, dissenting) ("In sum, it is silly to think that without tort suits, military contractors will simply be wandering around war zones unsupervised. What the chain of command does for military officers, contract law does for military contractors."). In short, the issues raised by Plaintiff's uniquely federal claims should be addressed in uniquely federal forums—not under state tort law.

Respectfully submitted,

NEXSEN PRUET, LLC

s/Andrew A. Mathias
William W. Wilkins, Fed. ID No. 4662
Andrew A. Mathias, Fed. ID No. 10166
Konstantine P. Diamaduros, Fed. ID No. 12368
55 E. Camperdown Way, Suite 400 (29601)
Post Office Box 10648
Greenville, South Carolina 29603-0648
Telephone: 864.370.2211
Facsimile: 864.282.1177
BWilkins@nexsenpruet.com
AMathias@nexsenpruet.com
KDiamaduros@nexsenpruet.com

HARTLINE BARGER LLP

Darrell L. Barger (*pro hac vice to be filed*)
1980 Post Oak Blvd.
Suite 1800
Houston, Texas 77056
Telephone: 713.759.1990
Facsimile: 713.652.2419
dbarger@hartlinebarger.com

J. Reid Simpson (*pro hac vice to be filed*)
800 N. Shoreline Blvd.
Suite 2000, North Tower
Corpus Christi, Texas 78401
Telephone: 361.866.8000
Facsimile: 361.866.8039
rsimpson@hartlinebarger.com

COVINGTON & BURLING LLP
Raymond B. Biagini (*pro hac vice to be filed*)
Daniel L. Russell Jr. (*pro hac vice to be filed*)
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: 202-662-6000
Facsimile: 202-662-6291
RBiagini@cov.com
DRussell@cov.com

51

*Attorneys for Defendants Fluor Corporation, Fluor Enterprises, Inc., Fluor Intercontinental, Inc., and Fluor Government Group International, Inc.*

February 26, 2021
Greenville, South Carolina