# Exhibit 6

# *Deposition of Lindsay Weindruch*

Lindsay Weindruch

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CHARLOTTE LOQUASTO, ET AL   )
                            )
VS.          ) C.A. NO.: 3:19-CV-01455-B
                            )
FLUOR CORPORATION, ET AL    ) JURY TRIAL DEMANDED

---------------------------------
ORAL AND VIDEOTAPED DEPOSITION OF
LINDSAY WEINDRUCH
OCTOBER 20, 2020
(REPORTED REMOTELY)
---------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF LINDSAY WEINDRUCH, produced as a witness at the instance of Mr. Peter K. Taaffe, and duly sworn, was taken in the above-styled and numbered cause on October 20, 2020, from 9:00 a.m. to 9:44 a.m., before Gina D. Ellis, CSR in and for the State of Texas, reported by machine shorthand, at 1 Rock Island Arsenal, Rock Island, Illinois, pursuant to the Federal Rules of Civil Procedure and the FIRST EMERGENCY ORDER regarding the COVID-19 State of Disaster.

## Page 2

APPEARANCES

MR. PETER K. TAAFFE
The Buzbee Law Firm
600 Travis Street, Suite 7300
Houston, Texas 77002
(713) 223-5393
ptaaffe@txattorneys.com
ATTORNEY FOR PLAINTIFFS

MR. DANIEL L. RUSSELL, JR.
MR. RAYMOND B. BIAGINI
Covington & Burling
850 10th Street NW
Washington, DC 20001
(202) 662-5420
(202) 662-5120
drussell@cov.com
rbiagini@cov.com
    - AND -
MR. DARRELL L. BARGER
Hartline Barger
1980 Post Oak Blvd., Suite 1800
Houston, Texas 77056
(361) 563-8090
dbarger@hartlinebarger.com
    - AND -
MR. J. REID SIMPSON
Hartline Barger
1105 Wooded Acres Dr., Suite 402
Waco, Texas 76710
rsimpson@hartlinebarger.com
ATTORNEYS FOR DEFENDANTS
FLUOR CORPORATION, INC.,
FLUOR ENTERPRISES, INC.,
FLUOR GOVERNMENT GROUP, INC.,
FLUOR INTERCONTINENTAL, INC.

MS. KATHY S. KIMMEL
Fox Rothschild
222 S. Ninth St., Suite 2000
Minneapolis, Minnesota 55402-3338
(612) 607-7306
kkimmel@foxrothschild.com
ATTORNEY FOR DEFENDANT
ALLIANCE PROJECT SERVICES, INC.

## Page 3

MAJOR TARIK J. DOWNIE
8110 Little Ridge Lane
Farfax Station, Virginia 22039
(850) 766-3360
Tarik.j.downie.mil@mail.mil
    - AND -
MR. SCOTT A. JOHNSON
1 Rock Island Arsenal
Rock Island, Illinois 61299
(309) 502-1825
scott.a.johnson84.civ@mail.mil
ATTORNEYS FOR THE UNITED STATES ARMY

ALSO PRESENT:
Mr. Tod Eric Nickles
Alliance Project Services

ZOOM HOST:
Jesus Garcia

## Page 4

                INDEX
                                        PAGE
Appearances...........................................2-3
Stipulations........................................  5
LINDSAY WEINDRUCH
  EXAMINATION BY MR. TAAFFE...................... 9
  EXAMINATION BY MR. RUSSELL..................... 29

...................................................
Reporter's Certification............................ 33

                EXHIBITS

NO.   DESCRIPTION                              PAGE

Exhibit 1    Deposition notice...................... 32
Exhibit 2    Touhy letter............................ 32
Exhibit 3    Declaration of Ms. Lindsay Weindruch.... 32

                                                    5

1              S-T-I-P-U-L-A-T-I-O-N-S
2
3
4         IT IS STIPULATED and agreed by and
5    between counsel for the respective parties hereto that
6    the deposition of the witness named in the caption
7    hereto may be taken at this time and place before the
8    officer named in the caption hereto; signature having
9    been waived; and that said deposition, or any part
10   thereof, when so taken may be used on the trial of this
11   case with the same force and effect as if the witness
12   were present in court and testifying in person.

                                                    6

1                   P-R-O-C-E-E-D-I-N-G-S
2
3         THE REPORTER: Today's date is October 20,
4    2020. This is the oral and videotaped deposition of
5    Lindsay Weindruch. It is being conducted remotely in
6    accordance with the First Emergency Order regarding the
7    COVID-19 State of Disaster, Paragraphs 2.b. and c. The
8    witness is located at 1 Rock Island Arsenal, Rock Island
9    Illinois. My name is Gina Ellis, Court Reporter, CSR
10   No. 2822. I am administering the oath and reporting the
11   deposition remotely by stenographic means from my home
12   residence in Houston, Texas. My business address is
13   11706 Playa Court in Houston, Texas.

