**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION**

| | |
|---|---|
| Timothy Tangen,<br><br>    Plaintiff,<br><br>        v.<br><br>Fluor Intercontinental, Inc., et al.,<br><br>    Defendants. | C/A No.: 6:21-cv-00335-JD |
| Marissa Brown,<br><br>        Plaintiff,<br><br>        v.<br><br>Fluor Intercontinental, Inc., et al.,<br><br>        Defendants. | C/A No.: 6:21-cv-01427-JD |
| Shelby Iubelt, individually, on behalf of the Estate of Tyler Iubelt, and as next friend of V.I., minor,<br><br>        Plaintiff,<br><br>        v.<br><br>Fluor Intercontinental, Inc., et al.,<br><br>        Defendants. | C/A No.: 6:21-cv-01420-JD |
| Lakeia Stokes,<br><br>        Plaintiff,<br><br>        v.<br><br>Fluor Intercontinental, Inc., et al.,<br><br>        Defendants. | C/A No.: 6:21-cv-01086-JD |

DC: 7602499-1

Maggie Bilyeu,

        Plaintiff,

    v.

Fluor Intercontinental, Inc., et al.,

        Defendants.

C/A No.: 6:21-cv-01078-JD

Addie Ford,

        Plaintiff,

    v.

Fluor Intercontinental, Inc., et al.,

        Defendants.

C/A No.: 6:21-cv-01159-JD

Marvin Branch,

        Plaintiff,

    v.

Fluor Intercontinental, Inc., et al.,

        Defendants.

C/A No.: 6:21-cv-01083-JD

Julianne Perry, individually, on behalf of the Estate of John Perry, and as next friend of L.P. and G.P., minors,

        Plaintiff,

    v.

Fluor Intercontinental, Inc., et al.,

        Defendants.

C/A No.: 6:21-cv-01250-JD

Haylee Rodriguez,

        Plaintiff,

      v.

Fluor Intercontinental, Inc., et al.,

        Defendants.

C/A No.: 6:21-cv-01084-JD

India Sellers,

        Plaintiff,

      v.

Fluor Intercontinental, Inc., et al.,

        Defendants.

C/A No.: 6:21-cv-01085-JD

Samuel Gabara,

        Plaintiff,

      v.

Fluor Intercontinental, Inc., et al.,

        Defendants.

C/A No.: 6:21-cv-01007-JD

Chris Colavita,

        Plaintiff,

      v.

Fluor Intercontinental, Inc., et al.,

        Defendants.

C/A No.: 6:21-cv-01017-JD

Robert Healy,

       Plaintiff,

    v.

Fluor Intercontinental, Inc., et al.,

       Defendants.

C/A No.: 6:21-cv-01018-JD

**MEMORANDUM IN SUPPORT OF
DEFENDANTS' RULE 12(B)(1) MOTION TO DISMISS
ALL PLAINTIFFS' CLAIMS BASED ON
THE POLITICAL QUESTION DOCTRINE AND
THE SOUTH CAROLINA DOOR CLOSING STATUTE**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

RELEVANT PROCEDURAL HISTORY ........................................................................4

    A.    The Consolidated Bagram Bomber Cases. ............................................. 4

    B.    The Related *Hencely* Matter. ...................................................................5

BACKGROUND ............................................................................................................ 6

STANDARD OF REVIEW ........................................................................................... 12

ARGUMENT.................................................................................................................. 13

I.    THESE BATTLEFIELD TORT SUITS SHOULD BE DISMISSED BASED ON THE POLITICAL QUESTION DOCTRINE.................................................... 13

    A.    These Suits Should Be Dismissed Under the First *Taylor* Factor Because the Military Exercised Direct Control Over the Challenged Conduct................. 14

        1.    The Military Controlled the Hiring, Retention, and Oversight of Nayeb. ................................................................................. 14

        2.    With Regard to the *Taylor* "Control" Factor, the *Hencely* Decision Was Legally Erroneous and Failed to Consider Key Facts. ..................... 19

    B.    These Suits Should Be Dismissed Under the Second *Taylor* Factor Because National Defense Interests Were Closely Intertwined with the Military's Decisions Governing Fluor's Conduct.................................................. 20

    C.    These Suits Should Be Dismissed Because Resolution of Fluor's Causation Defense Will Require Evaluation of Military Decision Making and Thus Implicate the Political Question Doctrine. ........................................... 22

        1.    Under South Carolina's Choice-of-Law Rules, the Law of Afghanistan Governs the Issue of Proportional Liability. ........................ 23

        2.    Afghan Law Includes Apportionment of Liability to Non-Parties. .......... 25

    D.    This Litigation Offends Basic Separation-of-Powers Principles Under Longstanding Supreme Court Precedent. ............................................. 27

II.    THE COURT SHOULD DISMISS PLAINTIFFS' CLAIMS BASED ON THE SOUTH CAROLINA DOOR CLOSING STATUTE. ...................................... 31

CONCLUSION.................................................................................................................. 35

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Accident Ins. Co., Inc. v. U.S. Bank Nat'l Ass'n*,
No. 3:16-CV-02621-JMC, 2019 WL 2865222 (D.S.C. July 3, 2019) .....................................25

*Adams v. Bain*,
697 F.2d 1213 (4th Cir. 1982) .................................................................................................12

*Aktepe v. United States*,
105 F.3d 1400 (11th Cir. 1997) ...............................................................................................30

*Al Shimari v. CACI Int'l, Inc.*,
679 F.3d 205 (4th Cir. 2012) ...................................................................................................31

*Al Shimari v. CACI Premier Tech., Inc.*,
758 F.3d 516 (4th Cir. 2014) ...................................................................................................14

*Al Shimari v. CACI Premier Tech., Inc.*,
840 F.3d 147 (4th Cir. 2016) ...................................................................................................13

*Al-Zahrahni v. Rumsfeld*,
684 F. Supp.2d 103 (D.D.C. 2010) ..........................................................................................23

*Baker v. Carr*,
369 U.S. 186 (1962) .................................................................................................................13

*Boisvert v. Techtronic Indus. N. Am., Inc.*,
56 F. Supp. 3d 750, 752 (D.S.C. 2014) ...........................................................17, 36, 37, 38, 39

*Boone v. Boone*,
345 S.C. 8, 546 S.E.2d 191 (S.C. 2001) ...........................................................................23, 24

*Burna v. United States*,
240 F.2d 720 (4th Cir. 1957) ...................................................................................................23

*Cal. Buffalo v. Glennon-Bittan Grp., Inc.*,
910 F. Supp. 255 (D.S.C. 1996) ...............................................................................................32

*Carmichael v. Kellogg, Brown & Root Servs., Inc.*,
572 F.3d 1271 (11th Cir. 2009) ....................................................................................... *passim*

*Cobb v. United States*,
191 F.2d 604 (9th Cir. 1951) ...................................................................................................23

*Collins v. RJ Reynolds Tobacco Co.*,
   92 F.3d 1177, 1996 WL 452595 (4th Cir. 1996) ........................................................33, 34, 35

*Conner v. Techtronic Indus. N. Am., Inc.*,
   No. 8:13-CV-02353-JMC, 2015 WL 3871889 (D.S.C. June 23, 2015) ................32, 33, 34, 35

*Dawkins v. State*,
   412 S.E.2d 407 (S.C. 1991) ..............................................................................................25

*Farmer v. Monsanto Corp.*,
   353 S.C. 553, 579 S.E.2d 325 (S.C. 2003) ............................................................................12

*Feres v. United States*,
   340 U.S. 135 (1950)...............................................................................................4, 27, 28

*Fung Lin Wah Enters. Ltd. v. E. Bay Imp. Co.*,
   465 F. Supp. 2d 536 (D.S.C. 2006)......................................................................................12

*Gilligan v. Morgan*,
   413 U.S. 1 (1973).............................................................................................................28

*Grimes v. Young Life, Inc.*,
   No. 8:16-1410-HMH, 2017 WL 5634239 (D.S.C. Feb. 17, 2017).........................................24

*Hencely v. Fluor Corp., Inc.*,
   475 F.Supp. 3d 464, 467-68 (D.S.C. 2020) ..........................................................................13

*Hencely v. Fluor Corp., Inc.*,
   No. 6:19-CV-00489-BHH, 2020 WL 2838687 (D.S.C. June 1, 2020)............................ *passim*

*Hughes v. Med. Depot, Inc.*,
   No. 2:18-CV-2187-RMG, 2019 WL 1772401 (D.S.C. Apr. 23, 2019) .............................24, 25

*In re KBR, Inc., Burn Pit Litig.*,
   744 F.3d 326 (4th Cir. 2014) ...................................................................................... *passim*

*In re KBR, Inc., Burn Pit Litig.*,
   893 F.3d 241 ...............................................................................................14, 16, 19

*KJ Appliance Ctr., LLC v. BSH Home Appliances Corp.*,
   No. 2:19-cv-795-RMG, 2020 WL 219600 (D.S.C. Jan. 15, 2020).........................................25

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
   313 U.S. 487 (1941).........................................................................................................23

*Lebron v. Rumsfeld*,
   670 F.3d 540 (4th Cir. 2012) ..............................................................................................13

iii

*Loquasto v. Fluor Corp., Inc.*,
　No. 3:19-CV-1455-B, 2021 WL 75550 (N.D. Tex. Jan. 8, 2021) ................................... *passim*

*Meredith v. United States*,
　330 F.2d 9 (9th Cir. 1964) ...............................................................................................24

*Nash v. Tindall Corp.*,
　375 S.C. 36, 650 S.E.2d 81 (Ct. App. 2007)....................................................................23

*Parsons v. Uniroyal-Goodrich Tire Corp.*,
　438 S.E.2d 238 (S.C. 1993), *overruled on other grounds by Farmer v.*
　*Monsanto Corp.*, 353 S.C. 553, 579 S.E.2d 325 (S.C. 2003) ....................................34

*Proctor & Schwartz, Inc. v. Rollins*,
　634 F.2d 738 (4th Cir. 1980) ...............................................................................33, 34, 35

*Quillen v. Int'l Playtex, Inc.*,
　789 F.2d 1041 (4th Cir. 1986) .........................................................................................23

*Rauton v. Pullman Co.*,
　191 S.E. 416 (S.C. 1937) .............................................................................................24, 25

*Richmond, Fredericksburg & Potomac R.R. Co. v. United States*,
　945 F.2d 765 (4th Cir. 1991) ...........................................................................................12

*Rosenthal v. Unarco Indus., Inc.*,
　278 S.C. 420, 297 S.E.2d 638 (S.C. 1982) .....................................................................33

*Sheppard v. CSX Transp., Inc.*,
　78 Fed. App'x 878 (4th Cir. 2003) ..................................................................................23

*Smith v. Mack Trucks, Inc.*,
　991 F.2d 791, 1993 WL 127963 (4th Cir. 1993) ............................................................32

*Spectrum Stores, Inc. v. Citgo Petroleum Corp.*,
　632 F.3d 938 (5th Cir. 2011) ...........................................................................................12

