# Exhibit B

## *Jones Deposition Excerpts*

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

WINSTON TYLER HENCELY,

Plaintiff,

CIVIL ACTION FILE

vs.

NO. 6:19-CV-00489-BHH

FLUOR CORPORATION FLUOR
ENTERPRISES, INC., FLUOR
INTERCONTINENTAL, INC.,
FLUOR
GOVERNMENT GROUP
INTERNATIONAL, INC.,

Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~

REMOTE VIDEO DEPOSITION OF

GORDON JONES

April 22, 2021

9:03 a.m.

3102 Brook Park Drive, SE

Owens Cross Roads, Alabama

S. Julie Friedman, CCR-B-1476

Gordon  Jones                                         April 21, 2021
Hencely, Winston Tyler v. Fluor Corporation Inc

Page 2

                      APPEARANCES OF COUNSEL

On behalf of the Plaintiff:

        BUTLER WOOTEN & PEAK LLP
        JAMES E. BUTLER, JR., ESQ.
        PO Box 2766
        105 Thirteenth Street
        Columbus, Georgia  31902-2766
        706.322.1990
        706.323.2962 Fax
        jim@butlerwooten.com


        BUTLER WOOTEN & PEAK LLP
        ROBERT H. SNYDER, JR., ESQ.
        DANIEL E. PHILYAW, ESQ.
        2719 Buford Highway NE
        Atlanta, Georgia  30324
        404.321.1700
        404.321.1713 Fax
        rob@butlerwooten.com
        dan@butlerwooten.com
AND
        BOWEN PAINTER LLC
        PAUL W. PAINTER, III, ESQ.
        W. ANDREW BOWEN, ESQ.
        3rd Fluor
        7302 Abercorn Street
        Savannah, Georgia  31406
        912.335.1909
        912.335.3537 Fax
        paul@bowenpainter.com
        andrew@bowenpainter.com
AND
        LAW OFFICE OF D. JOSEV BREWER
        D. JOSEV BREWER, ESQ.
        650 E. Washington Street
        Greenville, South Carolina  29601
        864.383.5250
        contact@joebrewerlaw.com

Page 3

APPEARANCES OF COUNSEL (CONTINUED)

On behalf of the Defendants:
    COVINGTON & BURLING LLP
    DAN RUSSELL, ESQ.
    RAYMOND B. BIAGINI, ESQ.
    One City Center
    850 10th Street, N.W.
    Washington, D.C. 20001
    202.662.5420
    drussell@cov.com
    rbiagini@cov.com
AND
    NEXSEN PRUET
    ANDREW A. MATHIAS, ESQ.
    KONSTANTINE DIAMADUROS, ESQ.
    Suite 400
    55 E. Camperdown Way
    Greenville, South Carolina  29601
    864.282.1195 (AAM)
    864.477.2697 Fax (AAM)
    864.282.1173 (KPD)
    864.477.2617 (KPD)
    amathias@nexsenpruet.com
    kdiamaduros@nexsenpruet.com

On behalf of U.S. Department of the Army and the
   Deponent:
    General Litigation Branch
    U.S. Army Legal Services Agency
    Tarik J. Downie, MAJ, JA
    Litigation Attorney
    9275 Gunston Road
    Fort Belvoir, Virginia  22060
    571.723.1127
    tarik.j.downie.mil@mail.mil

Gordon  Jones                                                April 21, 2021
Hencely, Winston Tyler v. Fluor Corporation Inc

Page 37

a prayer location at their workplace, so that

emphasis while they were at their workplace

should not be there.

The emphasis should be during certain

times.  That should be in italics, and that time

was when they were engaged in prayer.  Is

that --

Q.     (By Mr. Snyder)  Mr. Jones, is --

I'm sorry.  I thought you were done.

Please go ahead.

A.     No.  It's -- it's -- it's a --  It's

difficult to get your arms around and to visualize it

unless you were there, but we --  We were under a

general -- General Order 1, I think, Charlie while we

were there; and there were prohibitions against

entering mosques and areas for prayer.

So General Order 1 did get included in

the -- in the Fluor contract, and they were bound to

follow the prohibitions in General Order 1 C, and it

could have been --  It could have been 1 B.  I'm --

I'm --  I'm not sure at this time.  That's --

I've been in various locations where

the -- the -- the general order number --  The

severity of the general order number has -- has

changed.  I was in Kuwait, Iraq and -- and

Page 38

Afghanistan; and each one of them had its own variant.

