# Exhibit F

# *Declaration of Mehdi J. Hakimi*

## DECLARATION OF MEHDI J. HAKIMI

### I. Background and Qualifications

1. My name is Mehdi J. Hakimi. Since 2016, I have been serving as Lecturer-in-Law and the Executive Director of the Rule of Law Program at Stanford Law School. In this capacity, I develop and implement rule-of-law projects in various countries, including Afghanistan, through close collaboration with local institutions. One of these initiatives is the Afghanistan Legal Education Project (ALEP). As part of the ALEP project, I teach and supervise Stanford law students in classes on the Afghan legal system. I also oversee the development of textbooks on Afghan law at Stanford. These textbooks are used by an array of institutions inside Afghanistan—including law schools, law firms, and courts—and globally.

2. I am a native of Afghanistan. I speak, read, and write in multiple languages including Dari/Farsi (all dialects). I previously served as Assistant Professor and Chair of the Law Department at the American University of Afghanistan (AUAF) in Kabul. Besides teaching various courses, I also founded and directed AUAF's Law Clinic Program along with the university's Moot Court Program.

3. I have acted as a subject-matter expert on Afghan law in various jurisdictions including cases in the United Kingdom and the United States. I have also advised and assisted various institutions on Afghan law matters including Yale Law School, Cornell Law School, and The Asia Foundation. My work has been cited and quoted in judicial decisions and litigation briefs in national and international proceedings. I have also been referenced in publications

1

by the European Union, as well as Congressionally-mandated reports examining U.S. policies and actions in Afghanistan.

4. I have authored, co-authored, or edited several textbooks, journal articles, and essays on the laws of Afghanistan.[1] I have also taught and trained Afghan law professors and legal professionals in Afghanistan. My scholarship is published or forthcoming in various law journals including the *California Law Review*, *Yale Journal of International Law*, *Stanford Journal of International Law*, *Columbia Journal of Transnational Law*, *Georgetown Journal of International Law*, and *Northwestern Journal of Human Rights*. My work has been translated into Dari/Farsi.

5. I have given talks and presentations on Afghanistan and its legal system at various conferences and panel discussions inside Afghanistan and abroad including at Yale Law School, Stanford Law School, University of Houston Law Center, and the Association of American Law Schools' Annual Meeting, among others. I have also been interviewed by or featured in national and international media including National Public Radio, Al Jazeera, Voice of America, New York Daily News, The Pioneer, The Altamont Enterprise, Tolo News, and other outlets discussing Afghan issues.

6. A licensed attorney in Canada, I earned my J.D. and M.B.A. from the University of Ottawa (Canada), and B.A. (Economics and Law) from Carleton University. I am an LL.M. candidate at Harvard Law School.

---

[1] My publications are available at: https://www.mehdihakimi.org/publications. *See also* https://www.ssrn.com/author=2900283.

## II. Overview of the Afghan Legal System

*Civil law system*

7. Broadly speaking, Afghanistan follows the civil law tradition.  As such, unlike common law jurisdictions, caselaw or judicial precedent is not considered a main source of law under the Afghan legal system.  Rather, like other civil law jurisdictions, statutes and codified rules—promulgated by the legislature or the executive—are far more authoritative.[2]

*Separation of powers*

8. The Afghan Constitution, which was adopted in 2004, established a system of separation of powers between the three branches of government: the legislature, the executive, and the judiciary.  Broadly speaking, the legislative branch ("National Assembly") has the power to make laws, the executive branch implements the laws, and the judicial branch interprets and applies the laws to individual cases.  The separate branches function as checks to each other.

9. The National Assembly, which is composed of two chambers,[3] serves as the "highest legislative organ" and "manifest[s] the will of [the Afghan] people.[4]  The National Assembly's powers include, *inter alia*, ratifying and abrogating laws, approving the state budget, endorsing development programs, ratifying international treaties and agreements, and approving or rejecting high-level appointments.[5]

10. The Constitution confers substantial authorities on the executive branch which is headed by the President.  The President's powers include supervising the implementation of the

---

[2] The Afghan legal system is also characterized by legal pluralism.  That is, various sources of law—codified rules, religious maxims, and custom—exist and may become applicable depending on the circumstances.  The hierarchy of these legal sources, however, is determined by the Constitution and other key statutes.

[3] Constitution, Art. 82.

[4] Constitution, Art. 81.

[5] Constitution, Arts. 90 & 91.

