IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| Timothy Tangen, | |
|           Plaintiff, | C/A No.: 6:21-cv-00335-JD |
| vs. | |
| Fluor Intercontinental, Inc., et al., | |
|           Defendants. | |
| Marissa Brown, | |
|          Plaintiff, | C/A No.: 6:21-cv-01427-JD |
| vs. | |
| Fluor Intercontinental, Inc., et al., | |
|          Defendants. | |
| Shelby Iubelt, individually, on behalf of the Estate of Tyler Iubelt, and as next friend of V.I., minor, | |
|          Plaintiff, | C/A No.: 6:21-cv-01420-JD |
| vs. | |
| Fluor Intercontinental, Inc., et al., | |
|          Defendants. | |
| Lakeia Stokes, | |
|          Plaintiff, | C/A No.: 6:21-cv-01086-JD |
| vs. | |
| Fluor Intercontinental, Inc., et al., | |
|          Defendants. | |

| | |
|---|---|
| Maggie Bilyeu, | |
| Plaintiff, | C/A No.: 6:21-cv-01078-JD |
| vs. | |
| Fluor Intercontinental, Inc., et al., | |
| Defendants. | |
| Addie Ford, | |
| Plaintiff, | C/A No.: 6:21-cv-01159-JD |
| vs. | |
| Fluor Intercontinental, Inc., et al., | |
| Defendants. | |
| Marvin Branch, | C/A No.: 6:21-cv-01083-JD |
| Plaintiff, | |
| vs. | |
| Fluor Intercontinental, Inc., et al., | |
| Defendants. | |
| Julianne Perry, individually, on behalf of the Estate of John Perry, and as next friend of L.P. and G.P., minors, | C/A No.: 6:21-cv-01250-JD |
| Plaintiff, | |
| vs. | |
| Fluor Intercontinental, Inc., et al., | |
| Defendants. | |

| | |
|---|---|
| Haylee Rodriguez, | |
| Plaintiff, | C/A No.: 6:21-cv-01084-JD |
| vs. | |
| Fluor Intercontinental, Inc., et al., | |
| Defendants. | |
| India Sellers, | |
| Plaintiff, | C/A No.: 6:21-cv-01085-JD |
| vs. | |
| Fluor Intercontinental, Inc., et al., | |
| Defendants. | |
| Samuel Gabara, | |
| Plaintiff, | C/A No.: 6:21-cv-01007-JD |
| vs. | |
| Fluor Intercontinental, Inc., et al., | |
| Defendants. | |
| Chris Colavita, | |
| Plaintiff, | C/A No.: 6:21-cv-01017-JD |
| vs. | |
| Fluor Intercontinental, Inc., et al., | |
| Defendants. | |

| | |
|---|---|
| Robert Healy, | |
| Plaintiff, | C/A No.: 6:21-cv-01018-JD |
| vs. | |
| Fluor Intercontinental, Inc., et al., | **ORDER** |
| Defendants. | |

These consolidated cases[1] arise out of an attack on U.S. Military forces on a U.S. Military base at Bagram Airfield ("BAF"), Afghanistan, by an Afghan national who was employed by Alliance Project Services, Inc. ("APS") and allegedly supervised by Defendants Fluor Intercontinental, Inc. and Fluor Government Group International, Inc. (collectively "Fluor" or "Defendants"). Defendants challenge whether this Court has subject matter jurisdiction over the consolidated plaintiffs' lawsuit asserting the claims are nonjusticiable under the Political Question Doctrine, which provides that "the judiciary is deprived of jurisdiction to assess decisions exclusively committed to a separate branch of government." Taylor v. Kellogg Brown & Root Servs., Inc., 658 F.3d 402, 407 n.9 (4th Cir. 2011). In addition, Defendants believe that the South Carolina Door Closing Statute, S.C. Code Ann. § 15-5-150 ("Door Closing Statute" or "Statute") bars Plaintiffs' claims because they are not residents of South Carolina, Fluor is a foreign corporation, and Plaintiffs' claims have no connection to South Carolina. (DE 67-1, p. 12.)

Plaintiffs Timothy Tangen; Marissa Brown; Shelby Iubelt, individually, on behalf of the Estate of Tyler Iubelt, and as next friend of V.I., minor; Lakeia Stokes; Maggie Bilyeu; Addie

---

[1] On June 4, 2021, this Court consolidated the thirteen related cases in the above-referenced caption and designated Timothy Tangen v. Fluor Intercontinental, Inc. et al., as the lead case ("Consolidated Cases"). (DE 58.) The Court notes that Fluor has filed identical motions to dismiss in the Consolidated Cases. Accordingly, because of the separate filing numbers associated with each case, and because the motions mirror each other, the Court cites herein only to docket entries in the lead case unless otherwise specified.