                                                    7

1              LINDSAY WEINDRUCH,
2    having been first duly sworn, testified as follows:
3
4         MR. TAAFFE: Major Downie, would you like
5    to make the statement?
6         MAJOR DOWNIE: Yes. Good morning. I'm
7    Major Tarik Downie, an attorney with the United States
8    Army Litigation Division present here today representing
9    the United States Army. As required by 32 CFR Section
10   516.48, my representation of Ms. Lindsay Weindruch is
11   limited to matters related to the release of official
12   Army information and to her, in her role as -- she
13   currently serves as a contracting officer for the U.S.
14   Army, Army Contracting Command, Rock Island. In
15   accordance with 32 CFR Section 516.48 and Army
16   Regulation 27-40, Chapter 7, she's only authorized to
17   disclose her personal opinions and factual observations
18   related to Fluor's integration within the military and
19   contractual apparatus at Bagram Airfield as Fluor
20   performed under the LOGCAP IV Contract, Task Order 5,
21   where Fluor provided personnel to support the Army's
22   Force Protection Screening Cell at Bagram, her factual
23   information relating to Entry Control Points overseen by
24   the military and other factual matters addressed in her
25   declaration.

                                                    8

1         She is authorized to provide this information
2    in the matter of Loquasto v. Fluor Corporation. She is
3    specifically prohibited from disclosing certain
4    information without additional justification and
5    approval as required by 32 CFR Section 516.49. She may
6    not provide classified or privileged information or
7    provide information that is otherwise protected from
8    public disclosure, such as Privacy Act protected
9    information, without appropriate additional
10   authorization. She may not purport to testify on behalf
11   of the Department of the Army or Department of Defense,
12   or announce what it is or was the Army's official policy
13   position on any issue within the Army's jurisdiction.
14   She may not provide opinion testimony or expert
15   testimony regarding official Army or DOD information
16   without additional justification and approval as
17   required by 32 CFR Section 516.49. Therefore, during
18   this deposition, she is not authorized to provide
19   answers to hypothetical questions. As such, to the
20   extent any testimony regarding real or hypothetical
21   scenarios are elicited regarding official Army or DOD
22   information, that is not the view or position of the
23   Department of the Army or the Department of Defense and
24   should not be accorded any additional weight as would
25   accompany an expert's testimony. In accordance with 32

|   | 9 |
|---|---|
| 1 | CFR Section 516.48, I'm required to instruct her not to |
| 2 | answer questions that fall within the prohibited |
| 3 | categories. |
| 4 | It is the Department of the Army's policy that |
| 5 | official information should generally be made reasonably |
| 6 | available for use in private litigation, unless the |
| 7 | information is classified, privileged, or otherwise |
| 8 | protected from public disclosure.  The Army's policy is |
| 9 | one of strict impartiality in private litigation in |
| 10 | which the Army is not a named party or does not have a |
| 11 | significant interest as that term is defined in 32 CFR |
| 12 | Section 516, Appendix F.  Therefore, my role during this |
| 13 | deposition is solely to protect the Army's interest and, |
| 14 | as such, my intervention will be limited to that end. |
| 15 | The parties are responsible for advancing their |
| 16 | respective positions and objections as it relates to |
| 17 | matters outside the Army's interest.  Thank you. |
| 18 |   |
| 19 | EXAMINATION BY MR. TAAFFE: |
| 20 | Q.  Could you state your name, please? |
| 21 | A.  Lindsay Weindruch. |
| 22 | Q.  And who is your employer? |
| 23 | A.  Army Contracting Command, Rock Island. |
| 24 | Q.  Is that a division of the United States Army? |
| 25 | A.  Yes. |

|   | 10 |
|---|---|
| 1 | Q.  Have you ever worked for any of the Fluor, |
| 2 | F-L-U-O-R, companies? |
| 3 | A.  No. |
| 4 | Q.  How long have you held your current position? |
| 5 | A.  My current like contracting position? |
| 6 | Q.  Yes. |
| 7 | A.  Since 2012. |
| 8 | Q.  Have you always been primarily stationed at |
| 9 | Rock Island, Illinois? |
| 10 | A.  Yes. |
| 11 | Q.  Prior to 2012 what did you do? |
| 12 | A.  I was a contract specialist for the Army |
| 13 | Contracting Command.  So, I've been in contracting since |
| 14 | 2006. |
| 15 | Q.  Okay.  Okay. |
| 16 | A.  I became a contracting officer in 2012. |
| 17 | Q.  Understood.  Okay.  So, a couple of just |
| 18 | preliminary things.  Exhibits to the deposition will be, |
| 19 | No. 1 will be the deposition notice.  No. 2 will be the |
| 20 | Touhy letter.  And No. 3 will be your declaration.  Do |
| 21 | you have a copy of your declaration in front of you? |
| 22 | A.  I do.  I can pull it up. |
| 23 | Q.  Okay.  I'll be going through that with you, but |
| 24 | that will be the only -- I won't be going through any |
| 25 | other exhibits besides that one. |