*Stencel Aero Eng'g Corp. v. United States*,
　431 U.S. 666 (1971)......................................................................................................28, 29

*Szantay v. Beech Aircraft Corp.*,
　349 F.2d 60 (4th Cir. 1965) .............................................................................................33

*Taylor v. Kellogg, Brown & Root Servs., Inc.*
　658 F.3d 402 (4th Cir. 2011) ...................................................................................... *passim*

*Thornton v. Cessna Aircraft Co.*,
　886 F.2d 85 (4th Cir. 1989) .............................................................................................25

*Tiffany v. United States*,
    931 F.2d 271 (4th Cir. 1991) ............................................................................29, 30

*Tozer v. LTV Corp.*,
    792 F.2d 403 (4th Cir. 1986) ..................................................................................28

*United States v. Spelar*,
    338 U.S. 217 (1949)..................................................................................................23

*Wu v. United States*,
    777 F.3d 175 (4th Cir. 2015) ..................................................................................13

*In re Yamaha Motor Corp. Rhino ATV Prod. Liab. Litig.*,
    No. 3:09-CV-143-JBC, 2009 WL 2849576 (W.D. Ky. Sept. 2, 2009)...................25

**Statutes**

38 U.S.C. § 1110..............................................................................................................29

38 U.S.C. § 1131..............................................................................................................29

Federal Tort Claims Act..............................................................................................5, 27

S.C. Code Ann. § 15-5-150...................................................................................2, 31, 33

**Other Authorities**

Fed. R. Civ. P. 44.1.........................................................................................................22

Local Civil Rule 26.1.......................................................................................................29

Rule 12(b)(1).........................................................................................................5, 12, 13

Security Defense Cooperation Agreement,
    Afg-U.S. Sept. 30, 2014, T.I.A.S. 15-101
    (available at https:/www.state.gov/15-101/) ........................................................31

v

## INTRODUCTION

These consolidated cases arise out of an attack by a foreign enemy on U.S. Military forces in an active war zone. In November 2016, Ahmad Nayeb, a Taliban operative, detonated a suicide bomb inside the secure perimeter of the U.S. Military base at Bagram Airfield ("BAF"), Afghanistan. Plaintiffs, who were serving as active-duty members of the U.S. Army at the time of the bombing, allege injuries from the enemy attack and seek state-law tort remedies.

Although Plaintiffs purport to challenge actions by Defendants ("Fluor"), sensitive Military judgments governed and controlled Fluor's conduct. For example, the Military deliberately placed and kept the Taliban bomber Nayeb on the base, knowing he had Taliban ties, as part of a NATO counterinsurgency strategy. The Military dictated key parameters for oversight of Local Nationals at BAF, including which Local Nationals needed an escort; when and where escorts were required; and, when escorts were disallowed. The Military prohibited Fluor from providing "24/7 eyes-on" escorts. As the *Loquasto* court found, these and other sensitive Military decisions would be "front and center" at any trial, as the factfinder would be required to determine whether the actions and inactions of the Military caused the attack. *See Loquasto v. Fluor Corp., Inc.*, No. 3:19-CV-1455-B, 2021 WL 75550, at *6-7 (N.D. Tex. Jan. 8, 2021) ("such determination would require evaluating the wisdom of the military's decisions contributing to the circumstances surrounding the bombing"). As a result, these suits are barred under the Fourth Circuit's two-factor political question test because: (i) the Military exercised "control" over the challenged conduct; and (ii) "national defense interests" were intertwined with the governing Military judgments. *See Taylor v. Kellogg, Brown & Root Servs., Inc.* 658 F.3d 402, 411 (4th Cir. 2011).[1]

---

[1] That these suits implicate profound "national defense interests" is illustrated by the Military's designation of the vast majority of the Army's investigative file as classified. The reason that the Army classified this information and refuses to release it for use by the Court and the litigants is to protect national defense interests. *See*, *e.g.*, ECF 64-2 at 21.

1

Beyond meeting the Fourth Circuit's *Taylor* test, this suit offends fundamental principles of the separation of powers under Supreme Court precedent. Adjudicating these cases would allow the Judiciary to encroach upon matters of military planning and strategy, wartime risk assessments by commanders, and foreign relations between the United States and Afghanistan, including the "Afghan First Program" and the "Security and Defense Cooperation Agreement" between the United States and Afghanistan. Regardless of how Plaintiffs frame their claims, their allegations inherently question the wisdom of the Afghan First Policy and the foundational, risk-laden decision to place and keep a Taliban associate on the base. Fluor's conduct was inextricably linked to, and carried out in reliance upon, this and other Military judgments. Indeed, Fluor and other contractors ***must*** rely on the Military to strike the appropriate balance between the pursuit of foreign policy goals, strategic objectives, and the safety and protection of U.S. soldiers and civilians at BAF and at bases around the globe. Allowing the Judiciary to inject itself into that equation, in order to regulate Flour's conduct, would undermine the Military's exclusive control over these sensitive judgments. Furthermore, in any trial in these cases there would be "military versus military" testimony—*i.e.*, soldiers will be haled into court to testify against one another—proceedings that the Supreme Court has warned cause serious harm to military discipline. The record already previews one such offense: a retired three-star general, Gen. (Ret.) Mick Bednarek, testified that another three-star general, Gen. Thomas James, "just got it wrong" in his assessment of facts that caused the attack. *See* Ex. A, Bednarek Dep. 43:19-24; *id.* at 97:9-13 ("his findings…were just incorrect"). If this case proceeds, more soldiers will be placed in a position of implicating and contradicting, under oath, their fellow soldiers, commanders, and subordinates.

In addition to the political question doctrine, there is a separate threshold reason why Plaintiffs' claims are barred: the South Carolina Door Closing Statute, S.C. Code Ann. § 15-5-150

("Door Closing Statute"). Plaintiffs are nonresidents, they sued foreign defendants, and their claims have no connection to South Carolina. Plaintiffs' decision to pursue their claims in this forum was transparent, *ex post* forum shopping—the very sort of litigation that the Door Closing Statute was designed to eliminate.

This is not the first time Fluor has asserted these two defenses in this Court based on the Taliban attack at BAF. Over a year ago, in the related *Hencely* case, *Hencely v. Fluor Corp., Inc.*, No. 6:19-CV-00489-BHH, Judge Hendricks denied motions by Fluor based on the political question doctrine (*Hencely*, ECF 52) and the Door Closing Statute (*Hencely*, ECF 78). We respectfully submit that Judge Hendricks' analyses were flawed, but, in any event, this Court must independently assess the two defenses based on the now-expanded factual record, which confirms that several of the factual underpinnings for the *Hencely* decision are incorrect. And this Court must also address two legal issues that *Hencely* failed to address. **First**, Fourth Circuit precedent requires this Court to conduct a choice-of-law analysis to determine whether Fluor's "empty chair" defense triggers application of the political question doctrine. As *Hencely* confirmed, Fluor can put Military decisions on trial by presenting evidence that the Military, and not Fluor, caused Plaintiffs' injuries.[2] But *Hencely* assumed—***without*** conducting a choice-of-law analysis—that South Carolina's "joint and several liability" rule applied. As explained herein, that was clear error, as South Carolina's *lex loci* rule results in application of Afghan law to the apportionment issue, thereby mandating dismissal.[3] **Second**, the *Hencely* Door Closing opinion cited a purported factual

---

[2] *Hencely v. Fluor Corp., Inc.*, No. 6:19-CV-00489-BHH, 2020 WL 2838687, at *14 (D.S.C. June 1, 2020) ("[t]he factfinder, after the presentation of Fluor's causation defenses, could find that the actions and decisions for which Fluor blames the Army—and not Fluor's alleged conduct—caused Plaintiff's injuries").

[3] Fourth Circuit precedent requires the Court to conduct a choice-of-law analysis as part of this aspect of the political question analysis. However, we respectfully submit that the Fourth Circuit's

3

nexus to South Carolina based on a breach-of-contract claim. But even assuming such a nexus exists for the breach claims (which we dispute), *Hencely* did not address the threshold legal question, now squarely before this Court, of whether Plaintiffs have standing to sue for breach of contract as third-party beneficiaries. They do not, *see* ECF 64-2 at 44-50, thereby eliminating any argument that the breach claims create a nexus to this forum.

## RELEVANT PROCEDURAL HISTORY

### A.    The Consolidated Bagram Bomber Cases.

Although these cases were recently filed in this Court, this is not new litigation. In May 2019, twelve of the thirteen Plaintiffs filed identical claims in Texas. In January 2021, after these Plaintiffs had the opportunity to fully and fairly litigate their claims, the *Loquasto* court held that the claims were barred based on the political question doctrine. *Loquasto*, 2021 WL 75550, at *10.

In the wake of the *Loquasto* dismissal, Plaintiffs chose to file suit in this forum. The first to do so was Plaintiff Timothy Tangen, on February 3, 2021. *See* ECF 1.[4] On February 26, 2021,

---

ruling on this issue is legally erroneous—and these suits are barred regardless of the applicable law—for the reasons set forth by the Eleventh Circuit in *Carmichael*, a case that the Fourth Circuit has cited as persuasive authority. *See Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1288 n.13 (11th Cir. 2009) (affirming political question doctrine dismissal and noting: "The district court does not appear to have made any specific determination concerning the substantive law applicable to the dispute. We find it unnecessary to address the issue here as well since, given the uniformity of negligence law among the states, our analysis would remain the same regardless of which state's law applied."); *see also In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 338 (4th Cir. 2014) ("*Burn Pit I*") ("we—like the [Fourth Circuit] *Taylor* Court—look to the Eleventh Circuit's decision in *Carmichael*"). Fluor preserves its right to argue that the Fourth Circuit should reconsider this aspect of its jurisprudence. *Cf. Feres v. United States*, 340 U.S. 135, 144 (1950) ("That the geography of an injury should select the law to be applied to his tort claims makes no sense…It would hardly be a rational plan of providing for those disabled in service by others in service to leave them dependent upon geographic considerations over which they have no control and to laws which fluctuate in existence and value.").

[4] Tangen is the lone Plaintiff who was not a party in *Loquasto*, but he is represented by the counsel who litigated *Loquasto*, and he filed suit here just a few weeks after the *Loquasto* dismissal.

4

Fluor moved to dismiss Plaintiff Tangen's claims based on three grounds: (i) preemption based on the "combatant activities" exception to the Federal Tort Claims Act; (ii) the absence of classified information that is essential to fairly litigating the case; and (iii) lack of standing to assert a claim for breach-of-contract as a third-party beneficiary. *See* ECF 14-1.[5] Those three issues were fully briefed. *See* ECF 46 (Pl.'s Opposition); ECF 57 (Fluor's Reply). After the Court consolidated these cases, *see* ECF 59, Fluor has now asserted these three defenses as to *all* Plaintiffs. *See* ECF 64. As a result, those three issues are now ripe for resolution by the Court.

Fluor today filed a Rule 12(b)(6) motion to dismiss based on estoppel (as to the *Loquasto* Plaintiffs[6]) and statute of limitations (as to Plaintiffs Brown, Iubelt, and Perry). *See* ECF 66.