MR. SNYDER: Mr. Jones, I'm going to move to strike the latter part of that answer as nonresponsive.

Q. (By Mr. Snyder) As the senior contracting official on Bagram Airfield, isn't it true you're familiar with the contracts that govern Fluor's work for the Army?

A. Yes.

Q. You familiar with the April 1, 2013 Afghanistan North Task Order 005 Performance Work Statement?

A. Pretty much. Yes.

Hold -- Hold on.

(Discussion ensued off the record.)

THE WITNESS: Okay. All right. I'm primary caregiver for an elderly mother-in-law so --

Okay. I got called away for a second.

Q. (By Mr. Snyder) If you need to take a break at any point, just let us know.

A. No. I'm good. I'm good.

Q. Okay. Now I was asking you about the performance work statement. That was the --

Page 53

Army that's actually prohibited from supervising contractor personnel?

MR. RUSSELL:  Objection to form.  And you've, once again, deliberately misstated the quote from the brief that you've now deliberately misstated at least four times.

Q.    (By Mr. Snyder)  Do you remember the question, Mr. Jones?

A.    You know, I don't make Army policy.  I don't know what the Army's policy was.  I know what was contained in General Order 1, which prohibited entry into the prayer areas and the mosque.

Q.    My question was:  Isn't it true it's the Army that is actually prohibited from supervising contractor personnel?

A.    I know of no such policy.

Q.    Let's look at --

A.    Well, there is -- there is a contracting theory called privity of contract.  We supervise Fluor.  Fluor supervises their employees.

Q.    Thank you, sir.

Now you reference Army Regulation 700-137 in your declaration; is that correct?

A.    That's correct.

Q.    I'm going to show you an excerpt from

Page 60

MR. SNYDER:  I don't have any further questions for you today, sir.  Thank you.

MR. RUSSELL:  Now, Mr. Snyder, you have heard the witness off the record say he wanted to clarify an answer from his -- his prior testimony.  Were you going to ask him to do that?

MR. SNYDER:  No.

MR. RUSSELL:  No.  You're not going to ask him to do that, even though he requested the opportunity?

MR. BUTLER:  Ask him if he has any questions for the witness.

MR. SNYDER:  Do you have any questions for the witness?

MR. RUSSELL:  I --  I do.  I was just wondering, 'cause he had expressed an interest in clarifying his testimony, whether you were going to ask him do that.

Is your answer no?

MR. SNYDER:  If you've got questions, Mr. Russell, please ask them.

MR. RUSSELL:  Well, I'll start there, 'cause it seemed like that was the place that we were all going when we were off the record

Page 61

but --

CROSS-EXAMINATION

BY MR. RUSSELL:

Q.    Mr. Jones, my name's Dan Russell.  I'm an attorney for Fluor.

I'll --  I'll begin with -- with that. You had indicated off the record to Mr. Snyder and myself that you would like to clarify something from your prior testimony.  Would you like to do that?

A.    Yes.  It -- it --

MR. SNYDER:  Object to the characterization.

THE WITNESS:  It was apparent to me that the -- that Mr. Snyder had conflated the concepts of supervision and 24-7, eyes-on surveillance.

Fluor was tasked with supervising LN employees, just as they're tasked with supervising non-LN employees, just like government officials are tasked with supervising my conduct while at work.

But in nowhere in the contract is the concept of 24-7, eyes-on surveillance required with the exception of movement to and from the ECPs to the workplace.  That is a specific

Gordon Jones
Hencely, Winston Tyler v. Fluor Corporation Inc
April 21, 2021

Page 62

requirement of the contract.

And we actually had a quality control --
Actually, it's quality assurance on the
government side.  We had a -- a QA guy assigned
to making sure that any time there was a
movement of LN personnel, that they had -- they
didn't exceed the numerical requirement -- I
think it was ten to one or eight to one or five
to one or whatever it was -- escorts.

So an -- an -- an expat, which is a U.S.
employee, could be present with X number.  I
think the number was ten.  It's contained in the
base access policy.

But an -- an OCN, which is an other
contract national, let's -- let's call them a,
you know, a Bosnian or a Serb or -- or a
Filipino or whatever, they could escort maybe a
lower number.  Maybe five so --

But the movement to and from the workplace
was covered specifically under the contract
term -- 24-7, eyes-on during that movement, but
not while they're at work, and --  And this is
the concept which is -- appears to be lost
during this discussion.