3

Constitution; determining the national policy of the country with the approval of the National Assembly; serving as the Commander-in-Chief of the armed forces; declaring war and peace with the endorsement of the National Assembly; defending the territorial integrity and independence of Afghanistan; dispatching armed forces outside the country; proclaiming the state of emergency with the endorsement of the National Assembly; appointing high-level officials including cabinet ministers, the Attorney General, Supreme Court justices, and ambassadors; and pardoning and commuting sentences.[6]

11. The executive is also responsible for enforcing laws and court judgments, maintaining public order and combatting administrative corruption, preparing the state budget and protecting public wealth, devising and implementing development programs, and reporting progress to the National Assembly.[7]  The President also has the power to issue legislative decrees under certain conditions.[8]

12. The Constitution established an independent judiciary comprised of the Supreme Court, Courts of Appeal, and Primary Courts.[9]  The Supreme Court is comprised of nine members, appointed by the President and endorsed by the National Assembly.[10]  The judiciary is authorized to consider all cases filed by real or incorporeal persons (including the state).[11] The Supreme Court also has the power to review laws, legislative decrees, and international treaties for their compliance with the Constitution.[12]  Trials are generally open to the public,[13] and Afghan judges are required to state the reasons for their verdicts when issuing

---

[6]  Constitution, Art. 64.
[7]  Constitution, Art. 75.
[8]  Constitution, Art. 79.
[9]  Constitution, Art. 116.
[10]  Constitution, Art. 117.
[11]  Constitution, Art. 120.  No law may exclude any case or area from the jurisdiction of the courts and submit it to another authority.  Constitution, Art. 122.
[12]  Constitution, Art. 121.
[13]  Constitution, Art. 128.

4

decisions.[14]  (The Attorney General's Office is part of the executive organ and, as with the bench, independent in its performance.)[15]

### *Hierarchy of laws: Primacy of codified provisions over Shari'a and custom*

13. Afghanistan's 2004 Constitution is the supreme law of the country.  No law or regulation may violate the provisions of the Constitution.  The Constitution establishes, among other things, the hierarchy of legal sources in Afghanistan and, in so doing, underscores the primacy of statutory laws and codified provisions over Islamic law or *Shari'a*.

14. Pursuant to Article 130 of the Constitution, statutory laws take precedence over the *Hanafi* jurisprudence of Islamic law or *Shari'a*.[16]  In other words, the court may only apply Islamic law or *Shari'a* **if** "there is no provision in the Constitution or other laws."[17]  Even in the absence of statutory laws or codified provisions, the Constitution imposes further constraints on the application of Islamic law or *Shari'a* principles: the court must ensure that the religious principle under consideration falls "within the limits set by this Constitution," *and* that its application "attains justice in the best manner."[18]  This hierarchy of laws is also reflected in Afghanistan's 1977 Civil Code which regulates a wide array of situations arising from legal relationships between private parties in areas such as contracts, civil responsibility (torts), property, inheritance, and family law.[19]

---

[14]  Constitution, Art. 129.

[15]  Constitution, Art. 134.

[16]  The *Hanafi* jurisprudence is one of the major schools of Islamic jurisprudence, and the main school followed by Sunni Muslims in Afghanistan.

[17]  Constitution, Art. 130.  Article 131 of the Constitution provides a similar hierarchy of legal sources for followers of the Shia sect of Islam.

[18]  Constitution, Art. 130.

[19]  Like Article 130 of the Constitution, Article 1(1) of the Civil Code makes clear that provisions of the Code—including "its words and spirit"—take precedence over uncodified principles derived from Islamic law.  Pursuant to Article 1(2) of the Civil Code, recourse to the *Hanafi* jurisprudence of *Shari'a* is only permitted "in cases [where] no provision of law exists."  In such cases, the court must apply Islamic law principles in a manner that "secure[s] justice in the best possible way."  *Id.*

5

15. Besides codified laws (e.g., the Civil Code) and Islamic law, custom may also be applicable in certain circumstances.  In terms of the hierarchy of legal sources, however, the role of custom is comparatively limited.  According to Article 2 of the Civil Code, for instance, custom is of tertiary importance after Code provisions and *Shari'a* maxims.[20]

### *Recognition of fundamental human rights*

16. The Afghan Constitution recognizes and provides legal protections for fundamental human rights.[21] These rights include, *inter alia*, due process rights, freedom of expression, freedom of the press, equality and non-discrimination rights, and freedom of religion.[22]  Pursuant to Article 24, "[l]iberty and human dignity are inviolable.  The state shall respect and protect liberty as well as human dignity."[23]  The Constitution established the Independent Human Rights Commission of Afghanistan—a body specifically mandated to monitor, protect, and promote human rights in the country.[24]