Ford; Marvin Branch; Julianne Perry, individually, on behalf on the Estate of John Perry, and as next friend of L.P. and G.P., minors; Haylee Rodriguez; India Sellers; Samuel Gabara; Chris Colavita; and Robert Healy (collectively, "Plaintiffs") have brought these suits alleging negligence and breach of contract claims against Defendants.[2]  This matter is now before the Court on Fluor's Motion to Dismiss Plaintiffs' Complaints for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), Fed. R. Civ. P. (DE 67.)

Plaintiffs have filed a Response (DE 84) to Fluor's Motion to Dismiss (DE 67), and Fluor has filed a Reply (DE 90).  After reviewing the motions, memoranda submitted (along with exhibits), and the Complaint, the Court denies Fluor's 12(b)(1) Motion to Dismiss (DE 67) for the reasons stated herein.

## BACKGROUND

This suit arises from a suicide bombing on Veterans Day November 12, 2016, at BAF a U.S. Military installation in Bagram, Afghanistan. (DE 67-1, p. 2.) Plaintiffs, composed of various service members and representatives on behalf of the estates of fallen service members and themselves, have filed numerous claims against Defendants for injuries suffered because of the suicide bomb detonated by Ahmed Nayeb ("Nayeb"), an Afghan national working for APS (a Fluor subcontractor) in Fluor's Non-Tactical Vehicle Yard at BAF.[3] (DE 1, ¶¶ 50-51.)  On the morning of November 12, after his shift ended, Nayeb was not supposed to have been on the base, rather he was supposed to have been escorted off the base. (DE 84, p. 2-3.)  However, Nayeb was able to walk unsupervised and unescorted toward the Clamshell, the assembly point for the

---

[2]  Plaintiffs Marissa Brown, Shelby Iubelt, individually and on behalf of the Estate of Tyler Iubelt, and Julianne Perry, individually and on behalf of the Estate of John Perry (collectively, "wrongful death Plaintiffs") have also brought wrongful death claims against Defendants.

[3]  As a result of the bombing, five men were killed (in addition to the bomber) and seventeen soldiers were badly injured. (DE 84-1, p. 2.)

Veterans Day 5k race. (DE 84, p. 3.) At the same time, Fluor employees Jerrold Reeves ("Reeves") and Peter Provost ("Provost") began to walk toward the Clamshell while a group of servicemen began to walk away from the Clamshell. (DE 84, pp. 3-4.) Plaintiffs allege that Nayeb likely planned to detonate his device among the hundreds of people who would be gathering at the Clamshell later that morning for the race; however, his plan likely changed as the service members and Reeves and Provost converged on him from different directions. Nayeb detonated his device when the service members and Reeves and Provost were close. (DE 84, p. 4.) As a result, Reeves, Provost, John Perry, Tyler Iubelt, and Alan Brown were killed, and other service members sustained life altering injuries. Plaintiffs have now brought claims against Defendants for these injuries.

     Plaintiffs allege that Defendants participated in a government contracting program known as the Logistics Civil Augmentation Program ("LOGCAP") which allowed the government to use civilian contractors in wartime situations. (DE 1, ¶¶ 44-46.) The United States Department of Defense awarded several support contracts known as LOGCAP IV ("Contract" or "Task Order") to several companies to include Fluor. (Id.) The Contract set forth the framework within which Defendants were required to perform. Under the Contract, Defendants were "responsible for oversight of [local nationals and subcontractor personnel] to ensure compliance with all terms of the [LOGCAP Materials]." (DE 1, ¶ 53.) In addition, Defendants were "responsible for ensuring all personnel supporting [LOGCAP IV 005] comply with the standards of conduct, and all terms/conditions set forth in [the Performance Work Statement] and the Basic Contract." (DE 1, ¶ 54.) "Task Order 005 encompassed services and base life support for the eastern and northern sections of the Islamic Republic of Afghanistan." (DE 1, ¶ 48.)