|   | 11 |
|---|---|
| 1 | A.  Okay.  Let me see if I can print that quickly |
| 2 | to our printer. |
| 3 | Q.  Sure. |
| 4 | A.  Okay.  I'm gonna go check and see if it |
| 5 | printed. |
| 6 | Q.  Okay. |
| 7 | A.  Sorry.  I'm back and I have it. |
| 8 | Q.  Great.  Okay.  So, just a few preliminary |
| 9 | things.  One, I'm obviously here to ask you some |
| 10 | questions about your declaration.  In the course of |
| 11 | doing that, it is not my intent to try to elicit any |
| 12 | testimony from you that would be privileged, |
| 13 | attorney-client privileged communications; and that |
| 14 | would be anything between you and any Army lawyer or |
| 15 | government lawyer.  Secondly, I take very seriously the |
| 16 | admonitions that Major Downie gave at the beginning of |
| 17 | the deposition and also set out in his Touhy letter to |
| 18 | me.  And so, it is my intent to stay within, well within |
| 19 | the boundaries that have been set for me on this |
| 20 | deposition.  So, therefore, even if I may ask a question |
| 21 | that you may want to go beyond the scope of the |
| 22 | declaration, I'm gonna ask you to please be sure to stay |
| 23 | within the scope of the declaration and the boundaries |
| 24 | that Major Downie set at the beginning of this |
| 25 | deposition.  Okay?  Good with you? |

|   | 12 |
|---|---|
| 1 | A.  (Affirmative nod.) |
| 2 | Q.  Okay.  And you just -- have you ever been |
| 3 | deposed -- |
| 4 | A.  Yes. |
| 5 | Q.  -- before? |
| 6 | A.  No. |
| 7 | Q.  Okay.  So, the key thing, and this is a little |
| 8 | different since we're doing Zoom these days, is you just |
| 9 | have to -- even though we can see you and the court |
| 10 | reporter can probably see you, it's important to |
| 11 | verbalize all of your answers rather than nodding your |
| 12 | head or shaking your head. |
| 13 | A.  Okay. |
| 14 | Q.  All right.  So, did you draft the declaration? |
| 15 | Did you actually type it yourself? |
| 16 | A.  No. |
| 17 | Q.  Who typed it? |
| 18 | THE WITNESS:  Major Downie, was that you, |
| 19 | or Lou? |
| 20 | Q.  (BY MR. TAAFFE)  Yeah, well, he's not -- I |
| 21 | don't want Major Downie giving any testimony.  So, if -- |
| 22 | you believe that someone from the Army legal department |
| 23 | drafted it for you? |
| 24 | MR. RUSSELL:  Objection, form. |
| 25 | A.  Yeah.  I mean, I believe so.  It was sent to me |

3 (Pages 9 to 12)

|  | 13 |  | 15 |
|---|---|---|---|

13
1  and asked if I was in agreement with it; and then if I
2  was, to sign it.
3      Q. (BY MR. TAAFFE) Okay. Did you interact with
4  any Fluor employees or lawyers in the course of drafting
5  this and signing this declaration?
6      A. No.
7      Q. Okay. Okay. So, No. 2 in the declaration
8  says, "I have personal knowledge of the facts stated in
9  this declaration, and if called as a witness, could
10  competently testify to them." So, are you -- do you
11  have any legal training?
12      A. No.
13      Q. Okay. So, there's a -- I guess let me start
14  off. When you swore that you had personal knowledge of
15  facts, what did you mean by the term "personal
16  knowledge"?
17      A. I was the contracting officer at the time. So,
18  I was involved in, you know, all of the events that
19  occurred, you know, with meetings, letters,
20  investigations, all of that.
21      Q. Okay. So when you say "all the events that
22  occurred," what events are you referring to?
23      A. Well, the suicide bombing event at Bagram, I
24  was the one that was notified by Fluor and the
25  government that it had taken place.