This Rule 12(b)(1) motion asserts two separate and independent grounds for dismissal of *all* claims: the political question doctrine, and the South Carolina Door Closing Statute.

### B.     The Related *Hencely* Matter.

The related *Hencely* case remains pending in this Court before Judge Hendricks. In *Hencely*, Fluor has filed several dispositive motions based on: (i) preemption based on the "combatant activities" exception to the Federal Tort Claims Act; (ii) the absence of classified information that is essential to fairly litigating the case; and (iii) lack of standing to assert a claim for breach-of-contract as a third-party beneficiary. *See Hencely*, ECF 101-1, 102-1, 128-1. In addition, the plaintiff, Hencely, filed a motion in limine, seeking a ruling that the Army's heavily-redacted, mostly-classified Army Regulation 15-6 Report is admissible. *See Hencely*, ECF 87. The

---

[5] When Fluor filed its motion to dismiss Plaintiff Tangen's claims, this suit was pending before Judge Hendricks along with the related *Hencely* matter. Judge Hendricks later issued an order that transferred the *Tangen* matter, along with the twelve of the other related cases, to Judge Dawson as a result of the Court's *sua sponte* determination of mandatory disqualification. *See* ECF 51.

[6] Maggie Bilyeu, Marvin Branch, Marissa Brown, Chris Colovita, Addie Ford, Samuel Gabara, Robert Healy, Shelby Iubelt, Julianne Perry, Haylee Rodriguez, India Sellers, and Lakeia Stokes.

parties' motions were fully briefed, and the Court heard oral argument on them on June 4, 2021.

At the hearing, the Court denied Hencely's motion in limine. In a subsequent order, the Court held that it "cannot possibly pass on the admissibility of a government report that neither it, nor the parties have seen in a form that is even close to complete." *See Hencely*, ECF 162 at 6.

The Court did not rule on Fluor's motions at the hearing. However, both at the hearing and in a subsequent order, the Court indicated that it will send a letter "to the relevant personnel at the U.S. Attorney's Office and the Army requesting access to the classified version of the [Army] report for the Court's in-camera review." *See Hencely*, ECF 160.

## BACKGROUND

As Fluor has explained, Fluor was integrated into the Military's operations at BAF, and the conduct challenged in this suit, including the retention and oversight of the Taliban bomber, stemmed from Military directives. *See Tangen*, ECF 64-2 at 7-17. Many of the facts set forth in Fluor's "combatant activities" motion *also* establish that the Military exercised direct control over Fluor's conduct, and that adjudication of these suits would require evaluation of numerous sensitive Military judgments. We do not repeat all of those facts here, but highlight below the core Military decisions that are most relevant to Fluor's political-question motion.[7]

*First*, years before the attack, the Military made the foundational decision to bring Nayeb— a known Taliban associate—onto BAF, a secure military base. *See* ECF 64-27 (Letter from Commander, TF Red Bulls); *see also* ECF 64-20. This was not an accident; it was a deliberate decision, carried out in furtherance of a strategic objective, and premised on a quintessential

---

[7] As reflected herein, the universe of evidence has expanded since Fluor filed its "combatant activities" motion in February 2021, as the record now includes recent testimony from five witnesses who were deposed in the *Hencely* matter. Importantly, four of these witnesses were deposed by the *Loquasto* Plaintiffs in the *Loquasto* matter, when those Plaintiffs had a full and fair opportunity to litigate this political question issue the first time.

battlefield risk/benefit calculation. The decision was part of the "Afghan First Program," one of the Military's counterinsurgency strategies. *See* ECF 64-2 at 10-11. Through the Afghan First Program, the Military accepted risk and sacrificed efficiency at Afghan bases in hopes that "rehabilitating" Taliban members and providing jobs to the community would result in long-term economic and social stability. *Id*. The Military alone decided to accept the risk of Nayeb's presence on the base; the Military alone decided not to warn Fluor that Nayeb (and perhaps other Local Nationals at the base) had Taliban ties;[8] the Military alone accepted the duty to "mitigate the[] risk" of "admitting a former insurgent" onto the base; and, the Military alone promised to "respond to any security concerns promptly and fully." *See* ECF 64-27; *see also* ECF 64-7 ¶¶ 50-56.

*Second*, having sponsored Nayeb for employment, and having accepted the risk associated with bringing him onto the base, the Military also exclusively controlled the vetting of Nayeb and all other Local Nationals, before and during their employment, to ensure they did not pose an unacceptable security threat. As a senior Army contracting officer testified, "vetting Nayeb to ensure he did not have Taliban connections" was in "the Government's bailiwick":

> Q. …[W]ith respect to…the suicide bomber, Nayeb, is it true that the Government was solely responsible for vetting Nayeb to ensure he did not have Taliban connections?
>
> A. That was the Government's -- That was the Government's bailiwick. I don't know if -- I don't know a technical term for bailiwick. That was their area of responsibility, and the Government would not have [abdicated] that requirement to the contractor.
>
> Q. In other words, the -- the Government was responsible for vetting Nayeb. Fluor was not responsible for vetting Nayeb; is that true?

---

[8] As Fluor has explained, the large majority of information in the Army's 15-6 Report regarding the attack remains classified. *See* ECF 64-2 at 17-21. Among the information that is unknown to the parties and the Court is whether Nayeb was the lone Taliban associate who the Military placed on the base, or if there were some or many other such Taliban associates. Likewise, the Army Report indicates Nayeb was aided by co-conspirators, but the identities and specific roles of such co-conspirators remains classified. *Id*. at 20-21.

A. Correct.

Ex. B, Jones Dep. 72:12-25. *see also* Ex. C, Weindruch Dep. 34:19-35:5 (testifying it was the Army's responsibility, not Fluor's, to vet and approve badge entry onto Bagram Airfield).

*Third*, throughout Nayeb's five-year tenure at BAF, the Military controlled Nayeb's retention for LOGCAP work because the Military *alone* determined whether Nayeb (or any anyone else) posed a security threat requiring dismissal from the base. *See* ECF 64-7 ¶ 20 (explaining the Military could, at any time and without explanation, "immediately terminate" Local Nationals). The Military had exclusive knowledge of Nayeb's threat level, including exclusive access to intelligence regarding Nayeb and the potential for an attack. *See*, *e.g.*, ECF 64-16 at 3 ("I believe that [redacted name] the night before said there was going to be an attack but that it had been called off."). "Fluor did not—and could not—perform its own security screenings or counterintelligence to ascertain Nayeb's fitness for LOGCAP work and/or BAF access." *See* ECF 64-7 ¶ 49. Rather, the Military conducted periodic security screening interviews of Local Nationals, including Nayeb. The Military interviewed Nayeb at least six times; evaluated whether to retain him each time; and, decided each time that Nayeb should be retained rather than terminated—despite the Military's exclusive awareness of Nayeb's Taliban ties and his provision of "trained and coached" answers during a 2016 security interview.[9] *See* ECF 64-10 at 33; *see also* Ex. D, Wilson Dep. 98:4-99:1 ("Fluor is not responsible for vetting local nationals or authorizing them base access. US military is responsible for the force protection screening cell and all the vetting of the local nationals to

---

[9] Plaintiffs allege Nayeb should have been fired for minor infractions such as sleeping or reading a religious text at work. *See*, *e.g.*, ECF 1 ¶ 60. Putting aside the obvious fact that such common actions do not indicate a propensity to detonate a suicide bomb, the simple reality is that Fluor was required to operate within the Afghan First Program, which the Military recognized would "not always be the quickest or most efficient means to fulfill our requirements," and Fluor could not take steps to thwart that program. *See* ECF 64-23 at 1. Moreover, the Military alone controlled the decision of whether Nayeb was a security threat and should be terminated on that basis. *See supra*.

include counterintelligen[ce]…"); Ex. A, Bednarek Dep. 54:6-19 ("The military is exclusively responsible for screening, vetting, and securing the installation."). After the attack, the Army called its own failure to dismiss Nayeb from BAF through its screening process "a lost opportunity to mitigate the threat posed by Nayeb." *See* ECF 64-10 at 33.

*Fourth*, the Military exercised direct control over the manner and methods of oversight of the Local Nationals at BAF. Most notably, the Military dictated the requirements for escorting Local Nationals. *See* ECF 64-2 at 16-17; *see also* Ex. E, Riley Dep. 107:4-6. The Military controlled *which* Local Nationals needed to be escorted; *how many* Local Nationals could be escorted by a single escort at any given time; *who* could serve as an escort; *what* training the escorts were required to have; *when* and *where* escorts were required on the base; and, *when* and *where* escorts were *prohibited*. *Id*. For example, the Military *did* require escorting of Local Nationals "to and from the [Entry Control Points ("ECPs")]," but the Military did *not* allow escorting of Local Nationals "while they're at work." Ex. B, Jones Dep. 61:6-62:24; *see also* ECF 64-3 at ¶¶ 18-20; Ex. D, Wilson Dep. 32:4-19 ("they're the one that set the policies and procedures for escorting, which included that they did not have to be escorted in a -- at the facility or the worksite"); Ex. A, Bednarek Dep. 70:7-14 ("the Army decides the amount of supervision . . . based on base access and escort policies" and Fluor, as a contractor, "follows" those rules). In addition, the Military *did* require escorting of Local Nationals *to* the ECPs for a "hand off" to the Military, but the Military itself retained sole responsibility and total control over the escorting of Local Nationals *off the base*. Ex. B, Jones Dep. 81:6-21 ("Past [the ECP gate]…wasn't a contract requirement…The contractor's responsibility was to get them to the gate and hand off. Q. And…to be clear again, hand off to the military? A. Correct."); *see also* Ex. A, Bednarek Dep. 115:13-21 ("[T]he military . . . takes responsibility at that dismount point location very close to the entry

9

control point, where [Local Nationals] are then escorted single file, if you will, to that pedestrian turnstile for exit off of, in this case, Bagram Air Base or the installation."). The Military's control over escorting policies was absolute; Fluor could not unilaterally choose to provide greater levels of oversight. Prior to the attack, Fluor sought to modify the escorting policy to allow "24/7 eyes-on" escorts, which would have "require[d] escorting of local nationals while at their work place." Ex. B, Jones Dep. 62:16-67:16. The Military repeatedly rejected Fluor's proposals—meaning, Fluor was prohibited from carrying out such additional escorting. *Id.*; *see also* ECF 64-3 ¶ 20.

*Fifth*, the Military exercised additional control over the escorting of Local Nationals at BAF by implementing a "surveillance system" to ensure the Military's policies were followed each and every time Local Nationals were moved on base. Ex. B, Jones Dep. 80:25-81:21. As part of its surveillance system, the Military had "a [quality assurance] guy assigned to making sure that *any time there was a movement* of [Local National] personnel," the Military escorting policies were followed. Ex. B, Jones Dep. 62:2-13 (emphasis added).