Q.    (By Mr. Russell)  Thank you, Mr. Jones.

Gordon  Jones                                    April 21, 2021

Hencely, Winston Tyler v. Fluor Corporation Inc

Page 63

Was there anything else from your prior testimony that you wanted to clarify or correct?

A.    No.  I -- I think that's --  I think that's good.

Q.    Oh, I wanted to ask you a few questions about your -- your declaration that Mr. Snyder covered with you.  Do you have a copy of that declaration in front of you?

A.    I do.

Q.    All right.  And -- and I --  My first question does relate to this notion of 24-7, eyes-on that you've just referenced.

If you could, please turn to Paragraph 20 of your declaration.

A.    I have it.

Q.    Now in this paragraph, you state as follows.  Quote, "Prior to November 2016, I attended and participated in discussions with Fluor about possibly modifying the Base Access Policy to require escorting of local nationals while at their workplace."

First, is that -- is that statement in your declaration true?

A.    Yes.  And there --  There were many more times where Fluor had approached the -- the

Gordon  Jones                                      April 21, 2021
Hencely, Winston Tyler v. Fluor Corporation Inc

Page 64

Government with a -- a potential mod to the PWS, the requirement to expand the escort services or contract them, depending upon the situation.

Q.     Can you describe those conversations for me.

A.     Usually, Ron Riley, who is the Fluor contracts manager, would --  We had what we called monthly performance feedback sessions.  Think them as our report card.  They would get an opportunity to tell us the things that they had done; and we would tell them the results of our surveillances of what we had noticed; and we would compare to make sure that nobody was caught off guard by a slippage in performance and that we gave the contractor ample opportunity to correct any deficient performance, as noted.

So during these monthly meetings and, oftentimes, almost in a daily manner, Fluor, through Ron Riley, the contracts manager, would approach me with, hey, I -- I think we can save money by doing this.  Hey, I think we can improve our performance by doing that.  I think we can make it better for everybody if we adopted this new approach.

He would present a -- a very brief summation of the change and the impact to the

Page 65

dollars, both up and down; and we would take that and go to the proponent element.

Say, for example, if it was involving the garrison commander, it had to do with facilities maintenance, we would discuss it with the point of contact over at the garrison who had cognizances over that specific task to see if they wanted to implement that change.

Every change virtually had a -- had a -- a dollar impact associated with it, both up and down. Us contracting people, we're not -- we're not funded, so we can only act as the conduit to put Fluor in touch with our proponent element to see if they wanted to fund this additional work to improve performance or whether they were willing to suspend performance in order to achieve a savings.

So this was almost a daily requirement. I mean, our -- Fluor's offices and mine were probably a hundred meters apart, and we were in each offices -- each other's offices every day. We worked seven days a week, 16 hours a day with no breaks, no vacation; and we were in each other's office every day.

Q.    And during those interactions, that's when these discussions about modifying, possibly modifying

Page 66

the base access policy took place?  Those are the daily, weekly, monthly discussions?

A.    Yes.

Q.    In looking back at your declaration a little bit further on in Paragraph 20, you state, "During these discussions, Fluor indicated that it could take on this additional work with appropriate contract direction and funding."

Is that accurate?

A.    Yes.

Q.    What does that mean "take on this additional work"?

A.    The contract required Fluor to have 24-7, eyes-on surveillance to and from the ECP and the workplace.  It did not required 24-7, eyes-on surveillance once the LN employee got to the workplace.

There were a couple of -- of occasions where Fluor had approached our office with this 24-7 concept for every LN employee, but the price tag was going to be excessive.

And we presented it to the garrison, and it was never funded.  Therefore, never implemented.

Q.    And that decision not to implement it, that's made by the garrison command?

Gordon  Jones                                          April 21, 2021
Hencely, Winston Tyler v. Fluor Corporation Inc

Page 67

A.    I'm sure the garrison commander would have consulted with the chief of staff and the deputy and commanding general over US4A to get that approved or -- or not approved, but that -- that was several pay grades above my level.

Q.    As you describe, there's some consideration given to -- given to funding when they're making that decision; is that right?

A.    I'm sure that's one of the considerations. There may be many; but, you know, I don't --  I'm not intimately aware of -- of all of the -- the criteria that the garrison commander used to -- to formulate his conclusions.