17. The Constitution also obliges the Afghan government to comply with its international obligations including those relating to fundamental human rights such as religious freedom.  Pursuant to Article 7 of the Constitution, "[t]he state shall observe the United Nations Charter, inter-state agreements, as well as international treaties to which Afghanistan has joined, and the Universal Declaration of Human Rights."  The Universal Declaration of

---

[20]  Moreover, as in the application of *Shari'a* maxims, the court must ensure that "custom does not contradict provisions of law or principles of justice."  Civil Code, Art. 2.

[21]  *See, e.g.*, Chapter 2 of the Constitution titled "Fundamental Rights and Duties of Citizens."

[22]  While Afghanistan is an Islamic Republic, its Constitution recognizes the religious freedom of the followers of other faiths.  According to Article 2 of the Constitution, "[f]ollowers of other faiths shall be free within the bounds of law in the exercise and performance of their religious rituals."

[23]  The Constitution expressly forbids persecution and any punishment contrary to human dignity.  Constitution, Art. 29.  The state is constitutionally mandated to govern the society "based on social justice, preservation of human dignity, protection of human rights, realization of democracy, attainment of national unity as well as equality between all peoples and tribes."  Constitution, Art. 6.

[24]  Constitution, Art. 58.  Every individual can lodge a human rights complaint with this Commission (besides other institutions).  The Commission is mandated to refer alleged transgressions to legal authorities and assist the victims. *Id.*

Human Rights, for instance, guarantees the right to freedom of religion,[25] and prohibits discrimination of any kind including on the basis of religion.[26]

18. Despite formidable and ongoing challenges in a country plagued by armed conflict for more than four decades, Afghanistan has made important strides in promoting human rights, particularly through legislative frameworks.  These efforts have been increasingly recognized by the international community.  For instance, in 2017, Afghanistan gained membership of the United Nations Human Rights Council—for the first time in its history.[27]  The states comprising the 47-member Human Rights Council are elected by the majority of members of the U.N. General Assembly based on "the candidate States' contribution to the promotion and protection of human rights, as well as their voluntary pledges and commitments in this regard."[28]

## III. Tort Liability under Afghan Law

19. Liability for torts in Afghanistan is primarily governed by the Civil Code of 1977 ("Code").  Liability may arise if harm is directly caused to another person (or their property) by intentional or negligent acts or omissions.  Intent is not a requirement for liability; infliction of harm by mistake may be sufficient to trigger liability.[29]

20. The Civil Code makes clear that a person who commits harmful acts such as murder, assault, or other injury to another person is obliged to compensate for the inflicted harm.[30]  If a person causes the death of another person by any harmful act, he shall be obligated to pay

---

[25] Universal Declaration of Human Rights, Art. 18.
[26] *Id*. Art. 2.
[27] *See, e.g.*, *Afghanistan Gains UNHRC Membership*, TOLO NEWS (Oct. 17, 2017), https://tolonews.com/afghanistan/afghanistan-gains-unhrc-membership.
[28] *Membership of the Human Rights Council*, UNITED NATIONS HUMAN RIGHTS COUNCIL, https://www.ohchr.org/en/hrbodies/hrc/pages/membership.aspx.
[29] Civil Code, Art. 776.
[30] Civil Code, Art. 774.

7

compensation to the people whose alimony was the deceased's responsibility and who have become deprived of it due to his death.[31]

### *Compensation for infliction of harm*

21. If liability is established, then the defendant must pay compensation for any applicable harm—including physical and nonphysical injury.  The Code allows compensation for "intellectual harm" suffered by the plaintiff, or by the plaintiff's family and relatives in the case of death.[32]

22. In certain cases, if the court is unable to ascertain the precise amount of damages, it can grant the injured party the right to request that the court re-evaluate the amount of compensation award.[33]  Such right, however, must be exercised within a reasonable period of time.[34]

23. Moreover, the court has discretion in determining the method of compensation.  Depending on the circumstances, the court may order compensation in the form of a lump-sum payment or payment by installments.[35]  In the case of the latter, the tortfeasor may be required to provide a guaranty of the money owed.[36]

---

[31] Civil Code, Art. 775.  The Code also addresses liability for acts of others.  Article 791(2) deals specifically with the case of an employer's vicarious liability.  Under this provision, an "[e]mployer [*estekhdam konandah* or "hiring entity"] shall be considered liable for harms inflicted by his employee due to committing illegal act during work or due to the work, *unless otherwise provided by law or agreement*." (emphasis added).  As this provision makes clear, an employer's vicarious liability is subject to other provisions of law, including the rules regarding causation and limitation of liability which are discussed in the other sections.  Furthermore, under Article 792, if a person is found to be liable for another's tortious act or omission, he may claim the compensation that he has paid from the other person responsible for the harm.