6

Plaintiffs allege because of the bombing, the U.S. Army conducted an AR 15-6 Investigation (the "Army Investigation" or "Report"). (DE 1, p. 17.) The factual findings and conclusions of the Army Investigation were reported in a memorandum report dated December 31, 2016, issued by Major General Thomas James, Jr., U.S. Army, which is cited to by Plaintiffs in their Complaints. The Report states, among other things, several findings regarding Defendants' conduct. The Army Investigation established that Defendants ". . . negligently failed to supervise Nayeb at the HAZMAT work center; [] negligently entrusted Nayeb with tools he used to construct the vest bomb; [] negligently supervised Nayeb's escort on and off the Base; and [] negligently retained Nayeb after known poor job performance." (Id.) The Army Investigation also indicated that "Nayeb's job at the HAZMAT work center did not require tools at all. Yet, Fluor allowed the bomber to frequently check out unnecessary and suspicious tools from the Fluor tool room." (Id. at ¶ 109(f).) Further, the Report indicated that Nayeb used Fluor's tools to construct the bomb at his worksite. (Id. at ¶ 109(g).) The Army investigation concluded:

> the lack of reasonable supervision facilitated Nayeb's ability to freely acquire most of the components necessary for the construction of the suicide vest and the freedom of movement to complete its construction. [] The Bagram Airfield Badging and Screening Policy required Fluor escorts to 'remain in close proximity and remain in constate [sic] view of the individuals they are escorting.' [] In practice, Fluor ignored the Bagram escort policies. [] Fluor did nothing when Nayeb did not show up for escort off the Base the morning of the attack. [] Fluor's systematic lack of reasonable supervision enabled Nayeb to go undetected from 0445 until 0538 on 12 November 2016, which coincides with the average walking time of 53 minutes from the Non-Tactical Vehicle Yard to the blast site.

(DE 1, at ¶ 109(k)-(o).)

On February 2, 2019, Winston Hencely filed a Complaint against Fluor, which was assigned to Judge Hendricks in the United States District Court for the District of South Carolina. See Hencely v. Fluor Corp., Inc., No. 19-cv-00489-BHH, DE 1. In May 2019, twelve of the thirteen Plaintiffs (all Plaintiffs excluding Timothy Tangen) filed identical claims in the United

7

States District Court for the Northern District of Texas ("Texas Court"). (DE 67-1, p. 4.) However, in January 2021, the Texas Court held that the claims ("Texas Claims") were barred based on the Political Question Doctrine. See Loquasto v. Fluor Corp., Inc., 512 F. Supp. 3d 728, 741 (N.D. Tex. 2021).[4] As a result, Plaintiffs filed suit in the United States District Court for the District of South Carolina. The first to do so was Plaintiff Timothy Tangen, on February 3, 2021. (DE 67-1, p. 4.) Plaintiffs' cases were initially assigned to Judge Hendricks; however, the Consolidated Cases were reassigned to this Court and Hencely remained with Judge Hendricks. Fluor concedes that it asserted the same two defenses in this action as it did in Hencely. Judge Hendricks denied Fluor's motions to dismiss on its Political Question Doctrine and the Door Closing Statute defenses. See Hencely v. Fluor Corp., Inc., No. 6:19-CV-00489-BHH, DE 52 and 78.

## LEGAL STANDARD

**Federal Rule of Civil Procedure 12(b)(1)**

Federal district courts are courts of limited subject matter jurisdiction. "They possess only the jurisdiction authorized them by the United States Constitution and by federal statute." United States v. ex rel. Vuyyuru v. Jadhav, 555 F.3d 337, 347 (4th Cir. 2008). As such, "there is no presumption that the court has jurisdiction." Pinkley, Inc. v. City of Frederick, 191 F.3d 394, 399 (4th Cir. 1999) (citing Lehigh Mining & Mfg. Co. v. Kelly, 160 U.S. 327, 327, 16 S. Ct. 307, 40 L.

---

[4] The Texas Case is distinguishable from the present case because it required the Texas Court to examine Texas Civil Practices and Remedies Code § 33.003. Specifically, the Texas Court held "in deciding this case, the Court or jury may assign fault to the military. Tex. Civ. Prac. & Rem. Code §§ 33.003, 33.004. Such a finding, in turn, would require the Court to inquire into the propriety of the military's approval of Nayeb for base access and the soundness of the military's security screenings at base entry points. As explained below, these are decisions related to control and access to a military base and are textually committed to the political branches of government." Loquasto, 512 F. Supp. 3d at 736. Thus, in allowing the designation of the Military as a responsible third party under Texas law, the Texas Court held that the trier of fact could not decide the case without scrutinizing sensitive Military judgments and decisions.

Ed. 444 (1895)). Indeed, when the existence of subject matter jurisdiction over a claim is challenged under Rule 12(b)(1), FRCP, "[t]he plaintiff has the burden of proving that subject matter jurisdiction exists." Evans v. B.F. Perkins Co., 166 F.3d 642, 647 (4th Cir. 1999); see also Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991)). If subject matter jurisdiction is lacking, the claim must be dismissed. See Arbaugh v. Y & H Corp., 546 U.S. 500, 506, 126 S. Ct. 1235, 163 L. Ed. 2d 1097 (2006).