14
1      Q. Okay. You were not at Bagram when the bombing
2  took place?
3      A. No. I was in Rock Island.
4      Q. Were you part of the negotiations between Fluor
5  and the government that led up to the execution of the
6  LOGCAP IV contract?
7      A. Well, the LOGCAP IV contract was awarded
8  competitively; but, I mean, I have been part of
9  negotiations before for different periods of
10  performances.
11      Q. Okay. Were you involved in --
12      A. So, I would need --
13      Q. Go ahead. Sorry.
14      A. Go ahead. I would just say I would need more
15  clarification on what period you're talking about.
16      Q. Okay. Let's talk about Task Order 5. Were you
17  a part of any negotiations that led up to the execution
18  of Task Order 5?
19      A. Execution of periods of performance, yes. Not
20  the award of Task Order 5. So like option periods,
21  extension periods, I was part of negotiations with that.
22      Q. Okay. And have you ever been to Bagram Air
23  Force base?
24      A. Yes.
25      Q. When was, when was the last time you were

15
1  there?
2      A. It probably was 2012 time frame.
3      Q. What was your purpose for being there in 2012?
4      A. We did award fee. Evaluation board conducted
5  them at Bagram.
6      Q. Okay. And what is that, award fee?
7      A. Yeah. At the time Fluor had a cost plus award
8  fee contract. So we would have to go and evaluate
9  performance and determine the value of fee that they got
10  based on their performance that they would receive.
11      Q. And so, since 2012 you have not stepped foot
12  into -- onto Bagram Airbase or Airfield?
13      A. No. No.
14      Q. So, when you were doing that audit in 2012,
15  exactly what were you doing?
16      A. Well, it was -- you, basically, you would go
17  in; and there was a board that would determine the
18  percentage of, you know, fee pool that Fluor would be
19  awarded. So, the government participated and Fluor.
20  So, I would brief during the award fee board and
21  basically act as the contracting officer, you know, if
22  there was questions on how the process went. And so,
23  that was basically the purpose, is we would hold the
24  award fee board and listen to Fluor's briefing. And
25  then the government would brief on performance. And

16
1  then after the briefing, the government -- the award fee
2  board members would sit together and determine the
3  amount of award fee Fluor received based on their
4  performance for that period.
5      Q. Okay. Prior to your deposition did you meet
6  with anyone other than members of the Army legal team?
7      A. No.
8      Q. Okay. No. 3 you say, "Fluor's performance of
9  essential sustainment support services for the U.S. Army
10  in Afghanistan fell within the scope of LOGCAP IV
11  Contract," right?
12      A. Yes.
13      Q. All right. What are essential sustainment
14  support services?
15      A. Well, there's a whole host of services Fluor
16  performs at Bagram. They do -- you know, they operate
17  the dining facilities. They do the laundry. They do
18  repairs and maintenance on facilities. You know, they
19  order supplies, maintain supplies. They do some of the,
20  like, minor construction activities if there's minor
21  facilities that need to be constructed. They do
22  airfield operation. You know, there's a whole host of
23  base life support services that are offered under the
24  LOGCAP Contract.
25      Q. Is that all set out in the LOGCAP Contract

Lindsay Weindruch

**Page 17**

1  itself?
2  A. Yes. There is a performance work statement
3  attached to the LOGCAP Contract that lists out all of
4  the available services. And then there will be what is
5  called a service matrix that's attached to the contract
6  which will X the services that Fluor is performing at
7  any given time, you know, on the contract. Obviously,
8  you know, the services can change if things -- if
9  services are added or de-scoped over time.
10  Q. And is that, would that all be in writing?
11  A. Yeah, it should all be in the contract mod, in
12  the contract itself. There's modifications done that
13  incorporate those service matrix every period it's
14  awarded.
15  Q. Okay. Next statement is, the first clause
16  says, "Fluor augmented and was integrated within the
17  military at Bagram Airfield." So, subsequent to 2012
18  when you were actually there, how do you have personal
19  knowledge that Fluor augmented and was integrated within
20  the military at Bagram Airfield?
21  A. Because that's the scope of the LOGCAP
22  Contract. Essentially, LOGCAP is an augmentation
23  contract that supports the military. And we have
24  regular communications, you know, with people located at
25  Bagram. Like our ACOs are military. Some of the

**Page 18**

1  requiring activity obviously is military. So, I mean,
2  Fluor works alongside them, the military, for different,
3  you know, jobs that they do.
4  Q. Okay. But how do you have personal knowledge
5  of that? Did you observe it with your eyes, observe
6  that --
7  A. When I've, when I've went to Bagram, yes, we've
8  seen some of it. And then, um, you know, like I said,
9  we have daily communications, you know, with the
10  military on the ground, you know, ACOs, et cetera, that,
11  you know, work with Fluor.
12  Q. Got it. But since 2012 you don't have any --
13  you haven't eyeballed, actually observed, Fluor working
14  alongside the military at Bagram Airfield, correct?
15  A. No.
16  Q. Any information you have about what Fluor has
17  done at Bagram Airfield since 2012 is simply based on
18  what other people have told you, correct?
19  A. I mean, it would be based on quality,
20  surveillance checks, and, you know, audits of the
21  contract and different things, yes.
22  Q. Okay. And those would all be done via someone
23  telling you about it or you reading reports?
24  A. Both. It would be a combination of both.
25  There would be discussion and there would be reports