*Sixth*, beyond controlling which Local Nationals were allowed on the base and how much oversight they were subjected to once there, the Military also exclusively controlled numerous other aspects of force protection and security at the base; that is, the Military controlled the very mechanisms designed to prevent attacks such as the one carried out by Nayeb.[10] The Military controlled the ECPs, designed the base's perimeter defense systems, and decided who would man the ECPs. *See*, *e.g.*, ECF 64-3 ¶ 17 ("The military designed the overall security screening processes and the protocols used for security purposes at the ECPs. The military was responsible for multiple layers of screening and ensuring personnel could safely gain access to the base."). For example,

---

[10] "If Nayeb smuggled explosives onto Bagram, he did so through the military security screening checkpoints—and thus on the military's watch." *Loquasto v. Fluor Corp., Inc.*, No. 3:19-CV-1455-B, 2021 WL 75550, at *8 (N.D. Tex. Jan. 8, 2021).

10

the Military decided to utilize Local Nationals to monitor other Local Nationals performing security functions at the ECPs, and continued such practices despite warnings about the associated risks. ECF 64-12 at 1 ("There are Local National Supervisors at the specific posts overseeing the searching procedures that are done by Local National Guards on Local National workers coming onto Bagram. This practice might be a security risk."). In addition to perimeter security, the Military also conducted roving patrols. *See* ECF 64-7 ¶ 10. Local Nationals were subject to random physical searches, including bomb-sniffing dogs, intermediary checkpoints, and armed Military guards at buildings to enforce force protection measures. *See id.* ¶ 25. These random searches extended to work facilities, including the NTV yard where Nayeb worked. *See id.* ¶ 10. For example, before the November 2016 attack, the Military conducted K-9 sweeps of the NTV yard, searching for any contraband such as explosives. *See id.* ¶ 85 n.21.

In sum, as one witness recently summarized, there were countless Military decisions that pervaded and controlled the retention and oversight conduct at issue:

> [The] US military is the one that hired Nayeb; they're the one that put him through school; they're the ones that requested Fluor to hire Nayeb once he graduated the school; they're the ones that vetted him; they're the ones that processed him through the ECP and allowed him to bring explosives on the base; they're the one that set the policies and procedures for escorting, which included that they did not have to be escorted in a -- at the facility or the worksite. So all the policies and procedures, regulations, background checks, vetting, and requirements that led up to Fluor hiring him through the subcontract, or APS hiring him on behalf of Fluor, was conducted and performed by the military.

Ex. D, Wilson Dep. 32:5-19; *accord id.* 46:13-21 ("[The US Military] hired Nayeb; they allowed him on the base; they set the parameters on which he was to be escorted and supervised; they set the parameters on which Fluor was allowed to hire people to provide oversight; they set the policies and procedures and everything in regards to Nayeb, and they're the ones that was responsible for searching him the day he came onto the base and detonated the suicide bomb.").

11

## STANDARD OF REVIEW

"When a Rule 12(b)(1) motion challenge is raised to the factual basis for subject matter jurisdiction, the burden of proving subject matter jurisdiction is on the plaintiff." *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991) (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). In deciding such a motion, "'the district court may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.'" *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 333 (4th Cir. 2014) ("*Burn Pit I*") (quoting *Velasco v. Gov't of Indon.*, 370 F.3d 392, 398 (4th Cir. 2004)).

"Unlike the procedure in a 12(b)(6) motion where there is a presumption reserving the truth finding role to the ultimate factfinder, the court in a 12(b)(1) hearing weighs the evidence to determine its jurisdiction." *Adams*, 697 F.2d at 1219. In a factual challenge such as the political question doctrine motion here, a district court will look beyond the four corners of the complaint and "consider how [Plaintiff's] negligence claim would be litigated." *Taylor v. Kellogg, Brown & Root Servs., Inc.* 658 F.3d 402, 406-07 (4th Cir. 2011). If a plaintiff's claim—as it "would be litigated"—implicates a nonjusticiable political question, then the court should sustain the factual challenge and dismiss the suit. *See id.*; *accord Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 951 (5th Cir. 2011).[11]

---

[11] With respect to Fluor's Door Closing motion, for claims filed in state court, the South Carolina Supreme Court has held that the Door Closing Statute "affects only a party's capacity to sue and not the subject matter jurisdiction of the circuit court." *See Farmer v. Monsanto Corp.*, 353 S.C. 553, 557, 579 S.E.2d 325, 327–28 (S.C. 2003). However, as to claims filed in federal district courts (which are, of course, of limited jurisdiction), even after *Farmer* this Court has at least once addressed the Door Closing Statute in the context of a Rule 12(b)(1) motion. *See Fung Lin Wah Enters. Ltd. v. E. Bay Imp. Co.*, 465 F. Supp. 2d 536, 542 (D.S.C. 2006) (acknowledging *Farmer* and holding "because Plaintiff has produced some evidence that none of the defendants are foreign defendants, this court denies Defendants' motion to dismiss pursuant to Rule 12(b)(1) of the

## ARGUMENT

### I.   THESE BATTLEFIELD TORT SUITS SHOULD BE DISMISSED BASED ON THE POLITICAL QUESTION DOCTRINE.

"The political question doctrine prevents the courts from encroaching on issues" that are constitutionally committed to the legislative or executive branches. *Burn Pit I*, 744 F.3d at 334 (citing *Baker v. Carr*, 369 U.S. 186, 217 (1962)). Because the political branches have exclusive authority over military affairs, "judicial review of military decisions would stray from the traditional subjects of judicial competence." *Lebron v. Rumsfeld*, 670 F.3d 540, 548 (4th Cir. 2012); *accord Wu v. United States*, 777 F.3d 175, 180 (4th Cir. 2015). Thus, when resolving the justiciability of battlefield-contractor suits, courts must "carefully assess the relationship between the military and [the contractor], and . . . 'look beyond the complaint'" to consider how plaintiffs would attempt to prove their claims and how the contractor would defend. *Taylor*, 658 F.3d at 409 (quoting *Lane v. Halliburton*, 529 F.3d 548, 565 (5th Cir. 2008)). This requires a "discriminating inquiry" that cannot be resolved through "semantic cataloguing." *Baker*, 369 U.S. at 217.

In *Taylor*, the Fourth Circuit distilled the justiciability inquiry into a two-factor test. *See Taylor*, 658 F.3d at 411. The first factor examines "the extent to which [the contractor] was under the military's control." *Id.* at 411. This focuses on "what actually occurred in practice." *Al Shimari v. CACI Premier Tech., Inc.*, 840 F.3d 147, 157 (4th Cir. 2016). The second *Taylor* factor asks "whether national defense interests were closely intertwined with the military's decisions

---

Federal Rules of Civil Procedure"). And this Court has repeatedly described the Door Closing issue as whether the statute applies "to bar jurisdiction," including in the *Hencely* ruling last year. *See Hencely v. Fluor Corp., Inc.*, 475 F.Supp. 3d 464, 467-68 (D.S.C. 2020) ("the Door Closing Statute does not apply to bar jurisdiction"); *accord Boisvert v. Techtronic Indus. N. Am., Inc.*, 56 F. Supp. 3d 750, 752 (D.S.C. 2014) (framing Door Closing issue as whether statute "bars suit in this Court"). Thus, Fluor has included the Door Closing argument in this Rule 12(b)(1) motion. Ultimately, whether the Door Closing issue is properly addressed under Rule 12(b)(1) or some other standard is immaterial, as the facts relevant to the issue are plainly not in dispute.

governing [the contractor's] conduct." 658 F.3d at 411. Under this factor, the suit is nonjusticiable if *either* Plaintiffs' claims *or* Fluor's defenses would require the judiciary to evaluate actual, sensitive military judgments. *Id.* at 409, 411-12. If *either Taylor* factor is met ("military control" or "national defense interests"), the suit is nonjusticiable. *Burn Pit I*, 744 F.3d at 335.

As explained below, these suits are barred under *both Taylor* factors. Beyond that, these suits should be dismissed based on well-established separation-of-powers principles.

### A. These Suits Should Be Dismissed Under the First *Taylor* Factor Because the Military Exercised Direct Control Over the Challenged Conduct.

To determine whether the Military's control is sufficient such that the political question doctrine bars the suit, "a court must inquire whether the military clearly chose how to carry out [the contractor's activities], rather than giving the contractor discretion to determine the manner in which the contractual duties would be performed." *Al Shimari v. CACI Premier Tech., Inc.*, 758 F.3d 516, 534 (4th Cir. 2014) (internal quotation marks omitted). A hallmark of "control" triggering dismissal is a situation in which "[e]ach of the[] critical determinations was made exclusively by the military." *In re KBR, Inc., Burn Pit Litig.*, 893 F.3d 241, 261 (4th Cir. 2018) ("*Burn Pit III*")(quoting *Carmichael*, 572 F.3d at 1282). Conversely, "the military's control is not plenary if the military merely provides the contractor with general guidelines that can be satisfied at the contractor's discretion." *Id.* at 260 (internal quotations and citations omitted).

#### 1. The Military Controlled the Hiring, Retention, and Oversight of Nayeb.

Each of the critical determinations regarding retention and oversight of Nayeb was made exclusively by the Military. These were quintessential Military judgments—wartime decisions that required the balancing of strategic objectives, long-term policies, limited resources, and safety concerns. These are decisions entrusted to the Military alone. Indeed, Fluor and others at BAF *relied on the Military* to make these decisions in a manner that ensured the safety and security of

the soldiers and civilians at the base. Fluor was not given discretion to determine when it was appropriate to terminate Nayeb based on a perceived security threat. Nor was Fluor given discretion to determine the manner in which to oversee Nayeb.

With respect to Nayeb's retention as an APS employee,[12] the expansive record establishes:

- The Military controlled the decision to bring Nayeb onto the base for employment, and the Military dictated that Nayeb would be hired in the first instance, because the Military deemed it strategically beneficial to place a known Taliban associate on the base, and to do so without warning Fluor. *See* ECF 64-27 (Letter from Commander, TF Red Bulls, to Parwan ROK).

- The Military controlled whether Nayeb would be permitted onto the base to perform work each and every day of his five-year tenure at BAF. *See* ECF 64-7 ¶ 10; ECF 64-25 § 7.

- The Military controlled the retention of Nayeb throughout his five-year tenure at BAF by exclusively deciding whether Nayeb posed a security risk warranting dismissal from the base. *See* ECF 64-7 ¶ 20.

- The Military's control over Nayeb's retention was so pervasive that it included at least six instances in which the Military conducted security screenings of Nayeb for the specific purpose of deciding whether to terminate his employment, and each and every time the Military decided Nayeb should be retained. *See id.* ¶ 58.

- The Military's control over the retention of Nayeb also included exclusive knowledge of the fact that Nayeb had given "trained and coached" answers during a 2016 security screening—a critical warning sign that the Military missed and later characterized as "a lost opportunity to mitigate the threat posed by Nayeb." *See* ECF 64-10 at 33.

With respect to Nayeb's supervision and escorting, the expansive record establishes:

- The Military controlled the manner, means, and methods by which Nayeb was subjected to oversight because the Military established and enforced the BAF Access Policy, which dictated the key parameters for escorting Local Nationals. *See* ECF 64-25 §§ 7, 11, 12.