Q.    So it might -- might include other criteria in addition to funding?

A.    Possibly.  Yes.

Q.    And in your -- your declaration, you make a reference to appropriate contract direction and funding.  What are you referring to there?

A.    If the contract says 24-7, eyes-on surveillance to and from ECP and workplace, we don't direct the contractor to perform work outside of that PWS requirement.  That would be a violation of -- of one of the numerous antideficiency acts.

We are not funded.  I -- as -- As a

Veritext Legal Solutions

Page 68

contracting officer and as head of the contract administration function, I do not have the authority to incur costs that have not been obligated and applied to the -- the contract by a warranted contracting officer.

I --  I am a warranted contracting officer, but not that warranted contracting officer.

Q.    I understand, Mr. Jones.  And --  And if I could, what you're saying is -- it maybe simplifying it a bit -- Fluor cannot do that additional work unless it's given contract direction, because there's no funding to do that work?

A.    Correct.

Q.    So unless and until the Army gives a direction to Fluor to do that work, Fluor is prohibited from doing that additional work; is that fair?

A.    Correct.

MAJOR DOWNIE:  I just want to lodge an objection.  He's not authorized to speak on behalf of the Army or the Department of Defense.

Q.    (By Mr. Russell)  Mr. Jones, you referenced earlier that you had had discussions with the Army investigation team.

Do you know whether the Army investigation

Page 72

MAJOR DOWNIE:  It's a running -- running objection.

THE WITNESS:  Yeah.

MAJOR DOWNIE:  He's not authorized to discuss or provide opinion on official information, DOD policy, Army policy.

THE WITNESS:  But do you let your next-door neighbor determine who can enter your house?

Q.     (By Mr. Russell)  No.

A.     No.  Okay.  There you go.

Q.     Just to put a fine point on this section here, with respect to -- with respect to the -- the suicide bomber, Nayeb, is it true that the Government was solely responsible for vetting Nayeb to ensure he did not have Taliban connections?

A.     That was the Government's --  That was the Government's bailiwick.  I don't know if --  I don't know a technical term for bailiwick.  That was their area of responsibility, and the Government would not have advocated that requirement to the contractor.

Q.     In other words, the -- the Government was responsible for vetting Nayeb.  Fluor was not responsible for vetting Nayeb; is that true?

A.     Correct.

Gordon Jones
Hencely, Winston Tyler v. Fluor Corporation Inc
April 21, 2021

Page 80

THE WITNESS:  -- that could allow --

MAJOR DOWNIE:  -- and then if it's --

THE WITNESS:  -- into the --

MAJOR DOWNIE:  -- a concern or not.

THE WITNESS:  -- to a -- a -- a secure posture.  I'm --  Yeah.

Q.    (By Mr. Russell)  Understood.  I'm just asking for your experience, but I -- I understand.

THE WITNESS:  I see, Major.

MAJOR DOWNIE:  No.  I -- I --  The court reporter seemed -- seemed --

THE WITNESS:  Yeah.  I don't need to discuss -- I don't need to discuss our -- our -- the methods that we use to -- to validate employees or to clear them on or off the base. That's --  That's classified.

THE COURT REPORTER:  I'm sorry.  But I couldn't understand what the two of you talking on top of each other a few minutes -- you know, a minute ago.  That's why I was shaking my head, Major.

Q.    (By Mr. Russell)  Mr. Jones, I -- I think you just mentioned this; but I want to make sure I heard it correctly.

You said that as part of the process of

Veritext Legal Solutions
800.808.4958                                      770.343.9696

Page 81

getting local nationals from their work site to the -- the ECP at the end of the shift, I believe you said that the -- that the Army had a surveillance system in place to ensure that that was happening properly; is that correct?

A.    The Army had a surveillance system for every PWS requirement.  We had a checklist and a surveillance guide and a surveillance schedule.

Q.    And that would include the -- the function of getting local nationals to the ECPs?

A.    To the ECP gate.  Past that point was somebody else's --  It wasn't a contract requirement.  Therefore, we were not involved in it.

Q.    Now it wasn't the contract requirement to -- to physically escort them through the gate and off the base.  That was the military's job?

A.    The contractor's responsibility was to get them to the gate and hand off.

Q.    And --  And to be clear again, hand off to the military?

A.    Correct.

Q.    All right.  One other follow-up on an earlier discussion we had talked about, discussions about contract modifications that took place.

Prior to November of 2016, I wanted to ask