[32] Civil Code, Art. 778.  In the case of death, the "court may rule for compensation to the spouse and relatives up to second category." *Id*. Art. 778(2).  The Code further stipulates that "[c]ompensation for intellectual harm shall not be transferable to others, unless its amount is fixed by agreement of the parties or by final ruling of court." *Id*. Art. 778(3).

[33] Civil Code, Art. 780.

[34] *Id*.

[35] Civil Code, Art. 781.

[36] *Id*.

8

*Causation*

24. Causation is central to establishing liability for tortious conduct.  This general requirement is reflected in Article 777 of the Civil Code: "[a]ny assault that causes harm [] to another person, the perpetrator shall be obligated to pay compensation."  In other words, a person is not liable unless he *caused* the harm.  This general causation requirement is further elaborated in Articles 779 and 783.

25. Article 779 of the Civil Code further stipulates that liability will generally ensue if the injury was "***directly caused*** by the harmful act." [37]  (emphasis added).  In other words, pursuant to this provision, indirect harm generally does not create liability.  The significance of the direct causal link between the impugned act and the injury is also reflected in Article 783.

26. Pursuant to Article 783, a person is generally not liable if he proves that an *external cause* was responsible for the harm.  This provision sets out the following types of external cause which, if proved by the alleged tortfeasor, will completely release him from liability: "external cause without his interference", "unexpected event", "force majeure", plaintiff's fault, and third party's fault.[38]

27. Such limitation of liability due to "external cause" is also reflected elsewhere in the Civil Code.  For instance, in the context of public-service management contracts, Article 1528(1) provides, "[c]ontractor [for passenger transportation] shall be liable for the harm [] *unless* he proves that the harm has originated from an *external cause* beyond his will."  (emphasis added).  Similarly, Article 1528(2) states, "[i]nfliction of harm due to illegal use of certain tools by contractor *shall not be considered harm due to external cause*."  (emphasis added).

---

[37] Under Article 779 of the Civil Code, the "[c]ourt shall determine the amount of compensation proportionate to the damage incurred, provided that it is directly caused by the harmful act".

[38] These external causes, however, may not shield the person if the law or the parties' agreement states the contrary. Civil Code, Art. 783.

9

28. Read together, Article 783 may also be interpreted as clarifying the general direct-causation requirement in Article 779: a person does *not* directly cause an injury if an external cause is responsible for the harm. The alleged tortfeasor bears the burden of proving the existence of such external cause.

29. In short, a person will generally be found liable for tortious conduct if (1) he directly caused the injury and (2) there was no external cause responsible for the harm.

*Defenses to liability*

30. Even if the causation requirement, discussed in the preceding section, has been satisfied, the defendant may still be able to avoid or reduce his liability for harm directly caused to another person. The Civil Code provides a number of defenses to liability for tortious conduct. Broadly speaking, these defenses relate to lack of capacity, lack of free will, self-defense, and contributory or comparative negligence.

31. Lack of capacity can serve as a defense to liability. Minors, for instance, generally lack the requisite capacity to be held accountable for harm directly caused to others. In such a case, the minor's father or grandfather is instead presumed to be liable.[39] Similarly, individuals without the requisite mental capabilities, such as the insane, are also deemed to lack capacity to be held liable.[40]

32. Lack of free will may also negate liability. Pursuant to Article 787(1) of the Civil Code, if a person is coerced to act against his free will and, in doing so, directly causes harm to another person, he will *not* be held liable.[41] Similarly, under Article 787(2), a public officer will not

---

[39] Civil Code, Art. 790. The minor's father or grandfather, however, can rebut this presumption by proving that they took the necessary care or that the injury would have occurred notwithstanding their vigilance. *Id*.

[40] *See, e.g.*, Civil Code, Art. 791(1).

[41] In such cases, "only complete reluctance [or compulsion *(ekrah-e taam)*] shall be considered as acceptable coercion." Civil Code, Art. 787(1).