To determine whether jurisdiction exists, the district court is to regard the pleadings' allegations as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment. Richmond, Fredericksburg & Potomac R. Co. v. U.S., 945 F.2d 765, 768 (1991).

## DISCUSSION

**Political Question Doctrine**

Defendants argue that Plaintiffs' causes of action are nonjusticiable under the Political Question Doctrine because Defendants' Contract duties were carried out under the military's control and Plaintiffs' claims would require the judiciary to evaluate actual, sensitive military judgments to adjudicate their claims. This Court disagrees based on the facts and applicable law in this case.[5] "The political question doctrine had its genesis in the Supreme Court's decision of Marbury v. Madison, where Chief Justice Marshall explained that '[q]uestions, in their nature political, of which are, by the constitution and laws, submitted to the executive, can never be made in this court.'" Taylor v. Kellogg Brown & Root Servs., Inc., 658 F.3d 402, 408 (4th Cir. 2011) (quoting Marbury v. Madison, 5 U.S. 137 (1803)). "Pursuant to the political question doctrine,

---

[5] This Court is persuaded by the comprehensive research and analysis done by the Hencely Court in its 34-page Order on this issue and for the sake of brevity has relied on it and will not reexplore and reexamine the cases cited therein as support for this Court's conclusion.

9

the judiciary is deprived of jurisdiction to assess decisions exclusively committed to a separate branch of government. For example, most Military decisions lie solely within the purview of the executive branch." Id. at 407 n.9. The fact that a government contractor, however, "was acting under orders of the Military does not, in and of itself, insulate the claim from judicial review." Id. at 411. "Therefore, although cases involving Military decision making often fall in the political question box, we cannot categorize such a case as nonjusticiable without delving into the circumstances at issue." In re KBR, Inc., Burn Pit Litig., 744 F.3d 326, 334 (4th Cir. 2014).

The U.S. Supreme Court, in Baker v. Carr, set out a six-factor test for courts to consider when deciding whether a case presents a political question. See Baker v. Carr, 369 U.S. 186, 217 (1962). The Fourth Circuit Court of Appeals distilled the Baker factors into two questions for determining whether a court has subject matter jurisdiction when a case involves the civil liability of Military contractors for alleged negligence. The test is as follows:

> We first asked whether the government contractor was under the plenary or direct control of the Military (direct control). Second, we asked whether national defense interests were closely intertwined with Military decisions governing the contractor's conduct, such that a decision on the merits of the claim would require the judiciary to question actual, sensitive judgments made by the Military. An affirmative response to either of the two Taylor factors, namely, the fact of direct control or the need to question sensitive Military judgments, generally triggers application of the political question doctrine.

Al Shimari v. CACI Premier Tech., Inc., 840 F.3d 147, 155 (4th Cir. 2016) (internal citations and quotations omitted). The Fourth Circuit Court of Appeals has "clarified that the critical issue with respect to the question of "plenary" or "direct" control is not whether the Military exercised some level of oversight over a contractor's activities. Instead, a court must inquire whether the Military clearly chose how to carry out these tasks, rather than giving the contractor discretion to determine the manner in which the contractual duties would be performed." Al Shimari v. CACI Premier Tech., Inc., 758 F.3d 516, 534 (4th Cir. 2014).

In applying these principles, Defendants' contractual duties as they relate to Nayeb's conduct and activities on BAF were not under the direct control of the Military. In fact, the Army Investigation counsels otherwise. Plaintiffs' claims, among other things, are based in negligent supervision and breach of contract theories. (DE 1, ¶¶ 111-115 and 121-132.) The Army Investigation indicates that Nayeb used Fluor's tools to construct the bomb at his worksite. (Id. at ¶ 109(g).) The Army investigation concluded:

> the lack of reasonable supervision facilitated Nayeb's ability to freely acquire most of the components necessary for the construction of the suicide vest and the freedom of movement to complete its construction. [] The Bagram Airfield Badging and Screening Policy required Fluor escorts to 'remain in close proximity and remain in constate [sic] view of the individuals they are escorting.' [] In practice, Fluor ignored the Bagram escort policies. [] Fluor did nothing when Nayeb did not show up for escort off the Base the morning of the attack. [] Fluor's systematic lack of reasonable supervision enabled Nayeb to go undetected from 0445 until 0538 on 12 November 2016, which coincides with the average walking time of 53 minutes from the Non-Tactical Vehicle Yard to the blast site.