**Page 19**

1  submitted for the quality checks.
2  Q. Okay. Next statement is -- the next clause of
3  that sentence says, "and Fluor worked alongside the
4  military in performing services under the LOGCAP
5  Contract." So, same question. Since 2012 do you have
6  any personal knowledge of Fluor working alongside the
7  military in performing services under the LOGCAP IV
8  Contract at Bagram Airfield?
9  A. Are you asking if I've seen it visually again?
10  Q. Yes.
11  A. No.
12  Q. Okay. So any information you have to support
13  that statement is based on information that people have
14  either told you verbally or via sending you reports; is
15  that right?
16  A. Yes.
17  Q. And this person that committed the act in
18  November of 2016, the bombing, do you know where he was
19  working?
20  A. He was working in one of the maintenance areas
21  where they did maintenance, I believe, on vehicles where
22  I believe his position was to dispose of oil and, like,
23  hazardous waste --
24  Q. Okay. And you --
25  A. -- at Bagram.

**Page 20**

1  Q. And that's information that you had received
2  from other people, correct?
3  A. Yes.
4  Q. You don't have any personal knowledge? You
5  didn't observe him? You didn't see him doing any kind
6  of work, right?
7  A. No.
8  Q. All right. Next one is No. 4. You say, "I
9  have firsthand knowledge of Fluor's integration within
10  the military and contractual apparatus at Bagram
11  Airfield as Fluor performed under the LOGCAP IV
12  Contract." So, when you say you have firsthand
13  knowledge, are you talking about what you learned in
14  your visit in 2012?
15  A. Well, that. And then, obviously, I oversee the
16  contract on a daily basis. Again, you know, we would
17  coordinate with individuals at Bagram and discuss, you
18  know, the contract and, you know, like again, reports.
19  All of that are reviewed.
20  Q. Okay. So what do you -- how do you define
21  "firsthand knowledge"?
22  A. Well, to me, it doesn't necessarily need to be
23  visual. I mean, I have knowledge. I, you know, had
24  discussions. I know that that's part of the contract is
25  where Fluor augments the military and works alongside of

5 (Pages 17 to 20)

Ross Reporting Services, Inc.                                281-484-0770

                                                                21
1    them.  I mean, Bagram is a military base with a large
2    amount of soldiers.  So, to me, that would be firsthand
3    knowledge is, you know, I do have knowledge of the
4    contract and what is within scope of the contract; and
5    then I've talked to many individuals located in
6    Afghanistan on the performance.  And, you know, I mean,
7    we have ACOs, Administrative Contracting Officers, all
8    over, you know, Afghanistan that oversees performance,
9    along with quality, personnel, and property, et cetera.
10       Q.  Okay.  So you talked about having firsthand
11   knowledge of the contract.  Are you talking about the
12   LOGCAP IV contract?
13       A.  Yes.
14       Q.  Is there any part of the LOGCAP IV contract
15   that's not in writing?  Are there any verbal agreements
16   that maybe you would know about or someone else would
17   know about?  Or if I wanted to know exactly, I need to
18   know all four corners of this LOGCAP IV Contract, is
19   that all something that's in writing?
20       A.  For it to be a valid agreement and change, yes,
21   it needs to be in writing.  And the only individuals
22   that can change the contract are a warranted
23   Administrative Contracting Officer or the PC -- the
24   contracting officer, which would have been myself at the
25   time.

                                                                22
1        Q.  Okay.  And that would -- if that was done, it
2    would have to be done in writing and signed off by all
3    the parties, correct?
4        A.  Well, they're not always signed off by -- like,
5    we issue Letters of Technical Direction; but there are
6    statements in there that if, you know, Fluor would not
7    be in agreement with it, then they're to notify within a
8    specific, you know, period of time.  And then the con --
9    like, when we issue like change orders to the contract,
10   then, yes, Fluor would bilaterally sign those
11   modifications that incorporated them.
12       Q.  Okay.  The next one is No. 5 and it's long.
13   And I'm gonna read it slowly so that Gina, hopefully,
14   can get it.  It says, "On a daily basis, Fluor personnel
15   interacted with military and civilian Administrative
16   Contracting Officers, or ACOs, Procuring Contracting
17   Officers, or PCOs, LOGCAP Support Officers, or LSOs, and
18   various other military representatives, including
19   personnel within the Defense Contracting Management
20   Agency, or DCMA, and Army Contracting Command, ACC."
21   So, how do you have personal knowledge to support that
22   statement?
23       A.  Well, I would be the PCO.  So, you know, I
24   would talk to Fluor almost probably on a daily basis.
25   And then the Administrative Contracting Officers and the