- The Military controlled which Local Nationals needed escorts; when and where escorts were required; when and where escorts were prohibited; who could serve as an escort, including which Local Nationals could serve as escorts; and, how many Local Nationals could be escorted at any given time. *Id.* § 11, 12.

- The Military controlled when Local Nationals were to be left completely unsupervised and unescorted. For example, pursuant to General Order 1, issued by the U.S. Central Command,

---

[12] Nayeb was not a Fluor employee. As Plaintiffs allege, "Nayeb was an employee of Defendant APS [Alliance Project Services, Inc.]." *See*, *e.g.*, ECF 1 ¶ 2.

15

the Military "prohibited entry into the prayer areas and the mosque[s]" at BAF. *See* Ex. B, Jones Dep. 53:9-12; *accord id.* at 37:11-38:2.

- The Military's control over the manner and methods of oversight was absolute, as illustrated by the fact that Fluor repeatedly sought permission to perform "24/7 eyes-on" escorting— including constant escorting of Local Nationals such as Nayeb at the worksite—but the Military made a battlefield judgment to place its limited resources elsewhere, and rejected the proposals. *See* Ex. B, Jones Dep. 63:16-64:3; *id.* at 66:13-21.

- The Military further controlled the oversight and movement of Local Nationals on the base through a "surveillance system," which included "a surveillance guide and a surveillance schedule," whereby "any time there was a movement of [Local National] personnel," a Military quality-assurance person was assigned to ensure Military policies were followed. *See* Ex. B, Jones Dep. 61:6-62:24; 80:22-81:21.

- The Military controlled the escorting of Local Nationals off the base, as the Military alone— and not Fluor—was responsible for "physically escort[ing] [Local Nationals] through the gate and off the base" each day. *See* Ex. B, Jones Dep. 81:6-21 ("Past [the ECP gate]…wasn't a contract requirement…The contractor's responsibility was to get them to the gate and hand off. Q. And…to be clear again, hand off to the military? A. Correct.").

These facts establish that the extent of the Military's control here is akin to that which triggered dismissal in *Burn Pit*, as the Military "not only directed to [Fluor] 'what' must be done but also prescribed 'how' [Fluor] must accomplish those tasks." *See Burn Pit III*, 893 F.3d at 261. In fact, there are numerous parallels between these cases and *Burn Pit* on the "control" issue.

In *Burn Pit III*, the Fourth Circuit affirmed that the "control" factor warranted dismissal because, under the facts of that case, the contractor "had little or no discretion in choosing *how* to manage the waste," as "[t]he military mandated the use of burn pits as a matter of military judgment," and the contractor "could not unilaterally choose to use landfills, recycling, or incinerators instead." *Id.* The same is true here with respect to the hiring, retention, and oversight of Nayeb. To wit, Fluor "had little or no discretion" in deciding whether to hire Nayeb in the first place. Rather, the Military dictated that this known Taliban associate be placed on the base for employment. Fluor was given no option to exercise ***any*** meaningful discretion because the Military never warned Fluor that an enemy combatant was within the ranks of the labor pool, as hand-

16

selected by the Military. Fluor "could not unilaterally choose" to utilize a different labor pool that was free of enemy combatants. Likewise, Fluor "had little or no discretion" when it came to vetting Nayeb and monitoring the level of threat he posed, as Fluor "could not unilaterally choose" to perform *the Military function* of intelligence-gathering to gauge such threats. Fluor could neither "unilaterally choose" to conduct its own security screenings, nor utilize the many other mechanisms *exclusively controlled by the Military* for purposes of determining whether Nayeb should be terminated due to his threat level. Further, Fluor "had little or no discretion" in deciding whether, when, and how to oversee Nayeb while he was on the base. Instead, Fluor was required to follow the Military's directives, including without limitation, the BAF Access Policy. *See* ECF 64-25 §§ 7, 17 ("Installation Access" and "Contractor Compliance"). Fluor "could not unilaterally choose" to enact different or additional options for the oversight function—as the expanded record clearly shows. *See supra* at I.A.1; Ex. B, Jones Dep. 63:16-64:3; *id.* at 66:13-21 (noting that Fluor repeatedly proposed modifying contract to require constant escorting of Local Nationals, but the Military rejected the proposals). All of these actions, which are the core allegations in Plaintiffs' complaints, concern conduct controlled by the Military.

Further, Plaintiffs also *directly* challenge decisions and actions that were the *sole* responsibility of the Military. In particular, Plaintiffs allege that "Defendants were required to ensure that employees like Nayeb were physically escorted off the Base at the end of their work shifts." *See* ECF 1 ¶ 5; *see also id.* ¶ 108(c) ("Fluor negligently supervised Nayeb's escort on and off the Base."). However, indisputable facts show that the Military alone had the critical responsibility to physically escort Nayeb and other Local Nationals off the base each day. Ex. B, Jones Dep. 81:14-21; *see also* Ex. A, Bednarek Dep. 115:13-21 ("[T]he military…takes responsibility at that dismount point location very close to the entry control point, where [Local

17

Nationals] are then escorted single file, if you will, to that pedestrian turnstile for exit off of, in this case, Bagram Air Base or the installation.").

Finally, Plaintiffs cannot cabin their allegations in an attempt to avoid implicating the controlling Military decisions. For example, with respect to Plaintiffs' "negligent supervision" claims, the Eleventh Circuit's analysis in *Carmichael* is instructive and further illustrates why these suits should be dismissed. In *Carmichael*, the plaintiff pointed to provisions in a LOGCAP contract that obligated the contractor to supervise employees, but the court recognized that, notwithstanding such LOGCAP contract provisions, the contractor *was* operating under direct control of the Military. As the *Carmichael* court explained:

> To be sure, [the LOGCAP contractor] had responsibility for supervising employees such as [the employee who allegedly acted negligently]. Nevertheless, that authority plainly was not exclusive or absolute. Thus, the inquiry necessary to adjudicate [plaintiff's] negligent supervision claim could not be cabined to [the LOGCAP contractor's] supervisory practices, but would rather require examination of military policies and judgments.

*Carmichael*, 572 F.3d at 1295. The same is true here. Notwithstanding any contract obligation Fluor had to supervise employees to ensure they performed their work,[13] Fluor's authority "plainly was not exclusive or absolute." *See id*. Instead, the Military retained exclusive control over force protection and security and prohibited Fluor from performing enhanced oversight at the worksite via "24/7 eyes-on" escorting. The Military alone conducted security sweeps at facilities throughout the base, including Nayeb's worksite. ECF 64-7 ¶¶ 10, 85 n.21. As a result, the "inquiry necessary to adjudicate [Plaintiff's] negligent supervision claim could not be cabined to [Fluor's] supervisory

---

[13] As Mr. Jones explained, the requisite level of supervision under the contract was "just like government officials are tasked with supervising [Mr. Jones'] conduct while at work," which was plainly a level of oversight *far* short of "24-7, eyes-on surveillance." Ex. B, Jones Dep. 61:13-62:1; Ex. D, Wilson Dep. 36:19-21 ("there's a difference between supervising work and supervising and escorting and him not having someone over his shoulder").

practices, but would rather require examination of military policies and judgments." *See Carmichael*, 572 F.3d at 1295. And, as the Fourth Circuit has emphasized, focusing on a contract provision in abstract isolation "places form over substance" and is indicative of only "the formal, contractual relationship between the military and [the contractor] while ignoring the actual, operational relationship between them." *See Burn Pit III*, 893 F. 3d at 263.

      2.      With Regard to the *Taylor* "Control" Factor, the *Hencely* Decision Was Legally Erroneous and Failed to Consider Key Facts.

Although the *Hencely* court found a lack of sufficient "control" under the first *Taylor* factor, the *Hencely* decision's legal analysis was flawed, incomplete, and, in any event, based on several findings that are now demonstrably incorrect.

*First*, *Hencely* found: "The AR 15-6 Report and relevant Task Order 0005 PWS clearly demonstrate that Fluor, not the military, was responsible for and maintained direct control over the supervision of its job site and its employees, including Nayeb." *Hencely v. Fluor Corp., Inc.*, No. 6:19-CV-00489-BHH, 2020 WL 2838687, at *11 (D.S.C. June 1, 2020). The expanded record demonstrates this is wrong. In particular, testimony from a senior Army contracting officer shows that Fluor's authority under the contract was plainly not exclusive nor absolute, and in particular Fluor was ***prohibited*** from performing constant "24/7 eyes-on" escorting at the job site—meaning, the Military exercised direct control over the level of oversight, and Fluor had no discretion to perform increased oversight. In light of the expanded record, the *Hencely* court's abstract reliance on the contract terms, without regard to the reality on the ground, was both legal error, *see supra* (citing *Carmichael*, 572 F.3d at 1295), and factually erroneous.

*Second*, *Hencely* found: "[T]here were no formal directives issued to Fluor about how to operate the NTV Yard, how to supervise Fluor's personnel there, how to control the entrustment of tools, or how to escort personnel to and from the NTV Yard." *Hencely*, 2020 WL 2838687, at

19

*11. Again, the record refutes this, as it establishes that: (i) the BAF Access Policy provided detailed directives regarding "how to escort personnel"; (ii) the Military **prohibited** Fluor from carrying out "24/7 eyes-on" escorting at the worksite, and thus issued "formal directives" to Fluor "about how to operate the NTV Yard" and "how to supervise Fluor's personnel there"—i.e., **not** to do so via constant "eyes-on" escorting. Beyond that, the expanded record shows that the Military established a "surveillance system" in order to ensure its policies and directives were followed each time Local Nationals were escorted on the base. Ex. B, Jones Dep. 80:22-81:13.

**Third**, *Hencely* found: "Fluor operated with wide latitude and considerable discretion in the ways it supervised NTV Yard employees, entrusted NTV Yard employees with tools, evaluated [Local National] LN employee performance and chose to retain Nayeb, implemented the LN escort process to and from the NTV Yard, and exercised control over LN employees during said escort process." *Hencely*, 2020 WL 2838687, at *12. But again, the record refutes this: If Fluor had "wide latitude and considerable discretion," Fluor would have performed "24/7 eyes-on" escorting at Nayeb's worksite. Ex. B, Jones Dep. 63:10-68:17 (describing Fluor's proposals for enhanced surveillance of Afghan employees). Lacking such discretion, Fluor was required to follow Military protocols, which prohibited such oversight. *Id.* at 67:25-68:13 (Fluor "do[es] not have the authority to incur [24-7 surveillance] costs that have not been obligated and applied to the contract").

**B.     These Suits Should Be Dismissed Under the Second *Taylor* Factor Because National Defense Interests Were Closely Intertwined with the Military's Decisions Governing Fluor's Conduct.**

For many of the reasons set forth *supra* in § I.A., these cases also trigger dismissal under the plain language of the second *Taylor* factor because, as the facts make clear, national defense interests were intertwined with the Military decisions governing Fluor's alleged conduct. Thus, even if the Court were to determine that the "control" factor does not warrant dismissal, the Court should—like the Fourth Circuit in *Taylor*—nonetheless hold that these suits easily meet the second

20

factor and should be dismissed. *See Taylor*, 658 F.3d at 411-12.