10

be held liable for his harm-causing act if the act was performed "on the basis of order of an authority that had to be obeyed or he believed so."[42] This provision is related to the Civil Code's overarching principle that "[o]ne who exercises his rights within legal limits is not liable for ensuing damages."[43] In such cases, if the person's lack of free will is established, the injured party may be able to make a claim against the instigator instead (e.g., the person who issued the order).

33. Self-defense may also limit a person's liability. A person who acts in self-defense and, in doing so, directly causes harm to another person will not be considered liable so long as the principles of necessity and proportionality are not violated.[44]

34. Contributory or comparative negligence may be another defense available to an alleged tortfeasor. Under Article 782 of the Code, if the court determines that the injured party has "caused or increased the incurred harm by his own fault, [the] court may reduce the amount of compensation or even reject it."[45] Recall also that, under Article 783, the "fault of the harmed person" is one of the "external causes" that may negate the alleged tortfeasor's liability. The injured party is thus required to exercise reasonable care to mitigate damages. Failure to do so may result in less (or no) compensation depending on the extent of the complainant's contribution to his own injury.

*Apportionment of liability among tortfeasors*

35. In cases where multiple tortfeasors are responsible for the same injury, their liability will be apportioned. Pursuant to Article 789 of the Civil Code, "[i]f several persons are responsible

---

[42] Civil Code, Art. 787(2). The defendant must prove "his belief on legitimacy of the mentioned act by referring to reasonable means and observing necessary precautions." *Id*.

[43] Civil Code, Art. 8.

[44] Civil Code, Arts. 784 & 785.

[45] Civil Code, Art. 782.

11

for harmful act, they shall have equal liability for compensation, unless [the] judge determines compensation share of every one of them."

36. The default rule under this provision is that liability will be apportioned equally among the tortfeasors.  For instance, if two persons are responsible the same injury, each person will be liable for 50 percent of the damages.  The provision, however, grants the judge considerable discretion to determine the apportionment of liability based on the facts.  Indeed, it implies that the factfinder has a duty to evaluate the degree of each tortfeasor's responsibility for the damages.  For example, depending on the tortfeasors' respective degrees of responsibility for the injury, the judge may apportion 40 percent of liability to one tortfeasor and 60 percent of liability to the other tortfeasor.  This inquiry into the extent of each tortfeasor's liability is based on a thorough and objective assessment of each tortfeasor's conduct in causing the injury.  Accordingly, the apportionment of liability rule, as framed in Article 789, is not consistent with the U.S. common law doctrine of "joint and several liability."

37. Moreover, the provision's focus on "persons responsible for harmful act" [*mas'uleen-e fe'l-e mozer*] is quite broad.  The provision does not exclude any particular group from the application of the apportionment rule.  The apportionment rule, as articulated under Article 789, thus applies to *any* tortfeasor that is deemed to be "responsible for [the] harmful act" based on an objective assessment of the facts—irrespective of whether that person is named as a party to a particular lawsuit.

*Liability of the state*

38. Under Afghan law, the state is responsible for any harm caused to others through its unlawful or negligent acts or omissions.  The overarching basis of the state's liability is found in Article 51 of the Constitution.  Under this constitutional provision, "[a]ny individual

12

suffering damage without due cause from the administration shall deserve compensation, and shall appeal to a court for acquisition."

39. The state's obligation to compensate for such harm is also emphasized in the Administrative Procedures Law. Pursuant to Article 13(1) of this Law, "[t]he public administration is responsible and accountable for negligent activities of the public authorities that cause danger or damage to people."[46] Accordingly, the state is "obliged to pay compensation in case of unlawful administrative decisions or administrative contracts that cause damage."[47]

*Limitation period*

40. The Civil Code limits the period of time during which the injured party may bring a claim to the court after harm has occurred. Under Article 798, "[c]laim of compensation for damage caused by *any kind of harmful act* shall not be heard after lapse of *three years* since the date of knowledge of the harmed and the inflictor of the occurrence of damage and, in all circumstances, after lapse of 15 years since the date of occurrence of harmful act." (emphasis added).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 29, 2021.

Signature: _____

Mehdi J. Hakimi

---

[46] In such cases, the Law requires the government to be "open to dialogue with the citizens and respond to requests in the shortest time possible." Administrative Procedures Law, Art. 13(3).

[47] *Id*. Art. 72. In the absence of other specific legislation on state liability, the courts will proceed according to the general principles and rules enshrined in the existing laws. *Id*.

13