(DE 1, at ¶ 109(k)-(o).) On the other hand, Defendants assert numerous reasons to suggest the Military's direct control raises nonjusticiable political questions in this case because Plaintiffs' claims or Fluor's defenses would require the Court to question the propriety of sensitive Military judgments. See In re KBR, 744 F.3d at 339. ("As part of this analysis, we consider whether the Servicemembers' claims or . . . [Defendants'] defenses require us to question the Military's judgments.") Fluor suggests that national defense interests undergirded the Military's decision concerning general force protection measures at the Base; Afghan First/COIN LN hiring policy; generally applicable security screening/badging policies and protocols, as well as the specific decision to grant access to BAF to someone with Nayeb's past; and operational security measures at ECPs, etc. (DE 67-1, p. 30.) For instance, Defendants assert:

> Fourth, the Military exercised direct control over the manner and methods of oversight of the Local Nationals at BAF. Most notably, the Military dictated the requirements for escorting Local Nationals. (citation omitted) The Military controlled which Local Nationals needed to be escorted; how many Local Nationals

11

> could be escorted by a single escort at any given time; who could serve as an escort; what training the escorts were required to have; when and where escorts were required on the base; and, when and where escorts were prohibited. Id. For example, the Military did require escorting of Local Nationals "to and from the [Entry Control Points ("ECPs")]," but the Military did not allow escorting of Local Nationals "while they're at work." (citation omitted) ("they're the one that set the policies and procedures for escorting, which included that they did not have to be escorted in a -- at the facility or the worksite"); (citation omitted) ("the Army decides the amount of supervision . . . based on base access and escort policies" and Fluor, as a contractor, "follows" those rules). In addition, the Military did require escorting of Local Nationals to the ECPs for a "hand off" to the Military, but the Military itself retained sole responsibility and total control over the escorting of Local Nationals off the base (citation omitted) ("Past [the ECP gate]…wasn't a contract requirement…The contractor's responsibility was to get them to the gate and hand off. Q. And…to be clear again, hand off to the military? A. Correct."); (citation omitted) ("[T]he military . . . takes responsibility at that dismount point location very close to the entry control point, where [Local Nationals] are then escorted single file, if you will, to that pedestrian turnstile for exit off of, in this case, Bagram Air Base or the installation."). The Military's control over escorting policies was absolute; Fluor could not unilaterally choose to provide greater levels of oversight. Prior to the attack, Fluor sought to modify the escorting policy to allow "24/7 eyeson" escorts, which would have "require[d] escorting of local nationals while at their work place." (citation omitted) The Military repeatedly rejected Fluor's proposals—meaning, Fluor was prohibited from carrying out such additional escorting.

(DE 67-1, p. 18-19) (citation, emphasis, and italics omitted.)

If Plaintiffs' claims were premised on the Military's access and escorting policies, then assuredly the Court would agree that such claims were nonjusticiable because they implicate a category of decision-making that the Constitution assigns to the Executive Branch and which the judiciary is ill equipped to assess. See Carmichael v. Kellogg, Brown & Root Servs., Inc., 572 F.3d 1271, 1287 (11th Cir. 2009) ("[O]nly the military could accurately assess the risks presented by the mission; only the military was in a position to meaningfully balance those risks in light of its broader strategies and objectives; and only the military possessed the competence to make the many critical tactical decisions concerning the safest and most efficacious way to conduct the convoy."). However, Plaintiffs' claims target Defendants' failure to perform their contractual duties rather than a failure of Military policies. Thus, although the Military may have had broader

control over Defendants' and employees' access to BAF, it did not have actual control over the specific acts or omissions that form the basis of the Plaintiffs' claims.[6] Therefore, the Military did not choose how Fluor should carry out its contractual duties; instead, the Military gave Fluor discretion to determine the manner in which the contractual duties would be performed. Accordingly, since Fluor had discretion to act within the guidelines set by the Military, Plaintiffs' claims for breach of contract and negligence can be adjudicated without the Court questioning the Military's judgments.