                                                                23
1    LOGCAP Support Officers and even DCMA acted as, like,
2    Administrative Contracting Officers at one time.
3    That's, essentially, that's their function.  And, like I
4    said, we would talk to them some -- like on a daily
5    basis.  And, you know, they would go out and coordinate
6    with Fluor personnel at Bagram.  You know, they would be
7    doing their quality checks.  They would do, you know,
8    contractual matters, issue Letters of Technical
9    Direction or undefinitized change orders, which, I mean,
10   at the, you know, at the time, those are daily
11   occurrences on the contract.
12       Q.  Okay.  Well, you know about your interactions
13   with Fluor, obviously, because you had them, right?
14       A.  Yeah, but I'm copied on all those e-mails from
15   the Administrative Contracting Officers issuing
16   direction, like letters of, Letters of Technical
17   Direction and UCOs, et cetera, to Fluor.
18       Q.  Okay.  Okay.  No. 6, it says, "Under the LOGCAP
19   IV Contract Data Requirements List, or CDRLs, Fluor
20   submitted to the Army a variety of deliverables on a
21   daily or weekly basis, including personnel status
22   reports, cost reports, forecasts of expenditures, et
23   cetera, regarding activities at Bagram."  So, how do you
24   have personal knowledge of that statement?
25       A.  Because that is the con -- like, that is terms

                                                                24
1    and conditions of the contract where they're required to
2    submit these reports.  Depending on the report, there is
3    certain frequency.  And, again, they're submitted to
4    myself with a host of other, you know, government
5    personnel.
6        Q.  Okay.  What are personnel --
7        A.  So, if they -- what?
8        Q.  Go ahead.
9        A.  I was just gonna say if they didn't submit it,
10   then, you know, that would be -- you know, they wouldn't
11   be following the terms of the contract.
12       Q.  Okay.  So that's something, that requirement to
13   submit those deliverables, those are -- that's set out
14   in the actual LOGCAP Contract; is that right?
15       A.  Yes.  It's part of the contract award.  There's
16   a list of required reports, or CDRLs, that -- and it
17   lists out the frequency and who they need to go to, be
18   submitted to.
19       Q.  Just for the court reporter, when you said
20   CDRLs, you're talking about the C-D-R-Ls?
21       A.  Yeah, the Contract Data Requirement List.
22       Q.  Okay.  So, what are personnel status reports?
23       A.  So, those are -- Fluor will submit on a daily
24   basis -- every base in Afghanistan, they will list out
25   with every personnel, like every individual located on

Lindsay Weindruch

25

1  that base and then, you know, what their status is, if
2  they're on leave, if they're working, et cetera.  So
3  they have to list out -- like, on a daily basis they
4  submit a report tracking all of their personnel in
5  Afghanistan.
6      Q.  Okay.  By the way, do you oversee any other
7  contracts besides the Fluor LOGCAP IV Contract?
8      A.  Well, I'm no longer on the Fluor contract; so
9  yes.  And at the time I also oversaw the DynCorp
10  Afghanistan contract in the south -- Afghanistan South.
11     Q.  Okay.  When did you stop having involvement
12  with the Fluor contract?
13     A.  Probably 2018, beginning of 2018.
14     Q.  Okay.  Okay.  The next one, and this is gonna
15  be long, I'll read it slowly, "Pursuant to Task Order
16  0005, PWS Section 5.22.03, Fluor provided personnel to
17  support the Army's Force Protection Screening Cell at
18  Bagram, and this included providing badges to those
19  approved by the Army and providing personnel at Entry
20  Control Points overseen by the military."  All right.
21  So, for that first sentence, is that just -- are you
22  just summarizing what's contained in Task Order 5, PWS
23  Section 5.22.03?
24     A.  Um, yes.  I mean, essentially, that's a summary
25  of that PWS paragraph.

26

1      Q.  So that is -- the basis of your personal
2  knowledge to make that statement is you looked at
3  Section 5.22.03 and summarized it?
4      A.  Well, I mean, also Fluor was turned on to
5  perform that service.  So, they would have to be
6  performing the service; otherwise, you know, they
7  wouldn't be meeting the terms of the contract.  And like
8  I said before, when they would do quality checks, et
9  cetera, you know, they would be considered noncompliant
10  with the contract if they weren't performing it.
11     Q.  Got it.  But as far as your personal knowledge
12  for that statement, that all comes from information
13  that's in the Task Order 5, correct?
14     A.  Yeah.  It's what's contained in their contract
15  and what they're turned on for.
16     Q.  Okay.  And when you say "turned on," what do
17  you mean by that?
18     A.  Like that service is actually activated and
19  they're required to perform that service at Bagram.  So,
20  it would be contained in that service matrix I talked
21  about earlier.
22     Q.  Okay.  Next one, next sentence is, "The Army
23  vetted and was responsible for deciding whether to
24  approve the issuance of badges."  Is that something
25  that's contained in the four corners of the Task Order