For example, national defense interests undergirded the Military decision to place a known Taliban associate onto a secure Military base. Consistent with the Afghan First Program, the Military determined that it was in the best interests of national security, in the long term, to hire and retain Taliban associates, including Nayeb. *See* 64-23 ¶¶ 1-8 (Commanding General noting use of locals "may not always be the quickest or most efficient means" but prioritizing the "long term goal of developing the Afghan economy"); *see also* ECF 64-27 (commander advocating hiring of Nayeb despite "security concerns with admitting a former insurgent"). Likewise, national defense interests were at the heart of: (i) the Military's vetting and approval of Nayeb for base access; (ii) the Military's ongoing security screenings of Nayeb; (iii) the Military's establishment of escort policies and procedures; and (iv) the Military's establishment of a surveillance system for ensuring compliance with those policies. That such force protection and security decisions were "intertwined" with national defense interests is self-evident. Indeed, the BAF Access Policy's stated purpose was "to augment force protection measures, in order to establish and maintain a high degree of operational and physical security on BAF." *See* ECF 64-25 at 2.

In *Hencely*, the Court rejected the second *Taylor* factor, in part, based on its conclusions that "Fluor's alleged conduct was not 'governed' by military decisions." *Hencely*, 2020 WL 2838687, at *13. Based on the current record, this Court cannot reach the same conclusion. The expanded record illustrates—in dramatic fashion—that Fluor's ability to retain, escort, and oversee Nayeb was absolutely "governed" by Military decisions, including the Military's decision to reject Fluor's proposal to perform enhanced, "24/7 eyes-on" escorting, including constant escorting at the worksite. Ex. B, Jones Dep. 63:10-68:17. Like other governing Military decisions, the decision not to increase oversight of Local Nationals was premised on national defense interests, as it

21

concerned the level of resources to devote to security on an overseas Military base.[14]

**C.     These Suits Should Be Dismissed Because Resolution of Fluor's Causation Defense Will Require Evaluation of Military Decision Making and Thus Implicate the Political Question Doctrine.**

These cases also trigger dismissal under the second *Taylor* factor because Fluor's "empty chair" defense would inevitably force a factfinder to evaluate the causal role of the Military. In cases subsequent to *Taylor*, the Fourth Circuit has held that such a causation defense will trigger application of the political question doctrine when the governing law includes "a proportional-liability system that allocates liability based on fault." *Burn Pit I*, 744 F.3d at 340-41; *id.* at 340 n.3 ("the military's negligence becomes an issue only under a proportional-liability system that assigns liability based on fault").[15] Applying that Fourth Circuit precedent here, the Court should first conclude that the law of Afghanistan—the place of the alleged tortious conduct—controls this specific issue.[16] Next, for reasons set forth in the supporting expert declaration of Mehdi Hakimi, the Court should find that the Afghan Civil Code includes a proportional-liability rule that assigns liability based on fault—thereby triggering dismissal based on the political question doctrine.[17]

---

[14] National defense interests are inextricably linked to the underlying conduct. Indeed, as noted above, *see* n.8, the Army has refused to release information that is central to the case in order to protect national defense interests. *See* ECF 64-2 at 21; *see also Hencely*, ECF 101-4 (declining to release the unredacted version of the Army's 15-6 investigation).

[15] As noted *supra* at n.3, Fluor respectfully disagrees with the Fourth Circuit's holding that choice-of-law is a necessary prerequisite to the political question analysis, and Fluor maintains that these suits should be dismissed *regardless* of the applicable law because litigating these suits under *any* law would violate separation of powers.

[16] Pursuant to Fed. R. Civ. P. 44.1, and in accordance with direction from chambers, Fluor has attached hereto notice of its intent to raise an issue about a foreign country's law. *See* Ex. G.

[17] *Hencely* did not conduct a choice-of-law analysis, but instead assumed application of South Carolina law and held that, under South Carolina law, "fault cannot be apportioned to the military in this case." *Hencely*, 2020 WL 2838687, at *14.

1.     Under South Carolina's Choice-of-Law Rules, the Law of Afghanistan Governs the Issue of Proportional Liability.

District courts apply the choice-of-law rules of the forum state—here, South Carolina—to determine which substantive law applies. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). "Under traditional South Carolina choice of law principles, the substantive law governing a tort action is determined by the *lex loci delicti*, the law of the state in which the injury occurred." *Nash v. Tindall Corp*., 375 S.C. 36, 39, 650 S.E.2d 81, 83 (Ct. App. 2007) (citations omitted); *accord Sheppard v. CSX Transp., Inc.*, 78 Fed. App'x 878, 880 (4th Cir. 2003); *Boone v. Boone*, 345 S.C. 8, 13, 546 S.E.2d 191, 193 (S.C. 2001). In applying the *lex loci* doctrine, courts look to the place where "the last event necessary to make an [actor] liable for an alleged tort takes place." *Quillen v. Int'l Playtex, Inc.*, 789 F.2d 1041, 1044 (4th Cir. 1986) (citation omitted).[18]

Here, the analysis is straightforward: Plaintiffs' injuries occurred in Afghanistan, so South Carolina's choice-of-law rules result in application of Afghan law to the proportional liability issue. *See, e.g.*, *Healy* Compl. ¶¶ 17, 26. Moreover, *all* of the allegedly tortious conduct occurred at BAF in Afghanistan. *See e.g., id.* ¶¶ 111-15. Because the injuries and alleged negligence occurred in Afghanistan, Afghan law controls this specific issue.[19]

---

[18] Plaintiffs' breach-of-contract claims do not require a choice-of-law analysis, because Plaintiffs lack standing and those claims should be dismissed. *See* ECF 64-2 at 44-50; ECF 64-32 at 10-15.

[19] That the conduct occurred on a U.S. military base does not alter the *lex loci* analysis. The base itself remained property of Afghanistan pursuant to the Security and Defense Cooperation Agreement entered into by the United States and Afghanistan. *See* Security and Defense Cooperation Agreement, at 23, annex A (available at https:/www.state.gov/15-101/) (describing "Afghan Facilities and Areas Provided by Afghanistan for United States Forces Access and Use"). Beyond that, the Supreme Court has held that application of a *lex loci* rule to overseas military bases would result in the application of the foreign country's law. *See United States v. Spelar*, 338 U.S. 217, 219-21 (1949). Other courts have reached the same conclusion for claims arising in, for example, post-war Okinawa, Japan, and the Naval Base at Guantanamo Bay, Cuba. *See Burna v. United States*, 240 F.2d 720, 721-23 (4th Cir. 1957); *Cobb v. United States*, 191 F.2d 604, 609-611 (9th Cir. 1951); *Al-Zahrahni v. Rumsfeld*, 684 F. Supp.2d 103, 116–19 (D.D.C. 2010).

23

Plaintiffs may argue that Afghan law does not apply based on a rarely invoked exception to the *lex loci* rule known as the "public policy exception." *See, e.g., Boone*, 546 S.E.2d at 193. The Court should easily reject such an argument. The mere fact that Afghan law permits allocation of fault to a responsible third party—like laws of Texas and many other states— does not trigger South Carolina's public policy exception.

Under the public policy exception, courts overrule the *lex loci* doctrine and decline to apply a foreign law only when the law is "against good morals or natural justice or . . . would be prejudicial to the general interests of [South Carolina] citizens." *Grimes v. Young Life, Inc.*, No. 8:16-1410-HMH, 2017 WL 5634239, at *4 (D.S.C. Feb. 17, 2017) (quoting *Rauton v. Pullman Co.*, 191 S.E. 416, 422 (S.C. 1937), *aff'd sub nom. Grimes v. Inner Quest Inc.*, 731 F. App'x 249 (4th Cir. 2018). Mere differences between the two laws are insufficient to meet this standard. *Id.* ("the fact that the law of two states may differ does not necessarily imply that the law of one state violates the public policy of the other" (quoting *Dawkins v. State*, 412 S.E.2d 407, 408 (S.C. 1991)). As courts have emphasized, "it is not enough for the foreign state's laws to be against the policy underlying a [South Carolina] law"; the foreign law must be found to go further in being "against good morals or natural justice." *Hughes v. Med. Depot, Inc.*, No. 2:18-CV-2187-RMG, 2019 WL 1772401, at *2 (D.S.C. Apr. 23, 2019).

Consistent with this high bar, courts reserve the public policy exception for the rarest of cases, such as "prohibited marriages, wagers, lotteries, racing, contracts for gaming or the sale of liquor," *see Rauton*, 191 S.E. at 422, or interspousal immunity, *see Boone*, 546 S.E.2d at 194 (finding grant of interspousal immunity under Georgia law irreconcilable with "public policy of

---

Similarly, suits arising out of torts at U.S. embassies abroad would also require the application of foreign law under *lex loci. See Meredith v. United States*, 330 F.2d 9, 10 (9th Cir. 1964).

24

[South Carolina] to provide married persons with the same legal rights and remedies possessed by unmarried persons"). The exception is not triggered in situations where the foreign and forum laws reach different results on questions of tort liability. *See*, *e.g.*, *Rauton*, 191 S.E. at 422 (application of Mexican law would not violate South Carolina public policy for its failure to recognize punitive damages); *Dawkins*, 412 S.E.2d at 408 (application of Georgia law precluding emotional distress actions did not violate public policy "even if recovery may be had upon application of South Carolina law"); *Thornton v. Cessna Aircraft Co.*, 886 F.2d 85, 88-89 (4th Cir. 1989) (application of Tennessee's statute of repose did not violate public policy even though it barred suit that would have proceeded in South Carolina); *Hughes*, 2019 WL 1772401, at *2 (application of Georgia law barring strict liability for product sellers did not violate South Carolina public policy).

The exception is also not triggered "when foreign law is applied to preclude a tort action for money damages, whether against an individual or the State, even if recovery may be had upon application of South Carolina law." *Dawkins*, 412 S.E.2d at 408; *see also KJ Appliance Ctr., LLC v. BSH Home Appliances Corp.*, No. 2:19-cv-795-RMG, 2020 WL 219600, at *3 (D.S.C. Jan. 15, 2020) (same); *Accident Ins. Co., Inc. v. U.S. Bank Nat'l Ass'n*, No. 3:16-CV-02621-JMC, 2019 WL 2865222, at *4 (D.S.C. July 3, 2019) (same); *Hughes*, 2019 WL 1772401, at *2 (same); *In re Yamaha Motor Corp. Rhino ATV Prod. Liab. Litig.*, No. 3:09-CV-143-JBC, 2009 WL 2849576, at *3 (W.D. Ky. Sept. 2, 2009) ("Under South Carolina law, a court will not refuse to apply the law of the state where the wrong occurred simply because the foreign law is different and operates to reduce—or even to bar completely—the plaintiff's ability to recover.").