Finally, Fluor contends that these cases are nonjusticiable under the Political Question Doctrine because Fluor's "empty chair" defense would inevitably force a factfinder to evaluate the causal role of the Military. (DE 67-1, p. 31.) To that end, Defendants argue that their causation defense triggers application of the Political Question Doctrine because Afghanistan law (the place where the alleged tortious conduct occurred) includes a proportional liability system that allocates liability based on fault. (DE 67-1, p. 31); see also Burn Pit, 744 F.3d at 340-41; id. at 340 n.3 ("the military's negligence becomes an issue only under a proportional-liability system that assigns liability based on fault"). Accordingly, Defendants suggest, "[a]pplying that Fourth Circuit precedent here, the Court should first conclude that the law of Afghanistan—the place of the

---

[6] The Bagram Airfield Badge, Screening, and Access Policy (Dec. 5, 2015) provides an example of the type of control by the military over Fluor's escort responsibilities, which this Court believes does not rise to the level of actual control. (DE 65.) The relevant portion of the "Escort Procedures" provision within that policy states: "Escorts are responsible for the conduct and safety of the personnel they are escorting. Escorts must remain in close proximity and remain in constant view of the individuals they are escorting. Escorts will continuously monitor all escorted personnel and direct them during any Base security operations." (Id. at 18.) The Hencely Court noted that the mere existence of such a policy and generalized instructions regarding the standards expected of escort procedures do not exemplify actual control over Fluor's escort operations. See Hencely supra. Also, as noted in Hencely, the policy puts the specific onus on Fluor to ensure its employees' adherence to the policy terms: "Contractor Compliance. The Contractor will ensure all employees adhere to all rules and regulations, security and badging regulations, and updates immediately upon arrival and through their departure from Bagram Airfield. Ignorance of polices is not an excuse for contracted employee transgressions. A contractor's status will be reviewed by [Bagram Support Group] Commander and [Force Protection Screening Cell] in the event that contracted employee misconduct is determined to be a systemic problem." (Id. at 22.)

13

alleged tortious conduct—controls this specific issue[]" and "the Afghan Civil Code includes a proportional-liability rule that assigns liability based on fault . . . ." (DE 67-1, p. 31.) While this Court agrees with this general principle, the facts of this case do not support its application. "Under traditional South Carolina choice of law principles, the substantive law governing a tort action is determined by the lex loci delicti, the law of the state in which the injury occurred." Nash v. Tindall Corp., 375 S.C. 36, 39, 650 S.E.2d 81, 83 (Ct. App. 2007) (citations omitted); accord Sheppard v. CSX Transp., Inc., 78 Fed. App'x 878, 880 (4th Cir. 2003); Boone v. Boone, 345 S.C. 8, 13, 546 S.E.2d 191, 193 (2001). Thus, Fluor argues that Afghanistan law should apply even though the bombing took place on a United States military base. (DE 67-1, p. 32, n 19.) Fluor makes this argument in part based on a provision of the Security and Defense Cooperation Agreement ("Agreement") entered into by the United States and The Islamic Republic of Afghanistan, which it claims that because BAF remained the property of Afghanistan, the Agreement provides that Afghanistan law applies to torts committed there.[7] This Court disagrees.

The Agreement provides in pertinent part that:

The United States confirms its commitment to respect relevant Afghan environmental and health and safety laws, regulations, and standards in the execution of its policies. United States forces operations and activities on agreed facilities and areas shall be conducted with due regard for the protection of the natural environment and human health and safety, with due respect for applicable Afghan laws and regulations, and in accordance with applicable United States laws and regulations and applicable international agreements.

Agreement, p. 9, ¶ 6. The Agreement defines "United States forces" as "the entity comprising the members of the force and of the civilian component" and it defines "member of the civilian component as "any person employed by the United States Department of Defense". See

---

[7] The Agreement is cited by the parties and is available at https:/www.state.gov/15-101/ (last visited Jan. 5, 2022).

Agreement, p. 3, ¶¶ 1-3.  The Agreement also provides that "United States forces are bound by the laws and regulations of the United States . . . ."  See Agreement, p. 12, ¶ 1.  The Agreement makes clear that any "claims arising out of acts or omissions of members of the force and of the civilian component . . . shall be expeditiously processed and settled . . . in accordance with the laws and regulations of the United States," although "the laws, customs, and traditions of Afghanistan" would be "seriously consider[ed]."  See Agreement, p. 20, ¶ 2.  The United States military, therefore, contemplated that claims against government contractors for injuries on United States military bases in Afghanistan would be governed by the law of the United States.  Furthermore, the Court notes that Fluor sought to designate the U.S. Military as a responsible third party under Texas Civil Practice and Remedies Code § 33.004 and moved to dismiss all claims for lack of subject matter jurisdiction under the political question doctrine in the Texas Case.  Fluor did not seek to advance the application of Afghanistan law or question the propriety of Texas law in that case.  See n. 5.