27

1  5?
2      A.  I would have to verify if that was contained,
3  actually that statement.  It actually says the Army
4  would provide the badges.
5      Q.  Okay.  So, where did you get the information to
6  support that statement?
7      A.  Because it's an inherently governmental
8  function that has to be performed by the Army.  And it's
9  not a requirement of Fluor.  And based on the Bagram,
10  like, you know, policies, et cetera, and talking to the
11  ACOs on the ground, that is the -- like, how it's
12  worked.
13     Q.  Okay.
14     A.  You know, how it operates at Bagram.
15     Q.  So that's not something you have personal
16  knowledge and that you actually observed it, saw it.
17  That's information that you learned from other people,
18  correct?
19     A.  Correct.
20     Q.  Next sentence in that section is, "If the Army
21  gave approval, Fluor issued the badges to the particular
22  individual."  Is that something that you -- the support
23  for that, did that come from reading the contract?
24     A.  Like I said, again, it would be the process
25  that was approved at Bagram and how it was occurring at

28

1  the Bagram.
2      Q.  Okay.  But, anything after 2012, you wouldn't
3  have any personal knowledge of that, correct?
4      A.  Well, again, I mean, I would -- I talked to the
5  ACOs and the individuals on the ground and Fluor is
6  turned on for a service.  So, if Fluor was not
7  performing that service, you know, it would be elevated
8  to us that they were not complying with the terms of the
9  contract.  So, have I visually seen it?  No.  But
10  there's, you know, discussions, audits, quality checks,
11  et cetera, that we have visibility of, or myself has
12  visibility of.
13     Q.  Okay.  But any information you have to support
14  this statement, "If the Army gave approval, Fluor issued
15  the badges to the particular individual," any
16  information you have to support that either came from
17  reading the contract or from hearing -- or not hearing
18  from your colleagues in the Army that were on the ground
19  at Bagram?
20     A.  Yes.
21     Q.  Okay.  And then the last sentence is, "Fluor's
22  performance of these functions was within the scope of
23  the LOGCAP IV Contract."  Is the basis for that purely
24  the -- your reading of the four corners of the LOGCAP IV
25  Contract?

7 (Pages 25 to 28)

**29**

1  A. Yes.
2  Q. Okay. I believe those are all the questions I
3  have. I appreciate your time.
4       MR. TAAFFE: I'll pass the witness.
5       MR. RUSSELL: Thanks, Peter. This is, this
6  is Dan Russell. If you don't mind, I would like to take
7  just a short break here, maybe 3 to 5 minutes; and we'll
8  jump back on the record. So if we can go off the
9  record, please.
10      MR. TAAFFE: Yeah, of course.
11      THE VIDEOGRAPHER: Going off the record at
12 9:36 a.m.
13         (Short Break.)
14      THE VIDEOGRAPHER: Going on the record at
15 9:41 a.m.
16
17 EXAMINATION BY MR. RUSSELL:
18   Q. Good morning, Ms. Weindruch. My name is Dan
19 Russell. I'm counsel for Fluor. Thank you for your
20 time today. I've got a very few number of questions
21 here for you and I think we'll be done. I noted that at
22 the outset Major Downie gave his admonitions. I want to
23 reiterate what Mr. Taaffe said, that we understand those
24 admonitions and we're not, we're not -- we don't want
25 you to go outside the scope that he has approved you to

**30**

1  testify about. And, in particular, I know in his
2  approval letter and in his statement today he made a
3  statement that the Army has prohibited you from
4  providing any testimony that would reveal classified
5  information or intelligence sources and methods. So, I
6  want to make a hundred percent clear I'm not asking you
7  to do that here. I am -- I do have a question, though.
8  And this is my question.
9       MR. RUSSELL: And, Major Downie, you'll
10 tell me if the witness cannot answer; but I believe this
11 is within bounds; and you'll tell me if I'm wrong.
12   Q. (BY MR. RUSSELL) Ms. Weindruch, are you aware,
13 are you aware of any classified information related to
14 the November 2016 suicide bombing attack on Bagram
15 Airfield?
16      MR. RUSSELL: And I'll pause there, Major
17 Downie. If you have an issue and don't want the witness
18 to answer that, I welcome your input; but I thought that
19 was inbounds.
20      MAJOR DOWNIE: I think it's fine.
21   A. Yes, I do.
22   Q. (BY MR. RUSSELL) And maybe more specifically,
23 and again, not asking you to disclose classified
24 information, have you reviewed the Classified Army 15-6
25 Report regarding the suicide bomber attack on Bagram