2.    Afghan Law Includes Apportionment of Liability to Non-Parties.

As set forth in the attached Declaration of Mr. Mehdi Hakimi (Exhibit F), the Afghan Civil Code specifically provides for the apportionment of liability to responsible third parties. Thus, unlike South Carolina's pure joint-and-several liability rule, Afghan law will permit the factfinder

25

to apportion liability to the U.S. Military at any trial arising out of these cases. This alone—which was never considered by the *Hencely* court—provides reason to dismiss these suits.[20]

As Mr. Hakimi explains, the Afghan legal system has many attributes that are similar to those of the United States. For example, Afghanistan's Constitution is "the supreme law of the country," which establishes foundational principles such as separation of powers and an independent judiciary. Ex. F, Hakimi Decl. ¶¶ 8-12. Afghanistan follows the civil law tradition, meaning statutes and codified rules—rather than case law or judicial precedent—are considered the main source of law. The Civil Code of 1977 ("Code") primarily governs Afghanistan's tort law. *Id.* at ¶ 19. For the benefit of the Court, Mr. Hakimi outlines the Code and related Afghan legal provisions regarding basic tort concepts of causation, defenses to liability, and—directly relevant here—apportionment of liability among tortfeasors. *Id.* at ¶¶ 19-39.

Under Article 789 of the Code, "[i]f several persons are responsible for [a] harmful act, they shall have equal liability for compensation, unless [the] judge determines compensation share of every one of them." *Id.* ¶ 35. Thus, Afghan law "is not consistent with the U.S. common law doctrine of 'joint and several liability.'" *Id.* ¶ 36. Rather, Afghan law establishes a default rule whereby "liability will be apportioned equally"—meaning, if there are two persons responsible for the same injury "each person will be liable for 50 percent of the damages." *Id.* Afghan law, however, "grants the judge considerable discretion to determine the apportionment of liability based on the facts." *Id.* "For example, depending on the tortfeasors' respective degrees of

---

[20] As noted in his declaration (Ex. F), Mr. Hakimi is an internationally recognized Afghan law expert with broad experience and expertise teaching, writing, and advising on Afghan law. Mr. Hakimi, a native of Afghanistan, is currently Lecturer-in-Law and the Executive Director of the Rule of Law Program at Stanford Law School. He teaches and supervises classes on the Afghan legal system; oversees the development of textbooks on Afghan law at Stanford; and has authored, co-authored, or edited several textbooks, journal articles, and essays on the laws of Afghanistan.

responsibility for the injury, the judge may apportion 40 percent of liability to one tortfeasor and 60 percent of liability to the other tortfeasor." *Id*. In addition, as Mr. Hakimi explains, the Code's language is "quite broad" and permits apportionment of liability "to *any* tortfeasor that is deemed to be 'responsible for [the] harmful act' based on an objective assessment of the facts—irrespective of whether that person is named as a party to a particular lawsuit." *Id.* ¶ 37.

Because the law of Afghanistan applies to the apportionment issue, and because Afghan law includes "a proportional-liability system that allocates liability based on fault," this Court— like the *Loquasto* court—should dismiss these cases based on the political question doctrine. *See Burn Pit I*, 744 F.3d at 340-41; *see also Loquasto*, 2021 WL 75550, at *8 ("The military's alleged contribution to causation here is not so tenuous, and Defendants' defenses will require the Court or the jury to assess that contribution.").

> **D.     This Litigation Offends Basic Separation-of-Powers Principles Under Longstanding Supreme Court Precedent.**

Even if *Taylor* and its Fourth Circuit progeny did not compel dismissal of this action, the Court should dismiss these cases because they offend basic separation-of-powers principles established under longstanding Supreme Court precedent.

First, in *Feres v. United States*, the Supreme Court held that servicemembers are barred from pursing tort claims against the United States for injuries suffered "incident to" their service. 340 U.S. 135, 146 (1950). As the Court explained, the attempt by soldiers to recover in tort for service-related injuries was unprecedented: "We know of no American law which ever has permitted a soldier to recover for negligence, against either his superior officers or the Government he is serving." *Id*. at 141. Notwithstanding the then-recent enactment of the Federal Tort Claims Act, the Court refused to create a novel remedy for service-related injuries, based on two core elements: (i) the "distinctively federal" relationship between soldiers and the military; and (ii) the

existence of federally-implemented "systems of simple, certain, and uniform compensation for injuries or death of those in armed services," including the compensation system administered by the predecessor agency to the Veterans' Benefits Administration ("VBA"). *Id*. at 143-44.

Second, in *Stencel Aero Eng'g Corp. v. United States*, 431 U.S. 666 (1971), the Supreme Court relied on *Feres* to hold that a contractor was barred from pursuing an indemnification action against the United States for tort claims brought by a serviceman. The Court explained that such action would result in the same harms to federal interests as a direct action. As the Court explained:

> [I]t seems quite clear that ***where the case concerns an injury sustained by a soldier while on duty***, the effect of the action upon military discipline is identical whether the suit is brought by the soldier directly or by a third party. The litigation would take virtually the identical form in either case, and at issue would be the degree of fault, if any, on the part of the Government's agents and the effect upon the serviceman's safety. The trial would, in either case, involve second-guessing military orders, and would often require members of the Armed Services to testify in court as to each other's decisions and actions.

*Id*. at 673 (emphasis added).

Third, in *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973), the Supreme Court held that claims arising out of the tragic killing of four students by the Ohio National Guard were nonjusticiable because they would improperly allow the Judiciary to encroach upon matters committed to the Legislative and Executive Branches. As the Court explained:

> The complex subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches. The ultimate responsibility for these decisions is appropriately vested in branches of the government which are periodically subject to electoral accountability. It is this power of oversight and control of military force by elected representatives and officials which underlies our entire constitutional system….

*Id*. Following *Gilligan*, the Fourth Circuit has repeatedly dismissed claims requiring scrutiny of "complex, subtle, and professional decisions" by the Military. *See*, *e.g.*, *Tozer v. LTV Corp.*, 792

28

F.2d 403, 405-06 (4th Cir. 1986) ("The judicial branch is by design the least involved in military matters….Difficult choices, trade-offs, and compromises inhere in military planning that simply find no analogue in civilian life."); *Tiffany v. United States*, 931 F.2d 271, 277 (4th Cir. 1991) ("The strategy and tactics employed on the battlefield are clearly not subject to judicial review.").

These precedents require dismissal of these claims. Plaintiffs were active-duty members of the Military, stationed on a base in a combat zone at the time of an enemy attack. As such, they maintained a "uniquely federal" relationship with the United States, and they are entitled to a uniform and predictable federal remedy, pursuant to the VBA, for any injuries incident to their service. *See* 38 U.S.C. § 1110; 38 U.S.C. § 1131; *see also*, *e.g.*, ECF 3, Pl.'s Answers to Local Civil Rule 26.1 Interrogs. ("The Department of Defense and/or The Army may have a subrogation interest in this matter due to compensation or other benefits paid to Plaintiff. The Department of Veterans Affairs may also have a subrogation interest in this matter due to medical benefits and other disability benefits provided to Plaintiff as a result of his injuries."). As in *Stencel*, because this case "concerns an injury sustained by a soldier while on duty, the effect of the action upon military discipline is identical whether the suit is brought by the soldier directly or by a third party." *See Stencel*, 431 U.S. at 673. And, as in *Stencel*, any "trial would…involve second-guessing military orders, and would…require members of the Armed Services to testify in court as to each other's decisions and actions." *Id*. Moreover, any attempt to try this case would place judgments by Military commanders "front and center," including decisions regarding how to protect against enemy attacks on overseas bases. *See Loquasto*, 2021 WL 75550, at *7 ("[T]he Court would have to assess the soundness of military judgments related to approving Nayeb for base access and the propriety of his continued admission. These are military decisions related to control over base access. Thus, they are insulated from judicial review."). As *Carmichael* explained, this renders the

29

suits nonjusticiable regardless of which forum's law is held to apply. *See Carmichael*, 572 F.3d at 1288 n.13 ("We find it unnecessary to address the [choice-of-law] issue here as well since, given the uniformity of negligence law among the states, *our analysis would remain the same regardless of which state's law applied*.") (emphasis added).

Furthermore, courts lack standards to evaluate these issues. There are no civilian analogues for, *inter alia*, deciding when it is "reasonable" to place a known terrorist inside a secure military facility, nor are there civilian norms regarding how much oversight of a known terrorist is "reasonable" given competing demands, limits on resources, and balancing of policy objectives. *Loquasto*, 2021 WL 75550, at *7 ("the Court is aware of no standards by which it could evaluate which LNs should or should not have been approved for base access, let alone whether the military should have allowed Nayeb base access despite his known Taliban ties"). The Military judgments at issue involved "strategy and tactics employed on the battlefield [which] are clearly not subject to judicial review." *Tiffany*, 931 F.2d at 277. There are no standards "with which to assess whether reasonable care was taken to achieve military objectives while minimizing injury and loss of life." *Aktepe v. United States*, 105 F.3d 1400, 1404 (11th Cir. 1997). Courts cannot be expected to weigh whether the Military acted reasonably when it directed *who* should be permitted onto the base, *how* to vet and search them upon entry, *how* they should be escorted, and how best to surveil and ensure each movement of Local Nationals was executed in accordance with Military policies. Yet these Military judgments lie at the heart of Plaintiffs' claims and Fluor's defenses.

Furthermore, this litigation implicates foreign policy matters that are committed to the Executive Branch, including the "Security and Defense Cooperation Agreement" entered into in 2015 between the United States and Afghanistan, which set the conditions of the Military's continued military presence in Afghanistan. *See* Security Defense Cooperation Agreement, Afg-

U.S. Sept. 30, 2014, T.I.A.S. 15-101 (available at https:/www.state.gov/15-101/). That agreement reaffirmed that the two nations were "committed to strengthen[ing] long-term strategic cooperation in areas of mutual interest, including: advancing peace, security, and stability; strengthening state institutions; supporting Afghanistan's long-term economic and social development; and encouraging regional cooperation." *Id*. at 1. Allowing this litigation to proceed would permit judicial second-guessing of Executive Branch decisions as to how to implement this agreement, as well as the wisdom of the "Afghan First Program" and the Military's decision to place Nayeb at BAF to "support[] Afghanistan's long-term economic and social development." *See id*.

In sum, under the design of our government the Judiciary has no role in regulating the sensitive battlefield judgments described above. Fluor, and other contractors operating on overseas bases, ***rely on the Military*** to make these decisions. If the Judiciary were to inject itself into this arena to regulate this conduct, it would undermine the Military's ability to strike these balances as it deems appropriate. *See Al Shimari v. CACI Int'l, Inc.*, 679 F.3d 205, 226–27 (4th Cir. 2012) (J. Wilkinson, dissenting) ("allowing such claims to go forward against contractors integrated into wartime combatant activities under control of the U.S. military…raises thorny questions of whose law should apply, compromises the military's ability to utilize contractors in the future, and nudges foreign policy and war powers away from the political branches of the federal government and into the hands of federal courts").