Moreover, in the absence of Afghan law, Defendants do not offer another jurisdiction's substantive law for the Court's consideration except to claim that Texas law should apply because the Plaintiffs previously filed suit in Texas.  (DE 90, p. 16.)  The Court is not inclined to resolve at this stage the propriety of the parties' duplicity in the various proceedings whether either party should be estopped from arguing a different State or Country's substantive tort law should apply.  However, for the purpose of the jurisdictional motion, since there is no substantive State law given the Court's ruling on the application of the Agreement and since Plaintiffs have asserted a concomitant third party breach of Contract claim, which Plaintiffs assert Fluor negotiated and administered in South Carolina, the Court finds that South Carolina law should apply.  See Livingston v. Atlantic Coast Line R. Co., 176 S.C. 385, 180 S.E. 343, 345 (1935) ("Under South

Carolina's traditional choice-of-law rules, the "validity and interpretation [of a contract] is governed by the law of the place where it is made, the lex loci contractus.")

Furthermore, South Carolina law does not allow the jury to find that the conduct of an immune entity or a non-party was the proximate cause of a plaintiff's harm. See S.C. Code § 15-38-15; see also Machin v. Carus Corp., 419 S.C. 527, 543, 799 S.E.2d 468, 476 (2017) ("If . . . a defendant asserts a defense that assigns fault for the plaintiff's injuries to [an immune nonparty], the defendant shall, under the well-established "empty chair" defense, have the right to present such evidence and require the fact-finder to consider whether the [immune nonparty's] actions were the cause of the plaintiff's injuries. Of course, the [immune nonparty] cannot be found to be the proximate, or legal, cause of the plaintiff's injuries because the [nonparty] is immune from tort liability . . . ."). Neither party disputes that the United States possesses immunity in this case. Accordingly, under South Carolina law, Fluor can assert its empty chair defense to show that Plaintiffs have not proven Fluor caused their injuries, but the U.S. Army cannot be found to be the proximate legal cause because it retains immunity here. A factfinder, after the presentation of Fluor's causation defenses, could find that the actions and decisions for which Fluor blames the Army, rather that its own conduct, caused Plaintiffs' injuries. However, this factual determination would not require a factfinder to evaluate the reasonableness of the Army's decisions. Accordingly, since fault cannot be apportioned to the military in this case, Plaintiffs can obtain all of their relief—if any—from Fluor, and Fluor's defenses alleging the military caused Plaintiffs' injuries do not implicate the political question doctrine or justiciability. See Burn Pit, 744 F.3d at 340 (stating "under a pure joint-and-several liability system, the plaintiffs could obtain all of their relief from the military contractor, preventing the need to evaluate the military's decisions").

16

**The South Carolina Door Closing Statute**

As an alternative but separate ground for dismissal, Fluor contends Plaintiffs' claims are barred because the South Carolina Door Closing Statute "closes the doors of South Carolina's courts for suits, as the present one, involving a foreign cause of action brought by a foreign plaintiff against a foreign corporation." (DE 67-1, p.41-42); see also S.C. Code § 15–5–150 ("An action against a corporation created by or under the laws of any other state, government or country may be brought in the circuit court: (1) By any resident of this State for any cause of action; or (2) By a plaintiff not a resident of this State when the cause of action shall have arisen or the subject of the action shall be situated within this State."). Defendants contend Plaintiffs' suits are impermissible under the Statute because Plaintiffs are non-residents suing a foreign corporation over events that did not occur in South Carolina. The record before this Court does not support this supposition; and therefore, the Statute does not bar jurisdiction.[8] The Door Closing Statute "prevents a nonresident of South Carolina from bringing suit against a foreign corporation in the state courts of South Carolina unless the cause of action arises in the state or the subject of the action is situated in the state." Smith v. Mack Trucks, Inc., 991 F.2d 791 (Table), at *1 (4th Cir. 1993). There are three judicially recognized purposes of the Statute, namely: 1) It favors resident plaintiffs over nonresidents; 2) It provides a forum for wrongs connected with the state while avoiding the resolution of wrongs in which the state has little interest; and 3) It encourages activity

---

[8]     Plaintiffs question whether this motion is proper under Rule 12(b)(1), Fed. R. Civ. P., because they contend that the "[S]tatute addresses a plaintiff's capacity to sue, not the court's subject-matter jurisdiction." (DE 84, p. 33-34); citing Farmer v. Monsanto Corp., 579 S.E.2d 325, 328 (S.C. 2003) (overruling previous precedence and finding that "§ 15–5–150 does not affect subject matter jurisdiction"). However, the Fourth Circuit in Proctor & Schwartz and Szantay, have nonetheless "interpreted the door-closing statute in light of the then-prevailing understanding that § 15-5-150 restricted not capacity to sue but the subject matter jurisdiction of state courts." Ward v. Dixie Nat'l Life Ins. Co., 257 F. App'x 620, 628 (4th Cir. 2007) citing, Proctor & Schwartz, Inc. v. Rollins, 634 F.2d 738, 739 (4th Cir.1980) and Szantay v. Beech Aircraft Corp., 349 F.2d 60, 65–66 (4th Cir. 1965). Accordingly, this Court will resolve Defendants' motion under the prevailing Rule 12(b)(1), Fed. R. Civ. P., standard of review.