**31**

1  Airfield?
2       MAJOR DOWNIE: All right. Don't --
3    A. Yes.
4    Q. (BY MR. RUSSELL) Hold on.
5       MR. RUSSELL: Go ahead, Major Downie.
6       MAJOR DOWNIE: The scope of the deposition
7  is, the Touhy approval, is exactly what's in the
8  declaration. So, the 15-6 is not mentioned in any, in
9  any part of the approval or in her declaration. So, I
10 mean, I would instruct her to not answer anything about
11 15-6.
12      MR. RUSSELL: Understood, Major Downie.
13 And can I assume -- am I correct that you would instruct
14 the witness not to answer all questions regarding any
15 knowledge of the classified information in the 15-6?
16      MAJOR DOWNIE: That is correct.
17      MR. RUSSELL: Okay. I have no further
18 questions. Thank you.
19      THE REPORTER: Is that it? This is the
20 reporter. Are there any further stipulations under Rule
21 30(b)(5)(C) that need to be put into the record?
22      MR. TAAFFE: No for Plaintiff.
23      MR. RUSSELL: None here. Thank you.
24      THE REPORTER: All right. Therefore, we're
25 concluded.

**32**

1       THE VIDEOGRAPHER: Going off the record at
2  9:44 a.m.
3
4       (Exhibits 1, 2, and 3 were printed
5       and marked for identification.)

Lindsay Weindruch

### Page 33

```
 1           IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
 2                     DALLAS DIVISION
 3   CHARLOTTE LOQUASTO, ET AL   )
                                 )
 4   VS.            ) C.A. NO.: 3:19-CV-01455-B
                                 )
 5   FLUOR CORPORATION, INC.,    ) JURY TRIAL DEMANDED
     ET AL                       )
 6
 7
                REPORTER'S CERTIFICATION
 8         ORAL AND VIDEOTAPED DEPOSITION OF
                    LINDSAY WEINDRUCH
 9                 OCTOBER 20, 2020
                  (REPORTED REMOTELY)
10
11       I, Gina D. Ellis, Certified Shorthand Reporter in
12   and for the State of Texas, hereby certify to the
13   following:
14       That the witness, LINDSAY WEINDRUCH, was duly sworn
15   by the officer and that the transcript of the oral
16   deposition is a true record of the testimony given by
17   the witness;
18       That the deposition transcript was submitted on
19   _____ to the witness or to the attorney
20   for the witness for examination, signature and return to
21   me by _____;
22       That the amount of time used by each party at the
23   deposition is as follows:
24   MR. PETER K. TAAFFE.....00 HOUR(S):31 MINUTES
     MR. DANIEL RUSSELL.....00 HOUR(S):01 MINUTE
25   MR. RAYMOND B. BIAGINI.....00 HOUR(S):00 MINUTE(S)
```

### Page 34

```
 1   MR. DARRELL L. BARGER.....00 HOUR(S):00 MINUTE(S)
     MR. J. REID SIMPSON.....00 HOUR(S):00 MINUTE(S)
 2   MS. KATHY S. KIMMEL.....00 HOUR(S):00 MINUTE(S)
     MAJOR TARIK DOWNIE.....00 HOUR(S):00 MINUTE(S)
 3   MR. SCOTT A. JOHNSON.....00 HOUR(S):00 MINUTE(S)
 4
 5       That pursuant to information given to the
 6   deposition officer at the time said testimony was taken,
 7   the following includes counsel for all parties of
 8   record:
 9     MR. PETER K. TAAFFE
       ATTORNEY FOR PLAINTIFFS
10
       MR. DANIEL L. RUSSELL, JR.
11     MR. RAYMOND B. BIAGINI
       MR. DARRELL L. BARGER
12     MR. J. REID SIMPSON
       ATTORNEYS FOR DEFENDANTS
13     FLUOR CORPORATION, INC.,
       FLUOR ENTERPRISES, INC.,
14     FLUOR GOVERNMENT GROUP, INC.,
       FLUOR INTERCONTINENTAL, INC.
15
       MS. KATHY S. KIMMEL
16     ATTORNEY FOR DEFENDANT
       ALLIANCE PROJECT SERVICES, INC.
17
       MAJOR TARIK J. DOWNIE
18     MR. SCOTT A. JOHNSON
       ATTORNEYS FOR THE UNITED STATES ARMY
19
20       That $_____ is the deposition officer's
21   charges to MR. PETER K. TAAFFE for preparing the
22   original deposition transcript and any copies of
23   exhibits;
24       I further certify that I am neither counsel for,
25   related to, nor employed by any of the parties or
```

### Page 35

```
 1   attorneys in the action in which this proceeding was
 2   taken, and further that I am not financially or
 3   otherwise interested in the outcome of the action.
 4       Certified to by me this 23rd day of October, 2020.
 5
 6
                    _____
 7                  Gina D. Ellis, Texas CSR 2822
                    Expiration Date: 04/30/22
 8                  Firm Registration No. 169
                    Ross Reporting Services
 9                  11706 Playa Court
                    Houston, Texas 77034
10                  Job No. 140488
```

9 (Pages 33 to 35)

Ross Reporting Services, Inc.                                   281-484-0770