## II.    THE COURT SHOULD DISMISS PLAINTIFFS' CLAIMS BASED ON THE SOUTH CAROLINA DOOR CLOSING STATUTE.

Plaintiffs' claims are also barred on a separate and independent ground: the South Carolina Door Closing Statute, S.C. Code Ann. § 15-5-150 ("Door Closing Statute"). Plaintiffs are nonresidents who seek to utilize the South Carolina court system to assert claims against foreign defendants regarding conduct that has no connection to South Carolina. Beyond those simple core

31

facts necessitating dismissal, Plaintiffs' decision to file suit in this forum, on the heels of their

defeat in Texas, was blatant, *ex post* forum shopping. As such, these cases are exactly the sort of

litigation that the South Carolina Door Closing Statute was designed to eliminate.

The South Carolina Door Closing Statute "prevents a nonresident of South Carolina from

bringing suit against a foreign corporation in the [] courts of South Carolina unless the cause of

action arises in the state or the subject of the action is situated in the state." *Smith v. Mack Trucks,*

*Inc.*, 991 F.2d 791 (table), 1993 WL 127963 at *1 (4th Cir. 1993). As this Court has explained:

> There are three judicially recognized purposes of the Door Closing
> Statute: [1] It favors resident plaintiffs over nonresident; [2] It provides
> a forum for wrongs connected with the state while avoiding the
> resolution of wrongs in which the state has little interest; [and 3] It
> encourages activity and investment within the state by foreign
> corporations without subjecting them to actions unrelated to their
> activity within the state.

*Boisvert v. Techtronic Indus. N. Am., Inc.*, 56 F. Supp. 3d 750, 753 n.1 (D.S.C. 2014); *see also*

*Cal. Buffalo v. Glennon-Bittan Grp., Inc.*, 910 F. Supp. 255, 259 (D.S.C. 1996) ("The public policy

behind the adoption of the door closing statute is to prevent litigants with no connection with South

Carolina from clogging our court system with such transient suits.").[21]

For well over a century, South Carolina's state and federal courts have consistently

enforced the Door Closing Statute. *See Boisvert*, 56 F. Supp. 3d at 754 (citing *Central R.R. &*

*Banking Co. v. Georgia Constr. & Inv. Co.*, 32 S.C. 319, 11 S.E. 192, 203 (S.C. 1890)). In short,

the Door Closing Statute "closes the doors of South Carolina's courts for suits, as the present one,

---

[21] The constitutionality of the Door Closing Statute has been affirmed by this Court and others. *See Conner v. Techtronic Indus. N. Am., Inc.*, No. 8:13-CV-02353-JMC, 2015 WL 3871889, at *4 (D.S.C. June 23, 2015) (quoting *Clark v. Babbitt Bros., Inc.,* 196 S.E.2d 120, 121 (S.C. 1973)) ("'[T]here is nothing to compel a state to exercise jurisdiction over a foreign corporation unless it chooses to do so, and the extent to which it so chooses is a matter for the law of the state as made by its legislature.'"); *see also Boisvert*, 56 F. Supp. 3d at 753 (citing *Szantay v. Beech Aircraft Corp.,* 349 F.2d 60, 65 (4th Cir. 1965) ("[T]he [Door Closing] Statute is not unconstitutional.").

32

involving a foreign cause of action brought by a foreign plaintiff against a foreign corporation." *Proctor & Schwartz, Inc. v. Rollins*, 634 F.2d 738, 739 (4th Cir. 1980). "[A] federal court exercising diversity jurisdiction must apply § 15-5-150 unless countervailing federal considerations are present."[22] *Id.* at 739-40; *Boisvert*, 56 F. Supp. 3d at 752 (holding same). The Fourth Circuit has recognized three countervailing federal considerations: "(1) the purpose in the grant of diversity jurisdiction of avoiding discrimination against nonresidents; (2) the policy of encouraging a state to enforce the laws of its sister states; and (3) the fact that South Carolina was the only state in the country in which the [action could be brought]." *Rollins*, 634 F.2d at 740; *see also Szantay*, 349 F.2d at 65. "The importance of the last factor is paramount." *Collins v. RJ Reynolds Tobacco Co.*, 92 F.3d 1177 (Table), 1996 WL 452595, at *2 (4th Cir. 1996); *see also Boisvert*, 56 F. Supp. 3d at 752 ("*Szantay* has been almost completely limited, by the Fourth Circuit Court of Appeals, to circumstances in which the plaintiff does not have an alternative forum in which to assert his claims."); *Conner*, 2015 WL 3871889, at *2 ("'[T]he Fourth Circuit Court of Appeals has . . . limited the need to apply *Szantay* balancing to situations in which a plaintiff has no other available forum in which to bring its action.'" (quoting *Cal. Buffalo*, 910 F. Supp. at 257)).

Here, Plaintiffs' Complaints fall squarely within the purview of the Door Closing Statute, and thus all claims of all Plaintiffs are barred. *See Rosenthal v. Unarco Indus., Inc.*, 278 S.C. 420, 425, 297 S.E.2d 638, 642 (S.C. 1982) (granting motion for judgment on the pleadings where the defendants were foreign corporations, the plaintiff was a citizen and resident of New York, and the alleged injury occurred in the plaintiff's home state).

*First*, Plaintiffs' Complaints establish that they are all nonresidents, as they reside in Texas

---

[22] Plaintiffs allege diversity jurisdiction. *See*, *e.g.*, ECF No. 1 ¶ 38.

33

(ten Plaintiffs), Alabama, Illinois, and North Carolina.[23] ***Second***, Plaintiffs assert causes of action against foreign corporations. A foreign corporation's place of incorporation is the only relevant consideration under the Door Closing Statute. *See Parsons v. Uniroyal-Goodrich Tire Corp.*, 438 S.E.2d 238, 239 (S.C. 1993), *overruled on other grounds by Farmer v. Monsanto Corp.*, 353 S.C. 553, 556-57, 579 S.E.2d 325, 328 (S.C. 2003) ("[S]ection 15–5–150 applies to any corporation created by or under the laws of any other state, government, or country regardless of where its principal place of business is located."); *see also Conner*, 2015 WL 3871889, at \*3 (D.S.C. June 23, 2015) ("Plaintiff's emphasis on Defendants' principal places of business in South Carolina bears no relevance as the place of incorporation has been held to be the only relevant determination for the Door Closing Statute."). As the Complaints allege, Defendant Fluor Government Group International, Inc. is incorporated in Delaware[24], and Defendant Fluor Intercontinental is incorporated in California.[25] ***Third***, the allegations arise out of actions that occurred at BAF in Afghanistan.[26] As a result, the Door Closing Statute applies.

Furthermore, Plaintiffs could have brought this action in numerous other forums, including: (1) Texas, California, Illinois, or North Carolina (Plaintiffs' states of residence); (2) Delaware, where Fluor Government Group International, Inc. is incorporated; or (3) California, where Fluor Intercontinental, Inc. is incorporated. *See Collins*, 1996 WL 452595, at \*3 (holding "Georgia clearly constitute[d] an alternative forum for [a Georgia resident]"); *see also Conner*, 2015 WL 3871889, at \*4 ("The availability of an alternative forum is dispositive under *Rollins* and its progeny."); *Boisvert*, 56 F. Supp. 3d at 753 (same).

---

[23] In each of the complaints, Paragraph 21 alleges the Plaintiff's state of residency.

[24] *See*, *e.g.*, *Tangen*, ECF 1 ¶ 30.

[25] *See*, *e.g.*, *Tangen*, ECF 1 ¶ 28.

[26] *See*, *e.g.*, *Tangen*, ECF 1 ¶ 112 (alleging negligent conduct at BAF).

Even if Plaintiffs were barred from bringing their claims in another forum at the time they filed suit in South Carolina, the Door Closing Statute still applies. *Collins*, 92 F.3d 1177, at \*3 ("Following *Rollins*, we find that the fact that the statute of limitations in Georgia has lapsed is insufficient to overcome barring this action under the door-closing statute."); *Rollins*, 634 F.2d at 740 ("A plaintiff's failure to timely file suit in the more logical, convenient forum does not constitute a countervailing consideration favoring the exercise of federal jurisdiction."); *Boisvert*, 56 F. Supp. 3d at 753 (holding same); *Conner*, 2015 WL 3871889, at \*2 ("Even if Plaintiff was procedurally barred from filing this action in [his home state of] Alabama, . . . this would not constitute a countervailing federal consideration"). The case law is clear that foreign plaintiffs lack capacity to sue in South Carolina so long as there was another forum previously available.

Nothing in the *Hencely* Door Closing decision alters the need for dismissal. *See Hencely*, ECF 78. First, with all due respect, the *Hencely* Court's reasoning was flawed. *Hencely* contradicted settled precedent by creating a novel "full relief" requirement that is irreconcilable with the standard articulated by courts for more than a century. In denying Fluor's motion to reconsider, the *Hencely* Court backtracked from its "full relief" reasoning and based its denial primarily on the existence of a breach-of-contract claim. *Hencely*, ECF 85. But *Hencely* failed to consider the predicate issue of whether Plaintiffs may pursue breach-of-contract claims. As Fluor has now explained, those claims should be dismissed because Plaintiffs clearly lack standing to assert them, *see* ECF 64-2 at 44-50, and thus those claims cannot provide a basis for maintaining suit in this forum. For these reasons, this Court should independently assess the Door Closing issue, and reach a different conclusion from *Hencely*.

## CONCLUSION

The Court should dismiss these consolidated cases based on the political question doctrine and based on the South Carolina Door Closing Statute.

35

Respectfully submitted,

NEXSEN PRUET, LLC

s/Andrew A. Mathias
William W. Wilkins, Fed. ID No. 4662
Andrew A. Mathias, Fed. ID No. 10166
Konstantine P. Diamaduros, Fed. ID No. 12368
104 South Main Street, Suite 900 (29601)
Post Office Box 10648
Greenville, South Carolina 29603-0648
Telephone: 864.370.2211
Facsimile: 864.282.1177
BWilkins@nexsenpruet.com
AMathias@nexsenpruet.com
KDiamaduros@nexsenpruet.com

TREY GOWDY LAW FIRM, LLC

Harold Watson Gowdy, III, Fed. ID No. 5675
Post Office Box 3324
Spartanburg, South Carolina 29304
Telephone: 864.809.0917
trey@treygowdylawfirm.com

HARTLINE BARGER LLP

Darrell L. Barger (*admitted pro hac vice*)
1980 Post Oak Blvd.
Suite 1800
Houston, Texas 77056
Telephone: 713.759.1990
Facsimile: 713.652.2419
dbarger@hartlinebarger.com

J. Reid Simpson (*admitted pro hac vice*)
800 N. Shoreline Blvd.
Suite 2000, North Tower
Corpus Christi, Texas 78401
Telephone: 361.866.8000
Facsimile: 361.866.8039
rsimpson@hartlinebarger.com

COVINGTON & BURLING LLP
Raymond B. Biagini (*admitted pro hac vice*)
Daniel L. Russell Jr. (*admitted pro hac vice*)

36

One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: 202-662-6000
Facsimile: 202-662-6291
RBiagini@cov.com
DRussell@cov.com

*Attorneys for Defendants Fluor Corporation, Fluor Enterprises, Inc., Fluor Intercontinental, Inc., and Fluor Government Group International, Inc.*

July 30, 2021
Greenville, South Carolina

37