and investment within the state by foreign corporations without subjecting them to actions unrelated to their activity within the state. See Boisvert v. Techtronic Indus. N. Am., Inc., 56 F. Supp. 3d 750, 753 n.1 (D.S.C. 2014) (citing Murphy v. Owens–Corning Fiberglas Corp., 356 S.C. 592, 590 S.E.2d 479, 481 (2003)).

"[A] South Carolina federal court exercising diversity jurisdiction 'must apply § 15-5-150 unless there are affirmative countervailing federal considerations.'" Id. at 752 (quoting Proctor & Schwartz, Inc. v. Rollins, 634 F.2d 738, 739 (4th Cir.1980)).  The Fourth Circuit has recognized three countervailing federal considerations: "(1) the purpose in the grant of diversity jurisdiction of avoiding discrimination against nonresidents; (2) the policy of encouraging a state to enforce the laws of its sister states; and (3) the fact that South Carolina was the only state in the country in which [the plaintiff could gain full relief]." Rollins, 634 F.2d at 740; see also Szantay v. Beech Aircraft Corp., 349 F.2d 60, 65–66 (4th Cir. 1965) (outlining relevant federal considerations and holding that the Door Closing Statute did not restrict jurisdiction of South Carolina federal court over Delaware airplane manufacturing corporation, which was sued in diversity action by residents of Illinois on a theory of negligent manufacture and design, where airplane crashed in Tennessee but was serviced in South Carolina).

Here, the Court need not reach the countervailing federal considerations because the Statute does not apply to bar jurisdiction under the specific facts and circumstances of these cases.  It is undisputed that Plaintiffs are all nonresidents, as they reside in Texas (ten Plaintiffs), Alabama, Illinois, and North Carolina, and that they assert causes of action against foreign corporations. However, the controlling issue here is whether "the cause of action shall have arisen or the subject of the action shall be situated within this State." S.C. Code Ann. § 15-5-150.  "When a contract is involved, the question for purposes of the door-closing statute is whether the contract was made

or was to be performed in South Carolina." Tuttle Dozer Works, Inc. v. Gyro-Trac, Inc., 463 F. Supp. 2d 544, 551 (D.S.C. 2006); see also, Recreonics Corp. v. Aqua Pools, Inc., 638 F. Supp. 754, 757 (D.S.C. 1986) (quoting Curnow v. Phoenix Insurance Co., 37 S.C. 406, 16 S.E. 132 (1892) "When a contract is made in one place, and to be performed in another, the cause of action upon such contract arises at the latter place ' ... But 'in the absence of anything indicating the contrary, the place of the making of a contract is presumably that of its performance, by the law whereof it is to be interpreted and its effect defined.'").

Plaintiffs have alleged and produced some evidence that the Contract was made in South Carolina and performed in part in Greenville, South Carolina.  (DE 84-3); see also Hencely, 475 F. Supp. 3d 464, 467 (D.S.C. 2020).  Moreover, the Contract purports to require Defendants to be "responsible for oversight of [local nationals and subcontractor personnel] to ensure compliance with all terms of the [LOGCAP Materials]."  (DE 1, ¶ 53.)  In addition, Defendants were "responsible for ensuring all personnel supporting [LOGCAP IV 005] comply with the standards of conduct, and all terms/conditions set forth in [the Performance Work Statement] and the Basic Contract.  (DE 1, ¶ 54.)  Defendants have not offered any evidence to refute these claims.  Rather, Defendants argue that "the allegations arise out of actions that occurred at BAF in Afghanistan[]" and that "the location of the contract performance—not contract administration. . . is controlling for the purposes of a Door Closing analysis."  (DE 67-1, p. 43 and DE 90, p. 20.)  While the tragic events took place in Afghanistan, Defendants' work under the Contract was equally administered *albeit* remotely in South Carolina.  Accordingly, the Court does not lack subject matter jurisdiction pursuant to S.C. Code Ann. § 15-5-150.

## **CONCLUSION**

For the foregoing reasons, Fluor's Motion to Dismiss for lack of subject matter jurisdiction (DE 67) is denied.

**AND IT IS SO ORDERED.**

_____
Joseph Dawson, III
United States District Judge

January 6, 2022
Greenville, South Carolina

20